SAM S. PUATHASNANON, Cal. Bar No. 198430
Email: puathasnanons@sec.gov
ROBERT H. CONRAD, Cal Bar. No. 199498
Email: conrradr@sec.gov
THERESA M. MELSON, Cal. Bar No. 185209
E-mail: melsont@sec.gov
TODD S. BRILLIANT, Cal. Bar No. 147727
Email: brilliantt@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Elaine C. Greenberg, Chief
Mark R. Zehner, Deputy Chief
Municipal Securities and Public Pensions Unit
Philadelphia Regional Office
The Mellon Independence Center
701 Market Street
Philadelphia, Pennsylvania 19106

Michele Wein Layne, Regional Director
Lorraine B. Echavarria, Associate Regional Director
John W. Berry, Regional Trial Counsel
Los Angeles Regional Office
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. EDCV13-0776 JAK (DTBx) |
| Plaintiff, | |
| vs. | |
| CITY OF VICTORVILLE, SOUTHERN CALIFORNIA LOGISTICS AIRPORT AUTHORITY, KINSELL, NEWCOMB, & DEDIOS; KND AFFILIATES, LLC; J. JEFFREY KINSELL, JANEES L. WILLIAMS and KEITH C. METZLER, | **COMPLAINT** |
| Defendants, | |
| and | |
| KND HOLDINGS, INC., | |
| Relief Defendant. | |

Plaintiff Securities and Exchange Commission (the "SEC") alleges as follows:

## SUMMARY

1.      This matter involves a fraud committed by Defendants in connection with the offer and sale of tax increment municipal bonds issued from 2006 to 2008 by one of the Defendants, the Southern California Logistics Airport Authority (the "Authority"), which is an agency with redevelopment powers controlled by its co-Defendant, the City of Victorville (the "City").  The Authority was created to redevelop a 132-square mile area in and around a former Air Force base in San Bernardino County, California.  It conducted several tax increment bond offerings in connection with this redevelopment.  Defendant Kinsell, Newcomb & DeDios, Inc. ("KND") was the sole underwriter for these bond offerings.

2.      Tax increment bonds are secured solely by and repaid solely from increases in property tax revenues attributable to increases in the total assessed value of the property located in the redevelopment project area.  This means that the "tax increment" – that is, the increase in tax revenue from increases in property value – is critical to the security of the tax increment bonds.  Equally important is the metric called the "debt service ratio," which compares the annual tax increment revenue available to pay the outstanding bonds to the annual debt service on those bonds.

3.      The Authority used tax increment bond offerings to finance a number of ill-conceived redevelopment projects, including the construction of a power plant and four new airplane hangars ("Hangars") on the former Air Force base.  By late 2007, it needed $50 million to pay a deposit on a turbine for the power plant, and planned to finance that payment with a new $68 million tax increment bond offering.  However, given the tightening credit market and the subordinate nature of the bonds, prospective bond purchasers demanded that the debt service ratio for this offering be increased to 1.25 (from the 1.10 ratio governing prior bond

1

offerings).  As a result, the Authority was forced to downsize its December 2007 bond offering from $68 million to $42 million.  This left the Authority with few resources to continue its redevelopment activities.  Indeed, by this time, nearly all of the tax increment available to the Authority had been used to secure its prior bond issuances.

4.     In February 2008, in an effort to escape from this financial constraint, the Authority borrowed $35 million in short-term financing.  It then publicly offered $13.3 million of subordinate tax increment bonds in April 2008 to repay part of that short-term debt.  This April 2008 financing was premised, in part, on an assessed value of $65 million for the four Hangars.  This $65 million valuation was used to determine the all-important tax increment for the April 2008 bond offering, and allowed the Authority to satisfy the minimum 1.25 annual debt service ratio for the offering.

5.     However, the Hangars' $65 million assessed value was vastly inflated, resulting in the disclosure of false tax increment and debt service ratios in the Official Statement provided to investors in the April 2008 bond offering. Defendant Keith Metzler ("Metzler"), the Director of Economic Development for the City and an agent for the Authority, and the two KND investment bankers— Defendant Jeffrey Kinsell ("Kinsell"), the owner of KND, and Defendant Janees Williams—all knew that the assessed value of the Hangars was inflated, and, as a result, that the tax increment and debt service ratios disclosed to investors were false.  Yet they each withheld this information, resulting in materially misleading disclosures and a substantially oversized bond offering.

6.     Kinsell and KND also engaged in an additional fraudulent scheme to take undisclosed construction and management fees collected on the airport hangar project.  In 2006, the Authority retained Defendant KND Affiliates, LLC ("Affiliates"), an entity partially-owned by Kinsell, to manage this project.  The Authority agreed to compensate Affiliates and its contractor under a "cost plus

10% construction management fee" contract.  However, Affiliates exploited this fee arrangement by paying itself at least $450,000 more in fees than it was owed.

7.     Affiliates further misappropriated $2.3 million of bond proceeds through a fictitious 15% monthly "property management fee."  Affiliates transferred over $1 million of unauthorized property management fees to Relief Defendant KND Holdings ("Holdings"), the parent of KND.  KND then used the majority of these fees to finance KND's operating expenses, including payroll. The Authority never authorized Affiliates to collect these excessive fees, which Affiliates took from bond proceeds intended to complete construction of the Hangars.  As a result of the unauthorized construction management fees and property management fees, Affiliates misappropriated a total of approximately $2.7 million in bond proceeds.

8.     By engaging in this conduct, the Authority, KND, Affiliates and Kinsell violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act of 1933 (the "Securities Act"), and the City, Metzler, KND, Kinsell and Williams aided and abetted violations of these antifraud provisions of the federal securities laws.  Moreover, KND violated Section 15B(c)(1) of the Exchange Act and Municipal Securities Rulemaking Board Rules G-17, G-27 and G-32(a)(iii)(A)(2), Kinsell aided and abetted each of these violations, and Williams aided and abetted KND's violations of Section 15B(c)(1) and Rule G-17. Therefore, with this action, the SEC seeks permanent injunctions, disgorgement with prejudgment interest and civil penalties against Defendants.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa.

10.     Defendants Authority, KND, Affiliates and Kinsell have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

11.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because the City, the Authority and Metzler all reside in this district.

### DEFENDANTS

12.     **The City of Victorville** is located in southwestern San Bernardino County, approximately 90 miles northeast of Los Angeles, California.  As of 2012, the City's population was estimated at approximately 115,000 residents.  The City is governed by a five-member council, the members of which also comprise the governing board of the Authority.

13.     **The Southern California Logistics Airport Authority**, a joint exercise of powers authority under state law, is the issuer of the relevant bonds discussed herein, and is considered a component unit of the City for accounting purposes.  The Authority is governed by a five-member commission, which consists of all members of the city council of the City, and the City's administrative staff serves as the Authority's administrative staff.  The Mayor serves as the Authority's Chairman, the City Manager serves as the Authority's Executive Director and the City's Finance Director serves as the Authority's Treasurer.

14.     **Kinsell, Newcomb, & DeDios, Inc.** is a California corporation formed on March 22, 1985 and located in Carlsbad, California.  It has been

4

registered with the SEC as a broker-dealer since May 30, 1985.  It is owned by KND Holdings, which in turn is owned by Kinsell.

15.   **KND Affiliates, LLC** is located in Carlsbad, California.  Affiliates was incorporated in the state of California on October 29, 2002.  After June 2006, it was used for the sole purpose of developing the Hangars.  Kinsell is one of two managing members, who each have a 50% interest in Affiliates.

16.   **J. Jeffrey Kinsell**, age 61, resides in Carlsbad, California.  He is the owner, Director, President and Chief Compliance Officer of KND.  He is the owner of KND Holdings and 50% owner of Affiliates.  He has series 7, 24, 53 and 63 FINRA licenses.

17.   **Janees L. Williams**, age 36, resides in San Diego, California.  She is the Vice President of KND.  She has series 7 and 63 FINRA licenses.

18.   **Keith C. Metzler**, age 37, of Victorville, California, is the current Assistant City Manager of the City.  Although never formally a part of the Authority's staff, during the relevant time period, Metzler was the City's Director of Economic Development, in which capacity he integrated redevelopment activities, marketed industrial and commercial developments in the City, and administered redevelopment related grant programs.

## RELIEF DEFENDANT

19.   **KND Holdings, Inc.** is located in Carlsbad, California.  KND Holdings was incorporated in the state of California on August 15, 2001, by Kinsell.  KND Holdings is owned solely by Kinsell and is the parent company of KND.

## STATEMENT OF FACTS

**A.    The City and the Authority**

20.   Formerly a small town on the edge of the Mojave Desert, during the 2000s, the City became an "ex-urb" of Los Angeles, and saw its population jump from 40,000 in 1990 to 115,000 in 2012, making it one of the fastest growing cities

in the nation.  The City sought to use its expanding property tax base to establish local industries and create jobs, particularly after the 1992 closure of one of its largest employers, George Air Force Base, located within the City.

21.     Working in conjunction with the County of San Bernardino and other local communities, the City created the Authority.  The Authority adopted a plan under California's redevelopment law to redevelop a 132-square mile project area in and around the former George Air Force Base now known as the Southern California Logistics Airport (the "Airport").  Much of the work on the redevelopment plan was conducted under the auspices of the Authority's predecessor, the Victor Valley Economic Development Authority, which delegated all of its redevelopment powers to the Authority.

**B.     Tax Allocation, or Tax Increment, Financing**

22.     Municipalities often raise funds through "general obligation bonds," which, in general, are secured and their debt service paid by a municipality's its ability to raise revenue through the imposition of taxes.

23.     However, the Authority does not have the power to levy property taxes.  Therefore, instead of general obligation bonds, it relied on "tax allocation" bonds, also known as "tax increment" bonds, to finance the capital projects for the redevelopment of the Airport area.

24.     Although fairly common in California, tax increment bonds are structured very differently than the more familiar general obligation bonds.  Unlike general obligation bonds, tax increment bonds cannot rely on a municipality's general taxing authority to secure and pay the obligation of the bonds.  Instead, tax increment bonds are only secured, and their obligations can only be paid, by the "incremental" increase in property tax revenues resulting from an increase in the aggregate assessed value of the property within the relevant redevelopment area. The increased assessed value can result from appreciation in existing properties or new construction.

25.     Consequently, the amount of tax increment bonds that a redevelopment agency like the Authority can issue is limited to the increase in the aggregate assessed value of the property in the redevelopment area.

26.     To calculate the amount of the property tax increment available to secure and pay the debt service of tax increment bonds, the assessed value of property in a redevelopment area is first determined for a particular "base" year, typically the year immediately before the redevelopment plan was adopted.  The annual tax revenue collected from the property in the area is then divided among the local taxing agencies within the redevelopment project area and the redevelopment agency.  Generally, the tax agencies receive the taxes that are generated from the base year valuation of that property, while, subject to various exceptions and carve-outs, the redevelopment agency receives the remainder—that is, the "tax increment"—which is the tax revenue collected on any increase in the assessed value of the project area over the base year valuation of that property. The redevelopment agency may then pledge this tax increment revenue to repay tax increment bonds used to finance or refinance redevelopment projects.

27.     A redevelopment agency does not typically pledge tax increment to repay a specific bond issuance by that agency.  Instead, the aggregate amount of the tax increment in a project area is often "pooled" and pledged to repay all of the associated tax increment bonds issued by the agency.  Nevertheless, specific tax increment bonds may have a senior or subordinated claim to the aggregate tax increment pledged by a redevelopment agency.  Generally, investors holding subordinate bonds, like the April 2008 bonds that are at the heart of this action, are more sensitive to any changes in the tax increment than those holding senior lien bonds.

28.     Because the obligations under tax increment bonds are secured by and paid from the incremental increase in property tax revenues, the amount of the increase in the aggregate assessed value of the redevelopment area is material

information for the bond investors, especially those holding subordinate bonds. For the same reason, the ability of the agency issuing the bonds to pay the debt service is material information for bond investors, and even more so for subordinated bondholders.  One common measure of this ability is the "debt service ratio," which compares the annual tax increment revenue available to repay bonds to the annual debt service payments on all outstanding bonds.  The ratio shows how much the Authority and bondholders would be protected in the event assessed property values in the project area dropped.  For example, a debt service ratio of 1.25 means that the tax increment has a 25% cushion above the amount owed on all outstanding bonds.  As a result, the debt service ratio was material information to bond investors.

**C.     The Authority's Tax Increment Bond Offerings**

      **1.     The Offerings, KND and the Official Statements**

      29.     Between 2006 and 2008, the Authority offered and sold at least four tax increment financings relevant to this action:  (1) a $34,980,000 tax allocation revenue parity bond offering dated November 1, 2006 (the "November 2006 Parity Bonds"); (2) a $64,165,000 subordinate tax allocation revenue bond offering dated November 21, 2006 (the "November 2006 Revenue Bonds"); (3) a $42 million subordinate tax allocation bond offering dated December 5, 2007 (the "December 2007 Bonds"); and (4) a $13,334,924.85 subordinate tax allocation bond offering dated April 30, 2008 (the "April 2008 Bonds").

      30.     For each of the four tax increment bond offerings by the Authority, investors were provided with an "Official Statement" describing the terms and conditions of each bond.

      31.     KND was the underwriter for each of these four tax increment bond offerings.  KND was first engaged as the underwriter for the City in 1997, and by 2001, it began serving as the sole underwriter for the Authority.  Between 2001

and 2008, KND earned over $5.1 million in underwriter fees for bonds issued by the Authority and sold by KND to investors.

**2.     The Tax Increment for the Bonds**

32.     The assessed valuation of the Airport project area for its 1997-1998 base year was $1.8 billion.  Any increase in this assessed valuation, and the resulting tax revenue, subject to various exceptions and carve-outs, represented the tax increment available to the Authority for securing and paying the obligations of its tax increment bonds.  However, as discussed below, by the end of 2007, the Authority's total outstanding debt from its previously-issued tax increment bonds was so large that the Authority could not issue any additional tax increment bonds unless the property value in the area increased or there was new development in the area.

33.     For each offering, the Authority hired a fiscal consultant (the "Consultant") to determine the additional tax increment revenue available to secure the repayment of any new bond issue, and to prepare a report included as an appendix to the Official Statements for the bond offerings.

34.     In calculating projected tax increment revenues, the Consultant first looked to the county assessor's most recent property rolls to determine the assessed value of property in the area.  The county assessor is the municipal official responsible for determining the value of property in the county for tax purposes.

35.     The assessor's office revises the property tax rolls only once a year, creating a lag time before the current assessed values of properties resulting from new sales or construction appear on the property tax rolls.  As a result, the Consultant could not simply compare the county assessor's most recent annual property roll to that for the 1997-1998 base year.

36.     Rather, the Consultant had to add the new assessed values due to new construction, which had not yet been incorporated onto the annual property roll, to the assessed values reflected on the last annual property roll.  The Consultant

typically received the increased assessed values regarding new construction for the project area from Metzler's office.

37.     The Authority's Official Statements referenced the Consultant's reports, which discussed among other things, the current status of development in the project area and the resulting tax increment revenue available to serve as security for the bonds.  The Official Statements also attached the Consultant's reports as an appendix.  As such, the Consultant's reports were also provided to bond investors.

**D.     The Fraudulent Official Statement for the April 2008 Bond Offering**

**1.     The Hangars and the November 2006 Bond Offerings**

38.     The Authority undertook a variety of ill-conceived projects in connection with its efforts to develop the Airport area.  These included the construction of a proposed power plant known as "Victorville 2," an inter-modal rail facility and, at the crux of this action, the Hangars.

39.     In 2005 and 2006, the Authority issued bonds underwritten by KND in order to build the Hangars, including the November 2006 Parity Bonds and the November 2006 Revenue Bonds.  The Authority initially hired an outside developer to develop the Hangars.  As discussed in more detail below, however, the Authority eventually hired Affiliates to take over the project.

**2.     The Downsized December 2007 Bond Offering**

40.     The Authority initially planned to issue approximately $68 million of tax increment bonds in late 2007 to finance an initial deposit for an electric turbine for the "Victorville 2" power plant.  Ultimately, by the time it issued the December 2007 Bonds, the Authority was only able to offer $42 million in bonds, and netted just $37 million from the offering.

41.     The Authority was forced to downsize the December 2007 Bond offering because prospective bond purchasers demanded that the Authority increase the debt service ratio.  Bond investors had previously accepted a debt

service ratio of 1.10.  However, due to the tightening credit market at the time and the subordinate nature of the bonds, prospective bond purchasers demanded a significant increase in the annual debt service ratio to 1.25.

42.     The debt service ratio is determined by taking the projected annual tax increment revenue available to repay all tax increment bonds and dividing that number by the annual debt service payments on all outstanding tax increment bonds.  The debt service ratio was determined from data provided by the consultant and KND.  Specifically, the projected annual tax increment revenue available to repay all tax increment bonds was calculated by the Consultant and set forth in the report it issued for the December 2007 Bonds (the "December 2007 Report").  The annual debt service payments on all outstanding tax increment bonds was calculated by KND.

43.     Although the aggregate tax increment revenue available to pay debt service was substantial, by December 2007, the Authority had already consumed all but a small portion of that amount to service its prior bond issues.  Therefore, under the increased debt service ratio of 1.25 required by prospective investors, the Authority was no longer able to service $68 million in debt.  Therefore, it downsized the bond issuance from $68 million to $42 million.

44.     Prospective investors also demanded that, for all of the Authority's future tax increment bond issuances, the annual debt service ratio for each year all of the bonds are outstanding must be at least 1.25 to comply with the 1.25 annual debt service ratio.  This requirement was incorporated in the "additional bonds" covenant under the governing indenture, which generally set limitations on the Authority's ability to issue new bonds.

### 3.     The Private Placement in February 2008

45.     The downsizing of the December 2007 bond issuance from $68 million to $42 million left the Authority with few resources to continue its redevelopment activities.  Indeed, the Authority needed to apply all of the net

proceeds of the December 2007 Bonds to make the initial deposit on the "Victorville 2" electric turbine.

46.     In late November 2007, Kinsell recognized the Authority's difficult financial situation.  He wrote emails stating that the Authority had essentially "put themselves out of the redevelopment business and have few resources to do anything else."  Kinsell also described the Authority as being "panicked" at this time and believed it "needed money right away."  He noted that a third party could emerge to help the Authority obtain funds for other projects.

47.     Third-party financing is the option the Authority ultimately pursued. In particular, the Authority borrowed $35 million in a private placement offering of Subordinate Tax Allocation Revenue Notes to a major commercial bank (the "Bank"), on February 29, 2008.

48.     As part of this private placement, the Bank required the Authority to enter into a forward bond purchase agreement that, in essence, obligated the Authority to issue publicly offered "forward" tax increment bonds, at the time of the Bank's choosing, for the purpose of repaying, in whole or in part, the $35 million invested  by the Bank.  The Bank was not obligated to purchase any of those forward bonds, and the Authority's obligation was dependent on the existence of sufficient tax increment to secure such bonds.

**4.     The Hangars' Assessed Value for the Private Placement**

49.     The Authority needed sufficient tax increment revenue to repay the $35 million in Subordinate Tax Allocation Revenue Notes held by the Bank. Therefore, during the private placement negotiations, the Bank focused on the estimated additional assessed value and resulting tax increment from any new construction that had not been used to secure the December 2007 Bonds.

50.     On December 17, 2007, just two days after the December 2007 Bonds closed, the Bank held a conference call with Williams, Metzler and the Consultant to discuss the timing and amount of any new assessments, and, by virtue of being a

factor in determining the amount of any new assessed value, the cost of any new development at the Airport.  As conditions for closing the private placement, the Bank required, among other things, that:  (1) the Consultant certify the estimated tax increment revenues and compliance with the additional bonds test; and (2) Metzler provide an affidavit, attached to his estimates of assessed valuations, certifying that the estimates were correct to the best of his knowledge.

51.     Metzler prepared a spreadsheet for the Bank that, among other things, set forth the estimated additional assessed values for projects not reflected in the December 2007 Bonds (the "Metzler Spreadsheet").  These projects included the four Hangars, as well as the expansion of a cement factory by one of the largest taxpayers in the project area.  The assessed value of these projects was critically important to the Authority's ability to close the private placement with the Bank.

52.     On January 17, 2008, Metzler reported to the Bank, Kinsell and Williams that the assessor's office informed him the cement factory's additional assessed value was just $41 million.  This was tens of millions less than the anticipated range of $91 million to $141 million in additional assessed value from the cement factory expansion.

53.     That same day, Williams wrote to Kinsell that the Bank was concerned about the unexpectedly low assessed valuation increase.  Williams also called Metzler on or about January 17, 2008 to discuss the situation, and cautioned him that his assumptions need to be correct because they related to tax increment.  Around this time, Kinsell also expressed concern about the unexpectedly low assessed value of the cement factory.

54.     Although the increase in the assessed value for the cement factory dropped significantly from the earlier estimates, the estimated assessed value of all four Hangars never changed.  On January 17, 2008, Williams told the Bank that the total value of the four Hangars would be $65 million.  This figure had been

provided by Affiliates, and was purportedly based on the Hangars' construction costs.

55.     On January 18, 2008, Metzler forwarded an email he received from the assessor's office to Williams showing it had assessed the values of Hangar Nos. 1 and 2 at an aggregate value of only $8,779,000 for the 2007-2008 fiscal year, and $8,955,000 for the 2008-2009 fiscal year.  The assessor's office also informed Williams that it had not yet assessed the value of Hangar Nos. 3 and 4.

56.     These assessment figures undermined the $65 million estimate for all four Hangars.  Under this assessment, the remaining two Hangars (Nos. 3 and 4) would have to be valued at approximately $56 million alone for the previously provided estimate for all four Hangars of $65 million to have any validity.  But the remaining two Hangars could not be assessed at over $56 million. The four Hangars were too similar for such a disparate valuation to be possible.

57.     Nevertheless, Williams and Metzler used the $65 million assessed value for all four Hangars.  Metzler included the $65 million value in a draft of the Metzler Spreadsheet he prepared in advance of a conference call with the Bank, Williams, the Authority's counsel ("Disclosure Counsel") and others.  Williams emailed the Metzler Spreadsheet to the meeting participants, as well as to Kinsell. The Metzler Spreadsheet reflected:  (1) the estimated $65 million assessed value for all four Hangars for the 2008-2009 fiscal year; and (2) the $56,221,000 Hangar valuation available for bonding in 2008-2009 (i.e., the $65 million estimated assessed value for the Hangars in 2008-2009 minus the $8.779 million assessed value for Hangars No. 1 and 2 in 2007-2008 ).

58.     The Consultant relied on the $65 million estimated assessed value Metzler provided for the Hangars when it conducted its tax increment analysis. The Consultant prepared a spreadsheet (the "Consultant Spreadsheet") showing the total value of new development at the Airport was $111,309,322, and that the Hangars constituted $56,221,000, or over half, of that amount.  The Consultant

noted in its spreadsheet that the $56,221,000 valuation was based on "Data Provided By Keith [Metzler]."  On February 11, 2008, Williams emailed the Consultant Spreadsheet to the Bank, Kinsell and Metzler.   As alleged below, the Consultant used the $111,309,322 value of the new development at the Airport, which included the inflated $65 million value of the four Hangars, to determine the tax increment revenue for the April 2008 Bonds.

59.    On February 19, 2008, the Consultant sent a letter to Metzler, Williams and Disclosure Counsel setting forth the methodology it used to determine its tax increment revenue projection of $22,606,356.  That letter noted that the assessed values in the Airport's portion of the project area increased by $111,309,322 due to new construction.

60.    Metzler and Williams were concerned that the assessor's office would provide assessed values for Hangar Nos. 3 and 4 that, when added to the assessed values of Hangar Nos. 1 and 2, would reduce the total assessed value of the four Hangars to less than $65 million.  On February 19, 2008, Metzler received an email that attached a voicemail from the assessor's office alerting him that it had not received construction cost information for Hangar Nos. 3 and 4.  Metzler forwarded the email and attached voicemail to Williams that same day and wrote: "Can you follow up and make sure this happens….  My concern is without the construction numbers, they will value the hangars low as the leases are not commensurate with the construction costs."  Williams forwarded the email to Kinsell that same day.

61.    As part of the closing documents for the private placement on February 29, 2008, Metzler provided the final version of the Metzler Spreadsheet and attached it to a signed certification stating that his estimates were true and accurate based on his personal knowledge and communications with the assessor's office and the Airport's master developer.  In his certification to the Bank, Metzler noted that:  (1) the $65 million estimate for the Hangars was based on an estimate

provided by Affiliates; and (2) it was possible the value could change because the assessor's office had yet to complete its valuation of the Hangars.  Notably, Metzler did not make a similar disclosure in connection with the April 2008 Bonds sold to the public.

### 5. The April 2008 Bond Offering

62.    In April 2008, the Bank exercised its option to require the Authority to issue publicly offered bonds to repay part of the $35 million note. Approximately $13.335 million in subordinate tax increment bonds were offered on April 30, 2008 to repay part of this debt (the "April 2008 Bonds").

63.    The April 2008 Bonds are at the crux of this action.  The April 2008 Bonds were the only forward bonds the Authority was ever able to issue pursuant to its forward bond purchase agreement with the Bank.

### 6. The Hangars' Assessed Value for the April 2008 Bond Offering

64.    When the Authority began preparing for the April 2008 Bond offering to make the required payment to the Bank, the Consultant needed to revisit the amount of available tax increment.  For the April 2008 Bonds, the Consultant prepared a supplement to its December 2007 Report (the "April 2008 Supplement") that "contain[s] tax increment projections that supplement information contained in" the December 2007 Report.  The December 2007 Report and the April 2008 Supplement (collectively, the "April 2008 Report") were attached as Appendix D to the Official Statement for the April 2008 Bonds (the "April 2008 Official Statement").  The April 2008 Official Statement also references the April 2008 Report at page 23.  The April 2008 Official Statement and the April 2008 Report contained material information for bond investors related to the bonds' tax increment and debt service ratio.

65.    Like the Consultant's spreadsheet prepared for the February 2008 private placement, the April 2008 Supplement included assessed values and resulting increased tax increment derived from new, finalized construction and

sales not included in the December 2007 Report.  The April 2008 Supplement, at Exhibit 10C on page 4, provided that the increased assessed value due to new development at the Airport was $111,309,322, the same amount used in the Consultant Spreadsheet prepared for the private placement.

66.     This $111,309,322 valuation of new development at the Airport included Williams's and Metzler's inflated $65 million estimated value for all four Hangars.  The Consultant used this $111,309,322 valuation of new development at the Airport to determine the tax increment revenue for the April 2008 Bonds.

67.     By April 2008 though, Metzler, Williams and Kinsell knew that the Hangars' $65 million estimated assessed value was no longer valid.  On March 10, 2008, Metzler received an email from the assessor's office informing him that Hangar No. 3's 2008-2009 assessed value was only $9,483,260.  The assessor's office also informed Metzler that it had not heard from Affiliates regarding the construction cost of Hangar No. 4.  It further noted that if it did not hear from Affiliates, the assessor's office would assess Hangar No. 4 at the same value as Hangar No. 3 because "[b]oth hangars are identical."  Metzler directed his assistant to forward the assessor's office's email to Williams with the dictated message: "FYI…lower than we expected."  Williams forwarded that email the same day, copying Kinsell, and wrote that "we need to get this done ASAP this week."

68.     Also on March 10, 2008, Metzler's assistant replied to the assessor's office's email, asking if the assessor's office could re-send the assessed valuations for Hangar Nos. 1 and 2.  The assessor's office provided those assessed values to Metzler's assistant that night.  Metzler's assistant printed out her March 10, 2008 email correspondence with the assessor's office showing the assessed values for Hangar Nos. 1, 2 and 3, as well as the likely assessed value for Hangar No. 4, and gave it to Metzler on or about March 10, 2008.

69.     On April 16, 2008, Williams sent an email to Metzler asking him to confirm various facts for proposed buyers of the April 2008 Bonds.  Among the

items she asked Metzler to confirm was "4 Hangars approximately $65,000,000 based on construction value." Metzler's assistant responded at his direction to Williams the same day by email, attaching the assessor's office's March 10, 2008 emails containing the assessed valuations for Hangar Nos. 1, 2 and 3, and the likely assessed valuation for Hangar No. 4. That same day, Williams forwarded the email, along with the attached assessor's office's email, to Kinsell.

70.     Assuming Hangar No. 4 would be assessed at the same value as Hangar No. 3, the total assessed values of the four Hangars would have been $27.7 million for 2007-2008 and $27.9 million for 2008-2009. In either case, this valuation is less than half the estimated value of $65 million that was used in the April 2008 Supplement, referenced in and attached to the Official Statement.

71.     The minimum 1.25 annual debt service ratio for the April 2008 Bond offering was only achieved because the approximate $111.3 million valuation of new development at the Airport included the inflated $65 million valuation of the four Hangars.

### 7.     The False and Misleading April 2008 Official Statement

72.     Page 24 of the April 2008 Official Statement contained a debt service schedule listing the annual tax increment and debt service ratios for the April 2008 Bonds (the "Debt Service Schedule"). One column on that schedule listed the tax increment for every bond year (the "Total Non-Housing Increment"); another column showed an "all-in," "no growth" debt service ratio of 1.26 for 2008 (representing tax increment revenues of $22,606,356 and total debt service of $17,825,734), and 1.25 for every bond year thereafter.

73.     KND, which through Williams and Kinsell knew that the estimated assessed value of the Hangars was inflated, prepared the Debt Service Schedule. The figures KND used in the Total Non-Housing Increment column of the Debt Service Schedule relied on the inflated value of the Hangars, and came from the

"Total Pledge Revenue" column of Exhibit 10A on page 2 of the Consultant's April 2008 Supplement, which was attached to the April 2008 Official Statement.

74.     The statements regarding the tax increment and the debt service ratios in the April 2008 Official Statement and the attached April 2008 Supplement were false and misleading.

75.     Neither the Consultant nor Disclosure Counsel knew that the tax increment analysis in the April 2008 Report relied on false and inflated Hangar values overstating the tax increment revenue.  Williams, Kinsell and Metzler each failed to inform Disclosure Counsel that the $65 million estimated assessed value of the Hangars was wrong.  As a result, the Debt Service Schedule in the April 2008 Official Statement and Exhibits 10A and 10C of the April 2008 Supplement overstated the tax increment available to secure those bonds and to repay investors.

76.     The Debt Service Schedule also overstated the debt service ratio for the offering.  The Authority only met the required 1.25 minimum annual debt service ratio because it used the overstated Hangar valuation.  Therefore, the Debt Service Schedule failed to disclose a debt service ratio based on an accurate valuation of the four Hangars.  Had the Authority used the accurate valuation, it would have failed to meet the minimum 1.25 ratio in every bond year after 2008.

77.     Moreover, because of the overstated values of the Hangars and resulting false disclosure of the tax increment and annual debt service ratio, the April 2008 Bonds were substantially oversized.

78.     The tax increment and debt service ratio misrepresentations and omissions in the April 2008 Official Statement and the April 2008 Supplement were material.  The tax increment securing the April 2008 Bonds and the annual debt ratios disclosed in the Debt Service Schedule were critical factors investors used to determine how they would be repaid.  Moreover, the market required the 1.25 debt service ratio, which ensured that the Authority's total projected annual tax increment revenue would be 25% greater than the total annual debt service

payments for each year bonds would be outstanding, thereby providing a safety net in the event assessed property values in the project area suffered unexpected losses. Meeting the annual debt service ratio of 1.25 was also a prerequisite to the issuance of the bonds under the indenture.  Moreover, the credit rating agencies focused on the debt service ratio, and a ratio below 1.25 would have affected the credit quality of the April 2008 Bonds.

79.     The December 2007 Bonds and April 2008 Bonds are currently in default, and as of April 2013 were trading at roughly forty-five cents on the dollar.

### 3.     The Defendants' Roles in the April 2008 Official Statement

#### a.     The Authority, the City and Metzler

80.     As the issuer, the Authority had ultimate authority over all of the contents of the Official Statements and the attached Consultant reports, including the April 2008 Official Statement and the attached April 2008 Supplement.

81.     Metzler played a significant role in connection with the Authority's tax increment bond offerings, including the April 2008 Bonds.  He had intimate knowledge of the projects at the Airport, and understood tax increment financing and how annual debt service ratios are calculated.

82.     Although the Authority's Official Statements were drafted initially by Disclosure Counsel, these drafts were circulated to an unofficial disclosure committee for comments.  Metzler was a member of this committee.  Working at the direction of the City Manager, who also served as the Executive Director of the Authority, Metzler worked with the Disclosure Counsel and the underwriters at KND to draft sections of the Official Statements.  He took the lead in drafting some of the disclosure language concerning the Authority's redevelopment projects.

83.     Metzler was the Authority's "point person" concerning its Official Statements for all of the bond issuances, including the April 2008 Official Statement.  He communicated with the ratings agencies, gave presentations to

potential investors and transmitted the county assessor's most recent assessed value figures to the Consultant. The Executive Director specifically tasked Metzler with obtaining and providing the taxable assessed valuation data to the Consultant, and with reviewing the Official Statements to ensure they were accurate. In signing the April 2008 Official Statement, the Executive Director relied on Metzler's work and due diligence. Disclosure Counsel and the underwriter looked to Metzler as the Authority's representative to approve the Official Statements. As such, Metzler and his employer, the City, substantially assisted in the making of the misstatements and omissions in the April 2008 Official Statement regarding the inflated tax increment and debt service ratios.

84. Metzler knew, or was reckless in not knowing, that the April 2008 Official Statement materially misstated the tax increment and debt service ratio for the April 2008 Bonds. Because he was an employee of the City, and reported to the City Manager, the City had actual knowledge of, or was reckless in not knowing, the falsity and misleading nature of these misstatements.

85. Moreover, Metzler was the agent for the Authority with regard to content in the Authority's Official Statements. The Authority authorized him to perform acts and communicate on its behalf in connection with the Authority's bond offerings. Therefore, the Authority had actual knowledge of, or was reckless in not knowing, the falsity and misleading nature of the misstatements concerning the tax increments and the debt service ratio.

### b. KND, Kinsell and Williams

86. KND, as the underwriter, had ultimate authority over the portions of the Official Statements it prepared, including the false and misleading Debt Service Schedule in the April 2008 Official Statement. KND's name was also prominently featured on the first page of the Official Statement for each bond offering that it underwrote for the Authority.

87.     Kinsell and Williams knew that the April 2008 Official Statement materially misstated the tax increment and debt service ratio for the bonds. Williams was a member of the informal disclosure committee for the Official Statement, and both Kinsell and Williams reviewed and commented on draft official statements, the April 2008 Supplement and other documents related to the April 2008 Bonds.  Despite knowing that the $65 million estimated assessed value of the Hangars was wrong, Williams nonetheless used the April 2008 Supplement to determine the size of the April 2008 Bonds and to generate the false Debt Service Schedule in the April 2008 Official Statement.  The annual debt service ratios were critical to Williams's sizing calculation because they limited the principal amount of the bond offering.  As such, Kinsell and Williams, along with KND, substantially assisted the Authority in making that false and misleading April 2008 Official Statement.  Moreover, Kinsell and Williams substantially assisted KND in making the false and misleading Official Statement.

88.     Because Williams and Kinsell were employees of KND, KND had actual knowledge that the April 2008 Official Statement, the April 2008 Supplement attached as an appendix and the Debt Service Schedule were false and misleading.

**E.     Kinsell, Affiliates and KND's Scheme to Misappropriate Bond Proceeds**

89.     Kinsell, Affiliates and KND, which underwrote the Authority's bond offerings from November 2006 through 2008, misappropriated over $2.7 million of bond proceeds from the Authority and bondholders in connection with the project to construct the four Hangars.

**1.     The Unauthorized Construction Management Fees**

90.     Affiliates misappropriated bond proceeds of at least $450,534 from the Authority and the bondholders in the form of unauthorized and excessive construction management fees.

91.     By mid-2006, the Authority and Kinsell learned of allegations that the developer for the Hangars project had not been paying the subcontractors and that the developer's principal had likely diverted some of the bond proceeds from the project for his own personal use.

92.     Kinsell reached a "handshake deal" in June or July 2006 with the Executive Director of the Authority whereby Kinsell, through Affiliates, would oversee the project.  Although formed earlier in 2002, the sole purpose of Affiliates after June 2006 was to develop the Hangars.  Kinsell is one of two managing members of Affiliates, each of whom holds a 50% interest in the company.  Kinsell had no construction experience but retained a longtime friend as the new contractor to complete construction of the Hangars.

93.     Although that "handshake deal" was never reduced to a written contract, all of the parties understood that it was a "cost plus 10% construction management fee" arrangement.  In a memorandum Kinsell sent on October 18, 2006 to Disclosure Counsel and to Authority representatives, Kinsell confirmed that a 10% construction management fee would be charged "where necessary for a general contractor to be involved."  He also explained that he was "dividing these monies by eight (8%) to [the new contractor] and two percent (2%) to Affiliates for the overall project coordination."  Thus, although Affiliates was not actually building the Hangars, it would be paid this 2% to oversee the use of the funds and to perform "fund control."

94.     In July 2006, the Authority approved Affiliates's new role, and, over the next two years, made five separate loans totaling $60.38 million to Affiliates. These loans included $22.2 million lent in August 2006, which was used:  (1) to immediately pay over $12 million to disgruntled subcontractors and $6 million to the original developer to resolve various claims; and (2) to pay a portion of the remaining costs necessary to complete the Hangars.

95.     All of the loans made to Affiliates were funded from the proceeds of bonds or notes issued by the Authority and underwritten or placed by KND. Affiliates placed these lump sum amounts into bank accounts in its name, and there was little, if any, oversight regarding how Affiliates spent these bond funds.

96.     Periodically throughout the construction of the Hangars, Affiliates paid the new contractor the 10% construction management fee that had been earned as of that date.  The contractor retained its 8% share of the fee and "rebated" back to Affiliates the 2% fee owed to Affiliates, totaling not more than $865,990 from October 2006 through October 2010.

97.     However, Affiliates actually took at least $1,316,524 as the 2% construction management fee, or at least $450,534 more than the amount that was "rebated" back to it by the contractor.  Affiliates simply took this excess – and unauthorized – construction management fee directly from the bond proceeds the Authority loaned Affiliates to construct the Hangars.

98.     Affiliates collected the unauthorized 2% construction management fee based on expenses incurred in August 2006 that had nothing to do with the remaining costs of construction, such as the payments to subcontractors for prior work and the payment to the original developer to settle claims.  Thus, before KND underwrote bonds for the Authority in November 2006, Kinsell and KND knew, or were reckless in not knowing, that Affiliates planned to charge more than the authorized 2% construction management fee and did not disclose this information to investors.

### 2.     The Unauthorized "Property Management" Fees

99.     Affiliates also charged the Authority a fictitious and unauthorized 15% "property management fee" to misappropriate an additional $2.3 million – purportedly to "manage" the Hangars for the Authority.

100.   Kinsell told Affiliates's CFO in August 2006 that Affiliates was earning the property management fee as a result of Kinsell's discussion with the

Executive Director of the Authority.  This was false.  Kinsell never told the Executive Director about the property management fees, and the Authority never authorized or agreed to pay the purported property management fee taken by Affiliates.  In addition to the absence of any document confirming the property management fee agreement, the Executive Director lacked the authority to enter into any verbal agreement above $1,500 and any written agreement exceeding $125,000 per year, limitations that Kinsell generally understood.

101.   To keep track of the property management fees, Kinsell directed Affiliates's CFO to begin accruing the 15% property management fee based on what Kinsell claimed were the "market rates" for the Hangar rents, as opposed to the actual rents collected, which were much lower.  Affiliates's CFO prepared an internal spreadsheet showing that Affiliates was purportedly accruing the fees as early as March 2006, several months before KND underwrote the November 2006 Parity and Revenue Bonds.  The Official Statements for these bonds did not disclose this property management fee or the resulting conflict of interest.

102.   Although Affiliates began accruing these fees as early as March 2006, it did not take any of the property fees until much of the Hangars project was complete.  Specifically, the CFO's spreadsheet shows that Affiliates accrued property management fees of $3,657,540 from March 2006 until June 2011, when the Hangars were finally returned to the Authority.  But Affiliates only misappropriated $2,295,322 of these accrued fees because, as Kinsell explained, by 2009 or 2010 "the money ran out."  Indeed, Affiliates's bank records confirm that only $32,187 remained in its accounts as of December 2009.

103.   Kinsell used a significant portion of the unauthorized property management fees collected by Affiliates to pay the expenses of KND and its parent company, Holdings.  In October 2007 Affiliates transferred $25,000 to Holdings with the notation "payroll" and, just a day before the April 2008 Bonds were issued, Affiliates lent Holdings $100,000.  In July 2008, KND agreed to

immediately pay $4 million to the U.S. Treasury to settle unrelated I.R.S. claims involving advance refunding municipal bonds underwritten by KND between 1993 and 2003.  Beginning at that time and continuing through at least June 2011, Affiliates transferred over $1 million in unauthorized property management fees to Holdings.  Without the funds from Affiliates, it would have been difficult for KND to pay its employees.

### 3.     Kinsell, KND and Affiliates's Lulling and Concealment of the Property Management Fees from the Authority

104.   Throughout the scheme, Kinsell and Affiliates misled Authority representatives and hid the fact that Affiliates was earning a property management fee.  For example, in an October 18, 2006 memorandum to the Authority, Kinsell wrote that "KND Affiliates will provide a full accounting to-date of the Authority's loan proceeds and then on a monthly basis," but Kinsell never did so.  Moreover, on November 2, 2007, Affiliates's CFO provided the Deputy City Attorney with a spreadsheet showing the operating expenses of each Hangar, but it did not include the 15% monthly property management fee.  Further, on May 16, 2008, Affiliates's CFO provided the Authority's Director of Finance with an "operating expenses spreadsheet," but it did not include any reference to the property management fee.

105.   In March 2008, the City hired an independent audit firm to review Affiliates's books and records and identify all related party transactions.  Affiliates's CFO disclosed the 2% construction management fee to the auditors, but not the property management fee.  Around the same time, in February 2008, the Director of Finance personally visited Affiliates's office to review its books and did not see any indication that Affiliates was earning a property management fee.  Kinsell failed to tell the auditors or the Director of Finance about the property management fees.

106.   Kinsell and Affiliates waited until late 2008, after the auditors and the Director of Finance had completed their on-site review of Affiliates's books and records, to begin transferring the unauthorized property management fees out of Affiliates's bank account.

107.   On October 15, 2008, the Director of Finance emailed Kinsell about transferring the Hangars back to the Authority and confirmed that any unused loan proceeds would revert back to the City, to which Kinsell agreed.  In November 2008 and September 2009, the contractor hired by Kinsell to construct the Hangars, acting at the direction of Affiliates, provided detailed accountings to the Director of Finance.  On November 10, 2008, the contractor provided the Director of Finance with a detailed accounting that stated that Affiliates held excess funds and contingency funds totaling over $2 million.  The September 2009 accounting showed that Affiliates held at least $1.5 million in excess funds and contingency funds.  These accountings, however, were false.  As of September 2009, only $644,391 remained in Affiliates's bank accounts.  Kinsell reviewed both accountings but never told the contractor or the Authority that the majority of the excess bond proceeds had already been taken by Affiliates, allegedly as property management fees.

108.   From 2010 through June 2011, after many key individuals initially involved with the Hangars had left the Authority, Kinsell continued to conceal the property management fees as new Authority representatives negotiated the transfer of the Hangars back to the Authority.  Kinsell misled these representatives by repeatedly characterizing himself as the "good guy" and "white knight" who had "bailed the City out of the mess that they were in."  He further represented to the new City Manager that he had not made any money on the Hangar transaction.  As of February 2010, Kinsell claimed that there were no construction funds left.

109.   In September 2010, when the new City Manager asked questions about the Hangars, Kinsell told him to look at the report from the independent

audit firm that reviewed Affiliates's books and records.  Kinsell claimed the report set forth "the fees being charged by KND Affiliates for management services," but Kinsell did not tell him that the report excluded any reference to the property management fees collected by Affiliates because Kinsell had concealed those fees from the auditors.

110.   After many months of negotiations, the Authority voted and approved paying Kinsell and Affiliates an additional $40,000 for anticipated tax liabilities Kinsell claimed he would personally incur when the Hangars were transferred back to the Authority.

### 4.   KND and Williams's Lack of Disclosure of the Fees

111.   None of the Official Statements for the bonds the Authority issued between November 2006 and April 2008 disclosed to investors that Affiliates received more than the agreed upon 2% construction management fee or that Affiliates, an entity related to Kinsell and KND, was accruing an unauthorized property management fee.

112.   Affiliates received $9.9 million of proceeds from the November 2006 Parity Bonds, which, for a fee of $437,250, had been underwritten by KND.  The Official Statement for the November 2006 Parity Bonds did not disclose that:  (1) Affiliates was acting as construction manager of the Hangars and was receiving a 2% construction management fee; (2) Affiliates had already received $22,200,000 in bond proceeds from the Authority; or (3) Affiliates was accruing an unauthorized property management fee.

113.   On November 21, 2006, the Authority issued the November 2006 Revenue Bonds, which KND underwrote for a fee of $802,000.  Affiliates received $13.6 million of the proceeds from that offering.  The Official Statement disclosed that Affiliates had taken over the Hangars from the prior developer and that "[f]or its efforts in overseeing the completion of the Hangar-Facilities, KND Affiliates is in negotiations with the Authority to receive a construction management fee in an

amount no greater than 2% of the remaining costs to complete the Hangar Facilities . . ."  Although this Official Statement disclosed Affiliates's anticipated role as construction manager and its 2% fee, KND and Kinsell concealed from investors that Affiliates also charged a 2% fee for costs that were unrelated to the remaining construction and that Affiliates was also accruing an unauthorized 15% monthly property management fee.

114.   On February 29, 2008, the Authority issued the $35 million in Subordinate Tax Allocation Revenue Notes in the private placement with the Bank.  KND received a fee of $262,500 as the placement agent.  That same date, Affiliates received $10.4 million of the proceeds from this private placement to build the Hangars.

115.   During this 2007-2008 time period, KND underwrote other bonds issued by the Authority.  Although none of the proceeds of these issuances went to Affiliates, it was not disclosed to investors that Affiliates was taking unauthorized property management and excess construction management fees that came from prior bonds issued by the Authority and underwritten by KND.  These include the following bonds: (1) Taxable Housing Set-Aside Revenue Parity Bonds in March 2007 in the amount of $41,460,000 for which KND received an underwriter's fee of $518,250; (2) the December 2007 Bonds for which KND received an underwriter's fee of $735,000; and (3) the April 2008 Bonds for which KND received an underwriter's fee of $133,349.

116.   The misstatements and omissions in the Official Statements for the Authority's bonds from November 2006 through April 2008 were material because a reasonable investor would want to know about an undisclosed financial arrangement such as here, where an entity related to the underwriter, like Affiliates, received unauthorized proceeds from bonds underwritten by KND.  These misstatements and omissions were also material to the Authority because such fees increased the costs of issuing the bonds.

**F.     KND's, Kinsell's and Williams's Due Diligence Failures**

117.   KND, through Williams and Kinsell, served as the underwriter in negotiated offerings with the Authority and therefore substantially participated in the preparation of the Authority's Official Statements for the bonds.  KND's name appeared prominently on the first page of each Official Statement.  KND also recommended and sold the Authority's municipal securities to investors.  In so doing, KND made an implied representation it had reviewed the accuracy of the Authority's Official Statements and formed a reasonable basis for belief in the truthfulness and completeness of the key representations made therein.

118.   Kinsell and Williams worked on behalf of KND to underwrite the bonds.  In that regard, each reviewed and commented on draft Official Statements, the Consultant Reports, indentures and other bond documents.  Both Kinsell and Williams had authority to sign the bond purchase agreements.  Although Williams was responsible on a day-to-day basis, she made sure to copy Kinsell on emails and to talk to him daily about the bonds.  Indeed, the Authority was Kinsell's client and he had hands-on involvement with regard to the Authority's bond offerings.

119.   Notwithstanding its obligation as an underwriter, KND's implicit representations regarding its due diligence were false.  First, as alleged above, the April 2008 Official Statement, the Debt Service Schedule and the April 2008 Supplement misstated the tax increment and debt service ratios based on inflated assessed values of the Hangars.  Kinsell and Williams substantially assisted in preparing the Official Statement, and each knew the April 2008 Supplement relied on the inflated $65 million estimated assessed value of the Hangars, but omitted to disclose the estimate was no longer valid.  As set forth above, on two separate occasions before the April 2008 Bonds were issued, Williams and Kinsell received emails from the assessor's offices showing that the Hangars' $65 million estimated assessed value was inflated by more than 100%.

120.    Second, KND's lack of disclosure regarding the construction and property management fees paid to Affiliates in connection with the Authority's bonds from November 2006 through April 2008 was misleading.  Kinsell substantially assisted in preparing the Official Statements, and knew that these fees were being accrued by Affiliates.  Despite this knowledge, none of the Official Statements for those bonds disclosed to investors that Affiliates received more than the agreed upon 2% construction management fee or that Affiliates, an entity related to Kinsell and KND, was accruing an unauthorized property management fee.

121.    Following the April 2008 Bond offering, Kinsell decided to transition from investment banker to financial advisor for the City in order to assist the City with a power plant project.  Kinsell expressly acknowledged that in his new role as financial advisor, he was a fiduciary to the City, yet he never disclosed that Affiliates was taking unauthorized management fees from bond proceeds issued by the Authority.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

**(against the Authority)**

122.    The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

123.    Defendant Authority made material misrepresentations and omissions to investors in the April 2008 Official Statement, including the Debt Service Schedule and the April 2008 Supplement, regarding, among other things, the tax increment amount available to repay those bonds and the projected annual debt service ratios for every bond year after 2008.

124.    Defendant Authority by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the

use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

125.   By engaging in the conduct described above, Defendant Authority violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (against the Authority)

126.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

127.   The Authority's April 2008 Official Statement, including the Debt Service Schedule and the April 2008 Supplement contained material misrepresentations and omissions to investors regarding, among other things, the tax increment amount available to repay those bonds and the projected annual debt service ratios for every bond year after 2008.

128.   Defendant Authority by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

129.   By engaging in the conduct described above, Defendant Authority violated, and unless restrained and enjoined, will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

### THIRD CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

**(against KND)**

130.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

131.   Defendant KND, as underwriter for the Authority's bond offerings, made an implicit representation that it had reviewed the accuracy of the Authority's Official Statements, including the Debt Service Schedule and the April 2008 Supplement for the April 2008 Bond offering, and formed a reasonable basis for belief in the truthfulness and completeness of the key representations made in those offering documents.  These implicit representations were false.

132.   Defendant KND made material misrepresentations and omissions to investors in the April 2008 Official Statement, including the Debt Service Schedule, regarding, among other things, the tax increment amount available to repay those bonds and the projected annual debt service ratios for every bond year after 2008.

133.   Defendant KND also made material misrepresentations and omissions to investors in the Official Statements for the November 2006 Revenue and Parity Bonds regarding, among other things, KND's and Affiliates's compensation and the use of bond proceeds.

134.   Moreover, Defendant KND made material misrepresentations and omissions to investors in the Official Statements for the Authority's bonds issued from November 2006 through April 2008 regarding, among other things,

Affiliates's unauthorized receipt and misappropriation of over $2.7 million in bond proceeds.

135.   Defendant KND by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

136.   By engaging in the conduct described above, Defendant KND violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (against KND)

137.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

138.   Defendant KND, as underwriter for the Authority's bond offerings, made an implied recommendation that it had reviewed the accuracy of the Official Statements and formed a reasonable basis for belief in the truthfulness and completeness of the key representations made in those offering documents.  These implicit representations were false.

139.   Moreover, Defendant KND obtained money or property by means of material misrepresentations and omissions to investors in the April 2008 Official Statement, including the Debt Service Schedule and the April 2008 Supplement, regarding, among other things, the tax increment amount available to repay those

bonds and the projected annual debt service ratios for every bond year after 2008.

140.   Defendant KND also obtained money or property by means of material misrepresentations and omissions to investors in the Official Statements for the November 2006 Revenue and Parity Bonds regarding, among other things, KND's compensation and the use of bond proceeds.

141.   Defendant KND also obtained money or property by means of material misrepresentations and omissions to investors in the Official Statements for the Authority's bonds issued from November 2006 through April 2008 regarding, among other things, Affiliates's unauthorized receipt and misappropriation of over $2.7 million in bond proceeds.

142.   Defendant KND by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

143.   By engaging in the conduct described above, Defendant KND violated, and unless restrained and enjoined, will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

### FIFTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act**

**(against Kinsell, KND and Affiliates)**

144.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

145.   Defendants Kinsell, KND and Affiliates directed a series of acts and events with the principal purpose and effect of creating a false appearance about the true use of the bond proceeds and deceiving the Authority and other third

parties to further the scheme to misappropriate bond proceeds.

146.   Defendants Kinsell, KND and Affiliates, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

(a)   with scienter, employed devices, schemes, or artifices to defraud; and

(b)   engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

147.   By engaging in the conduct described above, Defendants Kinsell, KND and Affiliates, and each of them, violated, and unless restrained and enjoined, will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SIXTH CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

**(against Kinsell, KND and Affiliates)**

148.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

149.   Defendants Kinsell, KND and Affiliates directed a series of acts and events with the principal purpose and effect of creating a false appearance about the true use of the bond proceeds and deceiving the Authority and other third parties to further the scheme to misappropriate bond proceeds.

150.   Defendants Kinsell, KND and Affiliates, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities

exchange, with scienter:

      (a)    employed devices, schemes, or artifices to defraud; and

      (b)    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

151.   By engaging in the conduct described above, Defendants Kinsell, KND and Affiliates, and each of them, violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SEVENTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b)**

**of the Exchange Act and Rule 10b-5**

**(against the City, KND, Kinsell, Williams and Metzler)**

152.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

153.   Defendant Authority violated Section 10(b) of the Securities Act and Rule 10b-5(b) thereunder by making material misrepresentations and omissions to investors in the April 2008 Official Statement regarding, among other things, the tax increment amount available to repay those bonds and the projected annual debt service ratios for every bond year after 2008.

154.   Defendants City, Metzler, KND, Kinsell and Williams knowingly provided substantial assistance to the Authority in its violation of Section 10(b) of the Securities Act and Rule 10b-5(b) thereunder in connection with the Authority's April 2008 Bond offering.

155.   Defendant KND violated Section 10(b) of the Securities Act and Rule 10b-5(b) thereunder by making material misrepresentations and omissions to investors (1) in the April 2008 Official Statement regarding, among other things, the tax increment amount available to repay those bonds and the projected annual

debt service ratios for every bond year after 2008; (2) in the Official Statements for the November 2006 Revenue and Parity Bonds regarding, among other things, KND's compensation and the use of bond proceeds; (3) in the Official Statements for the Authority's bonds issued from November 2006 through April 2008 regarding, among other things, Affiliates's unauthorized receipt and misappropriation of over $2.7 million in bond proceeds and KND's professional review of the accuracy of the Authority's Official Statements and its reasonable basis for belief in the truthfulness and completeness of the key representations made in those offering documents.

156.   Defendants Kinsell and Williams knowingly provided substantial assistance to KND in its violation of Section 10(b) of the Securities Act and Rule 10b-5(b) thereunder in connection with the Authority's bond offerings from November 2006 through April 2008.

157.   By engaging in the conduct described above, Defendants City, Metzler, KND, Kinsell and Williams, and each of them, aided and abetted and, unless restrained and enjoined, will continue to aid and abet violations of Section 10(b) of the Securities Act and Rule 10b-5 thereunder.

## EIGHTH CLAIM FOR RELIEF

**Violations of Section 15B(c)(1) of the Exchange Act and**

**MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2)**

**(against KND)**

158.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

159.   Defendant KND, by engaging in the conduct described above, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, to effect a transaction in, or to induce the purchase or sale of, a municipal security in contravention of Rules promulgated by the Municipal Securities Rulemaking Board ("MSRB"), in particular Rules G-17, G-27 and G-

32(a)(iii)(A)(2).

160.   Defendant KND, by engaging in the conduct described above, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, to provide advice to or on behalf of a municipal entity with respect to municipal financial products or the issuance of municipal securities in contravention of Rules promulgated by the MSRB, in particular Rules G-17, G-27 and G-32(a)(iii)(A)(2).

161.   By engaging in the conduct described above, Defendant KND violated, and unless restrained and enjoined, will continue to violate, Section 15B of the Exchange Act, 15 U.S.C. § 78o-4.

## NINTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2)

### (against Kinsell and Williams)

162.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

163.   By engaging in the conduct alleged above, Defendant KND violated Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2).

164.   Defendant Kinsell knowingly provided substantial assistance to KND in its violations of Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2).

165.   Defendant Williams knowingly provided substantial assistance to KND in its violations of Section 15B(c)(1) of the Exchange Act and MSRB Rule G-17.

166.   By engaging in the conduct described above, Defendant Kinsell aided and abetted and, unless restrained and enjoined, will continue to aid and abet violations of Section 15B(c)(1) of the Securities Act and MSRB Rules G-17, G-27

and G-32(a)(iii)(A)(2).

167.   By engaging in the conduct described above, Defendant Williams aided and abetted and, unless restrained and enjoined, will continue to aid and abet violations of Section 15B(c)(1) of the Securities Act and MSRB Rule G-17.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

## **I.**

Issue findings of fact and conclusions of law that the Authority, the City, KND, Affiliates, Kinsell, Williams and Metzler committed the alleged violations.

## **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Authority and its agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

## **III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant KND and its agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Sections 10(b) and 15B(c)(1) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78o-4(c)(1), Rule 10b-5thereunder, 17 C.F.R. §§ 240.10b-5 and MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2),and from aiding and abetting violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**IV.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Affiliates and its agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

**V.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant City and its agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from aiding and abetting violations of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

**VI.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Metzler and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from aiding and abetting violations of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

**VII.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Kinsell and his agents, servants, employees, and attorneys, and those persons in active concert or participation with

any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5thereunder, 17 C.F.R. §§ 240.10b-5, and from aiding and abetting violations of Sections 10(b) and 15B(c)(1) of the Exchange Act, Rule 10b-5 thereunder, and MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2).

## VIII.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Williams and her agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from aiding and abetting violations of Sections 10(b) and 15B(c)(1) of the Exchange Act, Rule 10b-5 thereunder, and MSRB Rule G-17.

## IX.

Order Defendants City, Authority, KND, Affiliates, Kinsell, Williams and Metzler and Relief Defendant Holdings to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

## X.

Order Defendants City, Authority, KND, Affiliates, Kinsell, Williams and Metzler to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## XI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## XII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: April 29, 2013

Respectfully submitted,

Sam S. Puathasnanon
Robert H. Conrrad
Theresa M. Melson
Todd S. Brilliant
Attorneys for Plaintiff
Securities and Exchange Commission

43

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge John Kronstadt and the assigned discovery Magistrate Judge is David T. Bristow.

The case number on all documents filed with the Court should read as follows:

## EDCV13- 776 JAK (DTBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

Sam S. Puathasnanon, Cal. Bar No. 198430
Email: puathasnanons@sec.gov
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| SECURITIES AND EXCHANGE COMMISSION | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | EDCV13-0776 JAK (DTBx) |
| v. | |
| CITY OF VICTORVILLE; SOUTHERN CALIFORNIA LOGISTICS AIRPORT AUTHORITY; KINSELL, NEWCOMB, & DEDIOS; KND AFFILIATES, LLC; J. JEFFREY KINSELL; JANEES L. WILLIAMS and KEITH C. METZLER | **SUMMONS** |
| DEFENDANT(S). | |

KND HOLDINGS, INC., Relief Defendant

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Sam S. Puathasnanon_____, whose address is _SEC, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

APR 2 9 2013

Dated: _____

Clerk, U.S. District Court

By: _____
         Deputy Clerk
       *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**(a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

CITY OF VICTORVILLE; SOUTHERN CALIFORNIA LOGISTICS AIRPORT AUTHORITY; KINSELL, NEWCOMB & DEDIOS; KND AFFILIATES, LLC; J. JEFFREY KINSELL; JANEES L. WILLIAMS and KEITH C. METZLER, defendants; KND HOLDINGS, INC., Relief Defendants

(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Sam S. Puathasnanon     (323) 965-3998
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036

(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
See attachment

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No     ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
The Complaint alleges violations of the federal securities laws. 15 U.S.C. §§ 77q(a)(1), 77q(a)(2) & 77q(a)(3); 15 U.S.C. § 78j(b) & 78o-4; 17 C.F.R. §§ 240.10b-5(b) & 240.10b-5(c); and MSRB Rules G-17, G-27 & G-32(a)(iii)(A)(2).

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☒ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

FOR OFFICE USE ONLY:  Case Number:     **EDCV13-0776**

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

**CIVIL COVER SHEET**

**I(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ NO ☐ YES

If yes, list case number(s): _____

**I(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ NO ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**VENUE:** (When completing the following information, use an additional sheet if necessary.)

List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| See attachment | |

List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| San Bernardino County | |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT): _____ DATE: 4/29/13

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

## SEC v. CITY OF VICTORVILLE, et al.
### United States District Court – Central District of California

Attachment to Civil Cover Sheet

**I(b)** **DEFENDANTS Attorneys (for Defendants and Relief Defendant)**

Terree A. Bowers, Esq.
Arent Fox LLP, Attorneys at Law
Gas Company Tower
555 W. Fifth Street, 48th Floor
Los Angeles, California 90013
Telephone: (213) 629-7400
*Attorneys for Defendants City of Victorville and Southern California Logistics Airport Authority*

John R. Larson, Esq.
Messerli & Kramer P.A.
1400 Fifth Street Towers
100 S. Fifth Street
Minneapolis, Minnesota 54402
Telephone: (612) 672-3600
*Attorneys for Defendants Kinsell, Newcomb & Dedios; KND Affiliates, LLC; J. Jeffrey Kinsell and Janees L. Williams; and Relief Defendant KND Holdings, Inc.*

James N. Kramer, Esq.
Orrick, Herrington & Sutcliffe LLP
405 Howard Street
San Francisco, California 94105
Telephone: (415) 773-5700
*Attorneys for Defendant Keith C. Metzler*

**IX(b)** **VENUE** (List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.)

City of Victorville – San Bernardino County; Southern California Logistics Airport Authority – San Bernardino County; Kinsell, Newcomb & DeDios, Inc. – San Diego County; KND Affiliates, LLC – San Diego County; J. Jeffrey Kinsell – San Diego County; Janees L. Williams – San Diego County; Keith C. Metzler – San Bernardino County; KND Holdings, Inc. – San Diego County