1  KRISTIN S. ESCALANTE, Cal. Bar No. 169635
   Email: escalantek@sec.gov
2  DOUGLAS M. MILLER, Cal. Bar No. 240398
   Email: millerdou@sec.gov
3  DONALD W. SEARLES, Cal. Bar No. 135705
   Email: searlesd@sec.gov
4
   Attorneys for Plaintiff
5  Securities and Exchange Commission

6  Mark R. Zehner, Deputy Chief
   Municipal Securities and Public Pensions Unit
7  Philadelphia Regional Office
   One Penn Center
8  1617 JFK Boulevard, Suite 520
   Philadelphia, Pennsylvania 19103
9
   Michele Wein Layne, Regional Director
10 John W. Berry, Associate Regional Director
   Amy Jane Longo, Regional Trial Counsel
11 444 S. Flower Street, Suite 900
   Los Angeles, California 90071
12 Telephone: (323) 965-3998
   Facsimile: (213) 443-1904

13                UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15                     WESTERN DIVISION

16

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 5:13-cv-00776-JAK-KK |
| Plaintiff, | **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S AMENDED MEMORANDUM OF CONTENTIONS OF FACT AND LAW [L.R. 16-4]** |
| vs. | |
| CITY OF VICTORVILLE, et al., | Trial Date: January 23, 2018<br>Time: 9:00 a.m. |
| Defendants, | |
| and | Final Pre-Trial<br>Conference Time: January 8, 2018<br>Time: 2:00 p.m. |
| KND HOLDINGS, INC., | |
| Relief Defendant. | Ctrm: 10B<br>Judge: Hon. John A. Kronstadt |

1

## **TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................................... 1

II.  PLANTIFF'S CONTENTIONS OF FACT AND LAW.......................... 2

    A.   Summary Statement of Each Claim ............................................. 2

    B.   Elements Required to Establish Each Claim ............................... 3

        1.   Claim 1:   Violation of Section 17(a)(2) of the Securities Act. ... 3

            a.   Misrepresentation or Omission.................................. 3

            b.   Materiality ................................................................ 4

            c.   Knowing, Reckless, Negligence ............................... 5

            d.   Interstate Commerce ................................................. 7

            e.   Security .................................................................... 7

            f.   Offer or Sale ............................................................ 7

            g.   Liability of Corporations and Other Entities ............ 7

        2.   Claim 2:   Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b)........................................................................ 9

            a.   "In Connection With" .............................................. 9

        3.   Claim 3:   Aiding and abetting violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) ............................... 10

        4.   Claim 4:   Violation of Section 17(a)(2) of the Securities Act ........ 13

        5.   Claim 5: Violation of Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17 and G-27 ...................................... 14

        6.   Claims 6 & 7: Aiding and abetting violation of Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17 and G-27 .................................................................................... 14

    C.   Brief Description of Key Evidence in Support of Each Claim ................. 15

        1.   Claim 1: Securities Act, Section 17(a)(2) Against the Authority.... 15

            a.   The Authority's Use of Tax Increment Bond Financings ..... 15

            b.   The Authority's Bond Offerings ........................................... 16

            c.   Authority's Financial Crisis and Short-Term Deutsche Bank Loan.................................................................. 17

            d.   The Additional Bonds Test's 1.25 Debt Service Ratio ......... 18

i

| | | | |
|---|---|---|---|
| | e. | The Significant Shortfall in Assessed Property Values | 18 |
| | f. | Metzler's Misleading Certificate to Deutsche Bank | 20 |
| | g. | RSG's Reliance on Metzler's False Estimates | 22 |
| | h. | Metzler's Continued Communications with the Assessor's Office | 22 |
| | i. | Deutsche Bank's Exercise of its Option and RSG's Preparation of its Fiscal Consultant Report for the New Bonds | 23 |
| | j. | The Resulting Misleading Investor Disclosures | 24 |
| | k. | The Authority Acted Knowingly or Recklessly, or at a Minimum, Negligently | 25 |
| | l. | The Material Impact of the Authority's Negligent Disclosures | 27 |
| 2. | Claim 2: Exchange Act, Section 10(b) and SEC Rule 10b-5 | | 30 |
| 3. | Claim 3: Aiding and Abetting Violation of Exchange Act, Section 10(b) and SEC Rule 10b-5 | | 30 |
| 4. | Claim 4: Section 17(a)(2) Against KND | | 31 |
| 5. | Claim 5: Exchange Act, Section 15B(c)(1) | | 31 |
| 6. | Claims 6 & 7: Aiding and Abetting Violation of Section 15B(c)(1) | | 32 |
| D. | Anticipated Evidentiary Issues | | 32 |
| 1. | Plaintiff's *In Limine* Motions | | 32 |
| 2. | Defendants' *In Limine* Motions | | 32 |
| E. | Issues of Law | | 33 |
| 1. | The Defendants Violated Multiple Federal Securities Laws | | 33 |
| 2. | The SEC Is Entitled To The Relief It Seeks | | 35 |
| | a. | Permanent injunctions are appropriate | 35 |
| | b. | Disgorgement should be ordered | 36 |
| | c. | Remedies Act civil penalties should be imposed | 37 |
| F. | Bifurcation of Issues | | 37 |
| G. | Jury Trial | | 37 |
| H. | Attorney's Fees | | 38 |

I.      Abandonment of Issues ..................................................................................38

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>CASES</u>

3

*Aaron v. SEC,*
4      446 U.S. 680 (1980)....................................................................................6

5    *Basic v. Levenson,*
     485 U.S. 224 (1988)..............................................................................4, 34
6
     *Brody v. Transitional Hosps. Corp.,*
7      280 F.3d 997 (9th Cir 2002).....................................................................4

8    *Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.,*
      769 F.2d 561 (9th Cir. 1985)...................................................................34
9
     *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,*
10     480 F.2d 341 (2d Cir. 1973).....................................................................12

11   *DCD Programs, Ltd. v. Leighton,*
      833 F.2d 183 (9th Cir. 1987).............................................................11, 15
12
     *Dolphin and Bradbury Inc. v. SEC,*
13     512 F.3d 634 (D.C. Cir. 2008)..................................................................12

14   *Fecht v. Price,*
      70 F.3d 1078 (9th Cir. 1995)...................................................................34
15
     *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,*
16     Docket Nos. 15-1872-cv(L), 15-1874-cv(CON), 2017 U.S. App LEXIS
       18803 (2d Cir. Sept. 28, 2017) ...............................................................12
17
     *Gebhardt v. ConAgra Foods, Inc.,*
18     335 F.3d 824 (8th Cir. 2003).....................................................................5

19   *Global-Tech Appliances, Inc. v. SEB, S.A.,*
      __U.S.__, 131 S. Ct. 2060, 2069 (2011) ................................................5
20
     *Hamsen v. Smith,*
21     693 F.2d 932 (9th Cir. 1982).............................................................11, 15

22   *Hanson v. Berthel Fisher & Co. Fin. Servs.*
      No. 13-cv-67-LRR, 2014 U.S. Dist. LEXIS 72940
23     (N.D. Iowa, May 29, 2014) .....................................................................13

24   *In re Convergent Tech. Sec. Litig.,*
      948 F.2d 507 (9th Cir. 1991).....................................................................4
25
     *In re Parmalat Securities Litigation,*
26     684 F. Supp. 2d 453 (S.D.N.Y. 2010)......................................................8

27   *In re Worldcom, Inc. Sec. Litig.,*
      346 F. Supp. 2d 628 (S.D.N.Y. 2004)....................................................12

28

*Johnson v. Aljian,*
   394 F. Supp. 2d 1184 (C.D. Cal. 2004) ........................................... 34

*Mendelsohn v. Capital Underwriters, Inc.,*
   490 F. Supp. 1069 (N.D. Cal. 1979) ............................................... 11

*Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   Exchange Act. Rel. No. 40352, 1998 SEC LEXIS 1788 (Aug. 24, 1998) ........ 14

*Molecular Technology Corp. v. Valentine,*
   925 F.2d 910 (6th Cir. 1991) ........................................................ 11

*Pacific Dunlop Holdings v. Allen & Co.,*
   993 F.2d 578 (7th Cir. 1993) ........................................................ 13

*Paracor Fin., Inc. v. Gen. Electric Capital Corp.,*
   96 F.3d 1151 (9th Cir. 1996) ....................................................... 11

*Roberts v. Peat Marwick, Mitchell & Co.,*
   857 F.2d 646 (1988) .................................................................. 11

*Sanders v. John Nuveen & Co.,*
   554 F.2d 790 (7th Cir. 1977) *vacated and remanded,*
   425 U.S. 929 (1976) .................................................................. 12

*SEC v. Abacus International Holding Corp.,*
   [2001 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 91,542, 2001 U.S.
   Dist. LEXIS 12635, 2001 WL 940913 (N.D. Cal. August 16, 2001) ............ 37

*SEC v. Cohen,*
   No. 4:05CV371-DJS, 2006 WL 2225410 (E.D. Mo. Aug. 2, 2006) ............ 8, 15

*SEC v. Dain Rauscher, Inc.,*
   254 F.2d 852 (9th Cir. 2001) ................................................. 3, 12, 14

*SEC v. Fehn,*
   97 F.3d 1276 (9th Cir. 1996) ....................................................... 11

*SEC v. First City Financial Corp., Ltd.,*
   890 F.2d 1215 (D.C. Cir. 1989) .................................................... 36

*SEC v. First Pacific Bancorp,*
   142 F.3d 1186 (9th Cir. 1998) ...................................................... 36

*SEC v. Franco,*
   253 F. Supp. 2d 720 (S.D.N.Y. 2003) .............................................. 8

*SEC v. JT Wallenbrock,*
   440 F.3d 1109 (9th Cir. 2006) ...................................................... 36

*SEC v. Koenig,*
   No. 02 C 2180, 2007 WL 1074901 (N.D. Ill. Apr. 5, 2007) ................... 8, 15

*SEC v. Manor Nursing Centers, Inc.,*
   458 F.2d 1082 (2d Cir. 1972) ........................................................ 8

v

*SEC v. Murphy*,
    626 F.2d 633 (9th Cir. 1980) .................................................................35, 36

*SEC v. Platforms Wireless*,
    617 F.3d 1072 (9th Cir. 2010) ................................................................36, 37

*SEC v. Quan*,
    Civ. No. 11-723 ADM/JSM, 2013 U.S. Dist. LEXIS 145146
    (D. Minn. Oct. 8, 2013) .................................................................................5

*SEC v. Rind*,
    991 F.2d 1486 (9th Cir. 1993) .....................................................................37

*SEC v. Seaboard Corp.*,
    677 F.2d 1301 (9th Cir. 1982) .....................................................................34

*SEC v. Sells*,
    No. C 11-4941 CW, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) .............8, 15

*SEC v. Tambone*,
    550 F.3d 106 (1st Cir. ), *vacated*, 573 F.3d 54 (1st Cir. 2009),
    reinstated, in part, 697 F.3d 436 (1st. Cir. 2010) ...............................11

*SEC v. Tourre*,
    2014 WL 61864 (S.D.N.Y. Jan. 7, 2014) .............................................8, 15

*SEC v. Zandford*,
    535 U.S. 813 (2002) ....................................................................................9

*Shores v. M.E. Ratliff Inv. Co.*
    1982 U.S. Dist. LEXIS 10653 (N.D. Ala., Jan. 18, 1982) .......................13

*Strong v. France*,
    474 F.2d 747 (9th Cir. 1973) .....................................................................11

*TSC Indus. v. Northway*,
    426 U.S. 438 (1976).....................................................................................34

*Tull v. United States*,
    481 U.S. 412 (1987).....................................................................................38

*United States v. Henderson*,
    721 F.2d 276 (9th Cir. 1983) ........................................................................6

*United States v. Heredia*,
    483 F.3d 913 (9th Cir. 2007) ........................................................................6

*United States v. Jewell*,
    532 F.2d 697 (9th Cir. 1976) ........................................................................6

*United States v. Kessi*,
    868 F.2d 1097 (9th Cir. 1989) .....................................................................11

*United States v. LaPlante*,
    714 F.3d 641 (1st Cir. 2013).........................................................................6

vi

*United States v. Nicholson*,
   677 F.2d 706 (9th Cir. 1982) ...................................................................6

*United States v. Nosal*,
   844 F.3d 1024 (9th Cir. 2016) ...................................................................6

*United States v. O'Hagen*,
   521 U.S. 642 (1997) ...................................................................................9

*United States v. Prince*,
   496 F.2d 1289 (5th Cir. 1974) ...................................................................6

*United States v. Ramos–Atondo*,
   732 F.3d 1113 (9th Cir. 2013) ...................................................................6

*United States v. Tarallo*,
   380 F.3d 1174 (9th Cir. 2004) *amended*, 413 F.3d 928 (9th Cir. 2005)..............4

*United States v. United Medical and Surgical Supply Corp.*,
   989 F.2d 1390 (4th Cir. 1993) .................................................................13

**FEDERAL STATUTES**

**Securities Act of 1933**

Section 2(1)
   [15 U.S.C. § 77b(1)] ...................................................................................7

Section 2(3)
   [15 U.S.C. § 77b(3)] ...................................................................................7

Section 2(7)
   [15 U.S.C. § 77b(7)] ...................................................................................7

Section 17(a)
   [15 U.S.C. § 77q(a)] ...............................................................................2, 4

Section 17(a)(2)
   [15 U.S.C. § 77q(a)(2)]............................. 2, 3, 13, 15, 30, 31, 32, 33, 34, 35, 38

**Securities Exchange Act of 1934**

Section 5
   [15 U.S.C. § 78(e)] ...................................................................................15

Section 10(b)
   [15 U.S.C. § 78j(b)] ......................................................2, 9, 10, 30, 33, 35

Section 15B(c)(1)
   [15 U.S.C. § 78o-4]......................................................2, 3, 14, 31, 32, 38

Section 20(e)
   [15 U.S.C. § 78(e)] ...................................................................................11

Section 21(d)(3)(B)(iii)
   [15 U.S.C. § 78u(d)(3)(B)(iii)] .................................................................37

**FEDERAL REGULATIONS**

Rule 10b-5
    [17 C.F.R. § 240.10b-5]...................................................................2
Rule 10b-5(b)
    [17 C.F.R. § 240.10b-5(b)].............................2, 9, 10, 30, 33, 35

**OTHER AUTHORITIES**

3 KEVIN F. O'MALLEY ET AL., FEDERAL JURY PRACTICE AND
    INSTRUCTIONS §§ 120.02 & 120.10 (5th ed. 2000).......................6

4-82 Leonard Sand, et al., Modern Federal Jury Instructions—Civil, ¶ 82.02,
    Instruction 82-8 (2013) ...................................................................6

Disclosure Roles of Counsel, at 8, 42, 77; Louis Loss & Joel Seligman,
    Securities Regulation 4798 (3d ed. 1992) ......................................12

Manual of Model Civil Jury Instructions for the Ninth Circuit,
    No. 18.1 (2017 ed) ...............................................................7, 9, 12

Manual of Model Civil Jury Instructions for the Ninth Circuit,
    No. 18.3 (2017 ed.) ........................................................................4, 5

Manual of Model Civil Jury Instructions for the Ninth Circuit,
    Nos. 4.2, 4.4, 4.5, 4.8 (2017 ed.) ....................................................8

Manual of Model Civil Jury Instructions for the Ninth Circuit,
    Nos. 6.3, 18.0, 18.2 (2007 ed.) .......................................................4

Modern Federal Jury Instructions, Instr. 82-4 ....................................9

Restatement (Second) of Torts § 283, "Conduct of a Reasonable Man:
    The Standard" (1965) ......................................................................9

Restatement (Third) of Agency, § 2.04 (2006) ...................................8

## I. __INTRODUCTION__

In this civil action, plaintiff Securities and Exchange Commission ("SEC") alleges securities law violations by Defendants – the City of Victorville (the "City"), Southern California Logistics Authority (the "Authority"), Kinsell, Newcomb & Dedios ("KND"), Keith C. Metzler ("Metzler"), J. Jeffery Kinsell ("Kinsell") and Janees L. Williams ("Williams).

This fraud action arises out of tax increment bonds issued by the Authority, an agency with redevelopment powers that was controlled by City.  The fraud involves material misrepresentations regarding the collateral for tax increment bonds issued by the Authority in May 2008.  At the time the bonds were issued, Defendant Keith Metzler was the Director of Economic Development for the City, and was the primary point person acting on behalf of the Authority in connection with the bonds.  KND was the sole underwriter for the Authority's bond offerings.  Jeffery Kinsell was the president and owner of KND, and Janees Williams was KND's vice president.

Tax increment bonds are secured and repaid by incremental increases in property tax revenues, which are determined by the assessed values of properties in the project area.  The assessed values, in turn, are determined by the San Bernardino County Assessor's Office.  An accurate determination of assessed values is critical when offering these bonds.  Among other things, it is the amount of tax increment revenues that determines the size of the offering.   The SEC alleges that the municipal defendants (the Authority, the City, and Metzler), acting in concert with the underwriter defendants (KND, Kinsell and Williams), caused the tax increment revenues used to secure the bonds to be materially overstated.  Specifically, Metzler, Kinsell and Williams had obtained values from the assessor's office for four airplane hangars that had been constructed by Kinsell for the Authority, but the values were much lower than expected and threatened to tank a deal for desperately needed bridge financing.  The defendants concealed those values from the fiscal consultant

responsible for calculating the tax increment revenues and provided falsely inflated values instead.

Defendants' use of the inflated values caused the tax increment revenues to be materially overstated.  The amount of the inflation represented 36% of new collateral for the bonds, and allowed the Authority to fraudulently issue bonds without meeting the minimum debt service coverage ratio that was required, thus rendering the entire $13.3 million offering improper.

By engaging in this conduct, the SEC alleges that the Authority violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act of 1933 (the "Securities Act"), and that the City, Metzler, KND, Kinsell and Williams aided and abetted the Authorities' violation of Section 10(b) and Rule 10b-5.  The SEC further alleges that KND violated Section 17(a)(2) of the Securities Act in connection with the Authorities' 2006 –2008 bond offerings; that KND violated Section 15B(c)(1) of the Exchange Act and Municipal Securities Rulemaking Board Rules G-17 and G-27; that Kinsell aided and abetted each of these violations, and that Williams aided and abetted KND's violations of Section 15B(c)(1) and Rule G-17.  Therefore, by this action, the SEC seeks permanent injunctions, disgorgement with prejudgment interest and/or civil penalties against Defendants.  On a finding of liability, injunctive and monetary relief is determined by the Court, not the jury.

## II.   PLANTIFF'S CONTENTIONS OF FACT AND LAW

### A.   Summary Statement of Each Claim

Claim 1:  The Authority violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2). (FAC Claim 2).

Claim 2:  The Authority violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(b), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b). (FAC Claim 1)

Claim 3:  The City of Victorville, Metzler, KND, Kinsell, and Williams aided and abetted the Authority's violation of Section 10(b) of the Exchange Act and SEC

2

Rule 10b-5(b), 15 U.S.C. § 78t(e). (FAC Claim 7).

Claim 4:  KND violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2). (FAC Claim 4).

Claim 5:  KND violated Section 15B(c)(1) of the Exchange Act, 15 U.S.C. § 78o-4 and MSRB Rules G-17 and/or G-27.  (FAC Claim 8)

Claim 6:  Kinsell aided and abetted KND's violation Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17 and/or G-27). (FAC Claim 9).

Claim 7:  Williams aided and abetted KND's violation Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17 and/or G-27 (Williams Rule G-17 only).  (FAC Claim 9).

### B.    Elements Required to Establish Each Claim

#### 1.    Claim 1:    Violation of Section 17(a)(2) of the Securities Act.

To prove its claim that the Authority violated Section 17(a)(2) of the Securities Act, the SEC must establish, by a preponderance of the evidence that the Authority, in the offer or sale of securities, directly or indirectly: (1) obtained money or property; (2) by means of an untrue statement of material fact or by omitting a material fact necessary under the circumstances to keep the statement that was made from being misleading; (3) acted knowingly, recklessly or negligently; and (4) used a means or instrumentality of transportation or communication in interstate commerce or the mails as part of the offer or sale.  *See SEC v. Dain Rauscher, Inc.*, 254 F.2d 852, 856 (9th Cir. 2001) (violations of Section 17(a)(1) require a showing of scienter; violations of Sections 17(a)(2) and (3) may be predicated on negligence).

#### a.    Misrepresentation or Omission

A misrepresentation means a statement of fact that is false or misleading when it is made.  An omission is misleading it if affirmatively creates an impression of a state of affairs that differs in a material way from the one that actually exists.  This includes so-called "half-truths" – literally true statements that create a misleading impression if the context in which the statement was made caused the listener or

reader to remain unaware of the actual state of affairs.  A statement is misleading even if it is literally true if the context in which the statement was made caused the listener or reader to remain unware of the actual state of affairs.  Similarly, silence is misleading where the person had a duty to disclose information.

*See* Manual of Model Civil Jury Instructions for the Ninth Circuit, Nos. 6.3, 18.0, 18.2 (2007 ed.) (modified); Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir 2002) (a statement or omission is misleading it if "affirmatively creates an impression of a state of affairs that differs in a material way from the one that actually exists."); *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991) (a statement, although literally true, can be misleading).

### b.    Materiality

A misrepresentation concerning a security is material if there is a substantial likelihood a reasonable investor would consider the fact important in deciding whether to buy or sell that security. An omission concerning a security is material if a reasonable investor would have regarded what was not disclosed to the investor as having significantly altered the total mix of information the investor took into account in deciding whether to buy or sell the security. The question of materiality as to a statement or omission is an objective one, involving the significance of the misrepresented or omitted fact to a reasonable investor.  The assessment of materiality is based on the circumstances as they existed at the time of the statement or omission, not from the perspective of a reasonable investor with the benefit of hindsight.  *See* Manual of Model Civil Jury Instructions for the Ninth Circuit, No. 18.3 (2017 ed.) (modified); *Basic v. Levenson*, 485 U.S. 224, 231 (1988); *United States v. Tarallo*, 380 F.3d 1174, 1191 (9th Cir. 2004) *amended*, 413 F.3d 928 (9th Cir. 2005) ("It is also not a defense to charges of securities fraud and mail fraud that the victim may have been gullible or negligent. The laws against fraud are designed to protect the naive and careless as well as the experienced and careful."); *SEC v. Quan*,

Civ. No. 11-723 ADM/JSM, 2013 U.S. Dist. LEXIS 145146, *21 (D. Minn. Oct. 8, 2013) (information must be viewed from the perspective of a reasonable investor at the time the misrepresentation was made, not from the perspective of a reasonable investor with the benefit of hindsight) *citing Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir. 2003).

### c.    Knowing, Reckless, Negligence

An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. An act is also done knowingly if the defendant acts with deliberate ignorance.  A defendant is deliberately ignorant if he was aware of high probability that a fact existed yet deliberately avoided learning that fact.  However, a defendant is not deliberately ignorant if he actually believed that the fact did not exist, or was merely reckless or negligent in finding out that fact.

"Reckless" means highly unreasonable conduct that is an extreme departure from ordinary care, presenting a danger of misleading investors, which is either known to the defendant or is so obvious the defendant must have been aware of it.  A defendant may act recklessly where a defendant had no direct knowledge of the truth or falsity of his or her statements, and made the statements despite not knowing whether they were true or false.

"Negligence" may consist of either doing something a reasonably careful person would not do under like circumstances, or in failing to do something that a reasonable careful person would do under like circumstances.  In other words, negligence is the failure to use ordinary care, the care a reasonably prudent person would exercise under the same or similar circumstances.  In deciding whether this care was exercised in a given case, the conduct in question must be viewed in the light of all the surrounding circumstances as shown by the evidence.

*See* Manual of Model Civil Jury Instructions for the Ninth Circuit, No. 18.3 (2007 ed.) (modified); *Global-Tech Appliances, Inc. v. SEB, S.A.*, __U.S.__, 131 S. Ct. 2060, 2069 (2011) (setting forth deliberate ignorance standard in civil cases); *United*

1  *States v. Nosal*, 844 F.3d 1024, 1039-40 (9th Cir. 2016) ("We have repeatedly held

2  that a statutory requirement that a criminal defendant acted "knowingly" is "not

3  limited to positive knowledge, but includes the state of mind of one who does not

4  possess positive knowledge only because he consciously avoided it…. We have

5  equated positive knowledge and deliberate ignorance in upholding conspiracy

6  convictions and see no reason to distinguish aiding and abetting liability"); *United

7  States v. Heredia*, 483 F.3d 913, 918 (9th Cir. 2007) (internal citation and alterations

8  omitted); *United States v. Henderson*, 721 F.2d 276, 278 (9th Cir. 1983) ("[A] statute

9  requiring that the accused act with knowledge or knowingly is satisfied by proof

10  acted 'with an awareness of the high probability of the existence of the fact in

11  question.'"); *see also United States v. Jewell*, 532 F.2d 697, 700 (9th Cir. 1976) ("To

12  act 'knowingly,' therefore, is not necessarily to act only with positive knowledge, but

13  also to act with an awareness of the high probability of the existence of the fact in

14  question. When such awareness is present, 'positive' knowledge is not required.").

15  *See, e.g.*, *United States v. Ramos–Atondo*, 732 F.3d 1113, 1120 (9th Cir. 2013)

16  (holding the district court did not abuse its discretion by instructing the jury on a

17  theory of deliberate ignorance in the context of a conspiracy to import marijuana as

18  "'[t]he *Jewell* standard eliminates the need to establish such positive knowledge to

19  obtain a conspiracy conviction' " (alterations in original) (quoting *United States v.*

20  *Nicholson*, 677 F.2d 706, 711 (9th Cir. 1982)); *Aaron v. SEC*, 446 U.S. 680, 697

21  (1980); 3 KEVIN F. O'MALLEY ET AL., FEDERAL JURY PRACTICE AND

22  INSTRUCTIONS §§ 120.02 & 120.10 (5th ed. 2000);  Jury Instructions at 32-34,

23  *SEC v. Todd*, No. CV 03-2230 BEN-WMC (C.D. Cal. Mar. 7, 2007) (Docket No.

24  276); 4-82 Leonard Sand, et al., Modern Federal Jury Instructions—Civil, ¶ 82.02,

25  Instruction 82-8 (2013); *United States v. Prince*, 496 F.2d 1289, 1293 (5th Cir. 1974)

26  (affirming Section 10(b) conviction and noting that "direct proof of the appellant's

27  state of mind . . . is not required"); *United States v. LaPlante*, 714 F.3d 641, 644 (1st

28  Cir. 2013) (affirming a jury charge in which the district court explained that "direct

proof of intent . . . is not required; intent may be 'established by circumstantial evidence'").

### d.     Interstate Commerce

The term "interstate commerce" means trade or commerce in securities or any transportation or communication relating thereto among the several states.  An instrumentality of interstate commerce includes the postal mails, e-mails, telephone, telegraph, telefax, interstate highway system, Internet and similar methods of communication and travel from one state to another within the United States. *See* 15 U.S.C. § 77b(7); <u>Manual of Model Civil Jury Instructions for the Ninth Circuit</u>, No. 18.1 (2017 ed.).

### e.     Security

A security is an investment of money in a commercial, financial, or other business enterprise, with the expectation of profit or other gain produced by the efforts of others.  Some common types of securities are stocks and bonds. *See* 15 U.S.C. § 77b(1); <u>Manual of Model Civil Jury Instructions for the Ninth Circuit</u>, No. 18.1 (2017 ed.).

### f.     Offer or Sale

The term "offer" means any attempt or offer to dispose of or sell, or solicitation of an offer to buy.  In other words, an "offer" includes negotiations to sell, or attempts to produce the sale by urging or persuading another to act. The term "sale" means every contract of sale or disposition of a security, or interest in a security, for value. "Disposition" means a "final settlement or determination" of a matter, like transferring title. "For value" means "for money or something else valuable." *See* 15 U.S.C. § 77b(3).

### g.     Liability of Corporations and Other Entities

Entities, such as the Authority, the City, and KND  are considered to be persons.  Claims against entities can be predicated on the actions of individuals, as entities can only act through its officers, employees, or other agents.  Therefore, an

entity is responsible for the acts of its officers, employees, or other agents performed within the scope of their authority, whether express or implied. Thus, in determining whether an entity defendant has acted knowingly, recklessly or negligently, acts performed and knowledge acquired by the entity's officers, employees, or other agents in the scope of their authority may be imputed to the entity. In other words, if an individual defendant acted knowingly, recklessly or negligently, the entity defendant also acted knowingly, recklessly or negligently, where the individual defendant is acting within the scope of his authority, whether express or implied. *See* Manual of Model Civil Jury Instructions for the Ninth Circuit, Nos. 4.2, 4.4, 4.5, 4.8 (2017 ed.); Dkt. No. 405 at 67 (SJ Order "[c]laims against entities are always predicated on the actions of individuals. Thus, entities like the Authority can only "act" through its officers, employees, or other agents."); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972); *SEC v. Franco*, 253 F. Supp. 2d 720, 728 (S.D.N.Y. 2003) ("a person's knowledge can be attributed to a corporation in connection with actions which that person through his control causes the corporation to take."); *In re Parmalat Securities Litigation*, 684 F. Supp. 2d 453, 471 (S.D.N.Y. 2010) (acts performed and knowledge acquired by corporate agent within scope of employment may be imputed to the corporation). *SEC v. Sells*, No. C 11-4941 CW, 2012 WL 3242551, at *9 (N.D. Cal. Aug. 10, 2012) (holding that individual defendant's conduct and intent may be attributed to the company in determining whether company committed a primary violation that the individual defendant aided and abetted); *SEC v. Koenig*, No. 02 C 2180, 2007 WL 1074901, at *7 (N.D. Ill. Apr. 5, 2007) (same); *SEC v. Cohen*, No. 4:05CV371-DJS, 2006 WL 2225410, at *4 (E.D. Mo. Aug. 2, 2006) (same); *SEC v. Tourre*, 2014 WL 61864, at *6-7 (S.D.N.Y. Jan. 7, 2014) (negligence of employee may be imputed to corporation under doctrine of *respondeat superior*); Restatement (Third) of Agency, § 2.04 (2006); *see also id.*, 7.07 ("An employer is subject to vicarious liability for a tort committed by its employees acting within the scope of employment."); Restatement

(Second) of Torts § 283, "Conduct of a Reasonable Man: The Standard" (1965) (when the law has not specified a standard, the test is whether the actor's conduct meets a standard of reasonableness.

### 2.   Claim 2:   Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b)

To prove its claim that the Authority violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(b), the SEC must establish, by a preponderance of evidence, that the Authority, in connection with the purchase or sale of a security: (1) made an untrue statement of material fact or omitted a material fact necessary under the circumstances to keep the statement that was made from being misleading; (2) acted knowingly or recklessly; and (3) used any means or instrumentality of interstate commerce, or the mails, or any facility of any national securities exchange as part of the purchase or sale.

### a.   "In Connection With"

The term "in connection with" means some connection or relationship between the deceptive act or conduct and the sale or purchase of securities.  The fact finder is not required to find that the defendant actually participated in any securities transaction in order to find the deceptive conduct was in connection with the purchase or sale of securities.  Rather, it is enough if the defendant's conduct and the sale or purchase of securities coincide.

*See* Manual of Model Civil Jury Instructions for the Ninth Circuit, No. 18.1 (2017 ed.); *SEC v. Zandford*, 535 U.S. 813, 821-22 (2002) (the in connection with requirement must be read flexibly and broadly, and "[i]t is enough that the scheme to defraud and the sale of securities coincide"); *United States v. O'Hagen*, 521 U.S. 642, 656 (1997) (the in connection with requirement was met because "the securities transaction and the breach of duty . . . coincide[d];" Modern Federal Jury Instructions, Instr. 82-4.

### 3. __Claim 3:__ Aiding and abetting violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b)

To prove its claim that the City of Victorville, Metzler, KND, Kinsell, and Williams aided and abetted the Authority's violations of Section 10(b) and SEC Rule 10b-5(b), the SEC must establish, by a preponderance of the evidence, the following elements: (1) the Authority violated Section 10(b) and SEC Rule 10b-5(b); (2) the defendant had actual knowledge of the violation and his or her role in furthering it; and (3) the defendant provided substantial assistance in the commission of the violation by the Authority.

With respect to the second element, the SEC must prove that each of the individual defendants – Metzler, Kinsell, and Williams—knew that his or her role was part of an overall activity that is improper.  The SEC must prove that the defendants knew of the wrong, not that he or she knew that the primary violator (the Airport Authority) was violating the law.

With respect to the third element, "substantial assistance" means that the defendants' conduct was a substantial factor in causing the violations.  Substantial assistance includes participation in the editing of information for the purpose of marketing securities.  Substantial assistance may also be shown by silence or inaction.  However, for silence or inaction to constitute substantial assistance, you must find that the person had a duty to disclose or correct the information.  Such a duty arises upon possession of inside information or upon knowing assistance of or participation in a fraudulent scheme.  A duty of disclosure may also arise when the parties have a fiduciary or agency relationship, prior dealings or circumstances such that one party has placed trust and confidence in the other.  An issuer, and its officials and agents through which it acts, are generally responsible for the accuracy and completeness of the documents by which the securities will be sold, and that responsibility includes ensuring both material accuracy of what is said and the absence of material omissions.  Similarly, underwriters have a duty to correct

10

1   information in offering documents that they know, or are reckless or negligent in not

2   knowing, to be materially misleading.

3   *See* Section 20(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(e); *SEC v.*

4   *Tambone*, 550 F.3d 106, 145 (1st Cir. ), *vacated*, 573 F.3d 54 (1st Cir. 2009),

5   reinstated, in part, 697 F.3d 436 (1st. Cir. 2010) (allegation concerning third element

6   of aiding and abetting – defendant's knowledge and substantial assistance – satisfied

7   by defendant's failure to correct misleading disclosures in prospectuses, given their

8   duties as underwriters); *SEC v. Fehn*, 97 F.3d 1276, 1294 (9th Cir. 1996)

9   ("[s]ubstantial assistance includes participation in the editing of information for the

10  purpose of marketing securities.") (*quoting Molecular Technology Corp. v. Valentine*,

11  925 F.2d 910, 918 (6th Cir. 1991)); Dkt. No. 405 at 70 ("[s]ubstantial assistance may

12  be mere silence or inaction. However, a person must have a duty to disclose the

13  information for mere inaction to constitute substantial assistance.  Such a duty arises

14  upon possession of inside information or upon knowing assistance of or participation

15  in a fraudulent scheme.") (*quoting Strong v. France*, 474 F.2d 747, 752 (9th Cir.

16  1973)); *Roberts v. Peat Marwick, Mitchell & Co.*, 857 F.2d 646,653 (1988) (same)

17  *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 188-89 (9th Cir. 1987) ("Liability

18  may attach even though the aider and abettor assisted in the scheme only by silence or

19  inaction."); *United States v. Kessi*, 868 F.2d 1097, 1103 (9th Cir. 1989) ("[i]t is not

20  necessary for the SEC to show that the person acted in the offer or sale of securities

21  to be liable as an aider and abettor."); *Hamsen v. Smith*, 693 F.2d 932, 943 (9th Cir.

22  1982) (the secondary violator's duty to disclose may arise from a "knowing assistance

23  of or participation in a fraudulent scheme."); *Mendelsohn v. Capital Underwriters,*

24  *Inc.*, 490 F. Supp. 1069 (N.D. Cal. 1979) (same); *Paracor Fin., Inc. v. Gen. Electric*

25  *Capital Corp.,* 96 F.3d 1151, 1157 (9th Cir. 1996) ("A duty of disclosure may also

26  arise when  the parties have 'a fiduciary or agency relationship, prior dealings or

27  circumstances such that one party has placed trust and confidence in the other.'"); *see*

28

11

*also* Disclosure Roles of Counsel, at 8, 42, 77; Louis Loss & Joel Seligman, Securities Regulation 4798 (3d ed. 1992); SEC Final Rule 15c-2-12, 1989 Adopting Release, at n. 84. (accuracy and sufficiency of the disclosure document are the issuer's responsibilities); Manual of Model Civil Jury Instructions for the Ninth Circuit, No. 18.1 (2017 ed.); 15 U.S.C. § 77a(b)(11) (defining "underwriter"); 15 U.S.C. § 80-3(4) (same); *Dolphin and Bradbury Inc. v. SEC*, 512 F.3d 634, 641 (D.C. Cir. 2008) ("An underwriter must investigate and disclose material facts that are known or 'reasonably ascertainable.'"); *SEC v. Dain Rauscher*, 254 F.3d at 858 (holding that the underwriter "had a duty to make an investigation that would provide him with a reasonable basis for a belief that the key representations in the statements provided to the investors were truthful and complete" (citing *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977) *vacated and remanded*, 425 U.S. 929 (1976) (recognizing that an underwriter has a duty to investigate an issuer, and that a reckless failure to do so may give rise to 10b-5 liability)); *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 369-70 (2d Cir. 1973) (The Securities Act places upon underwriters "the primary responsibility for verifying the accuracy and completeness of information provided to potential investors."); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, Docket Nos. 15-1872-cv(L), 15-1874-cv(CON), 2017 U.S. App LEXIS 18803, *89 (2d Cir. Sept. 28, 2017) (if an underwriter encounters information that suggests a violation of the securities laws – so called "red flags" – reasonable care mandates that it examine them to determine if the offering documents contain a material falsehood and, if so, to correct it.); *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004) ("Congress recognized that underwriters occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering.  Congress believed that subjecting underwriters to the liability provisions would provide the necessary incentive to ensure their careful investigation of the offering" (*quoting The*

*Regulation of Securities Offerings*, Securities Act Release No. 7606A, 63 Fed. Reg. 67171, 67230 (Dec. 4, 1998)); *Pacific Dunlop Holdings v. Allen & Co.*, 993 F.2d 578 (7th Cir. 1993) (liability may be found where underwriter fails to correct misstatements contained in official statement); *United States v. United Medical and Surgical Supply Corp.*, 989 F.2d 1390, 1402-03 (4th Cir. 1993) (underwriter has duty to conduct a reasonable investigation of any security it recommends to investors); *Hanson v. Berthel Fisher & Co. Fin. Servs.*, No. 13-cv-67-LRR, 2014 U.S. Dist. LEXIS 72940 (N.D. Iowa, May 29, 2014) (underwriter is under a duty to conduct a reasonable investigation of the issuer's securities and the issuer's representations about it); *Shores v. M.E. Ratliff Inv. Co.*, 1982 U.S. Dist. LEXIS 10653 (N.D. Ala., Jan. 18, 1982) (an underwriter is under a duty to the investing public to make a reasonable investigation of the issuer of the bonds and to disclose material facts that it knew or that were readily ascertainable); MSRB Notice 2002-10 (Mar. 25, 2002) (MSRB Rule G-17 requires dealers to disclose to a customer at the time of trade all material facts about a transaction known by the dealer).

### 4. <u>Claim 4:</u> Violation of Section 17(a)(2) of the Securities Act

To prove its claim that KND violated Section 17(a)(2) of the Securities Act, the SEC must establish, by a preponderance of the evidence that KND, in the offer or sale of securities, directly or indirectly: (1) obtained money or property; (2) by means of an untrue statement of material fact or by omitting a material fact necessary under the circumstances to keep the statement that was made from being misleading; (3) acted knowingly, recklessly or negligently; and (4) used a means or instrumentality of transportation or communication in interstate commerce or the mails as part of the offer or sale.

These elements are the same as for Claim 1, discussed *supra*.

13

### 5.   Claim 5:   Violation of Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17 and G-27

To prove its claim that KND violated Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17 and/or G-27 the SEC must establish, by a preponderance of the evidence, that KND: (1) acted as a broker, dealer or municipal securities dealer; (2) violated MSRB Rules G-17 and/or G-27; (3) acted knowingly, recklessly, or negligently; and (4) used the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of any municipal security.

A broker buys and sells securities for clients, usually for a commission.  A broker can also be a dealer. A dealer buys securities and resells them to clients.  A dealer can also be a broker. A municipal securities dealer buys and sells municipal securities.

MSRB Rule G-17 requires KND, in the conduct of its municipal securities activities, to deal fairly with all persons and shall not engage in any deceptive, dishonest, or unfair practice.

MSRB Rule G-27 requires KND to supervise the conduct of the municipal securities activities of its employees to ensure compliance with Board rules. *See Dain Rauscher, Inc.*, 254 F.3d at 856 (identifying negligence as the standard by which MSRB Rule G-17 is evaluated); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc.*, Exchange Act. Rel. No. 40352, 1998 SEC LEXIS 1788, *37 (Aug. 24, 1998) (applying same standard to Rule G-17 violations as those of Section 17(a)(2) and (3) of the Securities Act).

### 6.   Claims 6 & 7:   Aiding and abetting violation of Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17 and G-27

To prove its claim that Kinsell and/or Williams aided and abetted KND's violations of Section 15B(c)(1) of the Exchange Act, the SEC must establish by a

preponderance of the evidence the following elements: (1) the existence of an independent primary violation by KND; (2) the defendant had actual knowledge of the violation and his or her role in furthering it; and (3) the defendant provided substantial assistance in the violation.

*See* 15 U.S.C. § 78(e); *DCD Programs, Ltd. v. Leighton*, 833 F.2d at 188-89; *Hamsen v. Smith*, 693 F.2d at 943; *SEC v. Sells*, No. C 11-4941 CW, 2012 WL 3242551, at *9 (holding that individual defendant's conduct and intent may be attributed to the company in determining whether company committed a primary violation that the individual defendant aided and abetted); *SEC v. Koenig*, No. 02 C 2180, 2007 WL 1074901, at *7 (same); *SEC v. Cohen*, No. 4:05CV371-DJS, 2006 WL 2225410, at *4 (same); *SEC v. Tourre*, 2014 WL 61864 at *6-7 (S.D.N.Y. Jan. 7, 2014); *DCD Programs, Ltd, v. Leighton*, 833 F.2d at 189 ("Liability may attach even though the aider and abettor assisted in the scheme only by silence or inaction.").

### C.    Brief Description of Key Evidence in Support of Each Claim

#### 1.    <u>Claim 1</u>:    Securities Act, Section 17(a)(2) Against the Authority

The key evidence in support of the SEC's claim against the Authority under Section 17(a)(2) will show:

##### a.    The Authority's Use of Tax Increment Bond Financings

The Authority is a joint powers agency controlled by the City.  The Authority had no power to levy taxes, and therefore relied on "tax increment bonds" to finance capital projects.  Tax increment bonds are secured, and payments on the bonds made, only with the incremental increase in property tax revenues over a base year value.

The property tax revenues used to secure and pay these bonds are based on the assessed values of the properties in the project area.  The assessed values, in turn, are determined by the San Bernardino County Assessor's Office.  Because the incremental increase in tax revenues used to secure and pay these bonds comes only from increases in the assessed values of property, an accurate determination of these

1    values is critical when offering these bonds.

2         Another key metric for investors is "the debt service coverage ratio," which

3    compares the source of payments on the bonds (the annual tax increment revenue) to

4    how much is owed each year on all outstanding bonds (the annual debt service).

5    Investors considered this coverage ratio to be the "crux of the deal."

6              **b.    The Authority's Bond Offerings**

7         The bonds that are the focus of this claim were issued in May 2008.

8    Information about this offering was provided to prospective investors in a preliminary

9    official statement, an official statement and a fiscal consultant report that was

10   attached to and incorporated into the preliminary and final official statements.

11        The fiscal consultant who wrote those reports was Rosenow Spevacek Group,

12   Inc. ("RSG").  RSG's report was a critical part of the disclosures to investors because

13   it, among other things, estimated the tax increment revenues that would be available

14   to secure the bonds based on increases in assessed value of property.

15        KND was the sole underwriter for Authority bonds.  Kinsell was KND's

16   president, and Williams was KND's vice president with day-to-day underwriting

17   responsibility.

18        The law firm Fulbright & Jaworski, LLP ("Fulbright"), served as the

19   Authority's bond counsel and co-disclosure counsel.  Fulbright partners Danny Kim

20   and Donald Hunt worked on Authority bonds.

21        Metzler served as the City's Director of Economic Development.  Metzler

22   played a critical role in the offerings and in the associated disclosures to investors. He

23   served as a member of an informal disclosure team for the issuance and offer of $400

24   million in tax allocation bonds, including the bonds issued by the Authority.  Both

25   with respect to the May 2008 bond offering, and in numerous prior offerings, Metzler

26   was the point person with primary responsibility for communicating for the Authority

27   with the fiscal consultant, the underwriter and disclosure counsel.

28

16

c.     **Authority's Financial Crisis and Short-Term Deutsche Bank Loan**

By early 2008, the City was in dire financial condition.  The City had pledged its tax increment revenues to the Authority for redevelopment projects at the airport. Fueled by the rapid growth in the housing market during the prior decade, the Authority had issued bonds with outstanding principal of over $269 million, requiring bond payments of over $17.6 million each year through 2043.  The tax increment revenues were the only source of payment of that debt.  But by late 2007, the housing market was in decline, and the City had committed to a $172 million contract for construction of power plant equipment that required a $50 million down-payment. The City had intended to fund the down-payment with proceeds from a bond offering in December 2007, but widespread panic in the bond market over declining property values and the subprime crisis had forced the Authority to substantially downsize the issue.

Faced with pressing needs for capital, the Authority turned to Deutsche Bank for a short-term bridge financing loan.  As part of this transaction, the Authority agreed to grant Deutsche Bank a forward bond purchase option that gave Deutsche Bank the right to require the Authority to issue new bonds, which would then be used to pay back the Deutsche Bank note.

Because the Authority had already reached its maximum limit for bond offerings with its December 2007 offering, the Authority could not issue new bonds unless it could find new construction and sales that would increase the assessed values.  Since Deutsche Bank was dependent on the Authority's ability to issue bonds to obtain repayment for the note, Deutsche Bank was concerned with whether new growth would provide sufficient bonding capacity to allow Deutsche Bank to be repaid.  The Authority's underwriter, Kinsell, induced Deutsche Bank to enter into negotiations with wildly inflated estimates for the assessed value of new construction to be added to the next equalized assessment rolls and that would give rise to new

bonding capacity that could be used to pay back the Deutsche Bank loan.

### d.  The Additional Bonds Test's 1.25 Debt Service Ratio

The Authority's ability to issue new bonds was limited by the "additional bonds test" in the indenture for its previously issued December 2007 bonds.  That test prohibited the Authority from issuing any new bonds on parity with the December 2007 offering unless the new bond offering had a debt service coverage ratio that was equal to or higher than 1.25 (as calculated in accordance with the test).  Since Deutsche Bank would be repaid only if the Authority could issue bonds that met that test, the amount of tax increment revenue that was available to support the issuance of new bonds was critical information to Deutsche Bank.

In calculating those revenues to determine that increment, the additional bonds test allowed the Authority to use pledged tax revenues that had already been included 2007-2008 rolls, plus additional revenues from estimated increases in assessed value from new construction that were expected to be included on the 2008-2009 rolls. Because the Authority had already bonded against the pledged tax revenues based on the assessed values on the 2007-2008 rolls, and because the 2008-2009 equalized rolls would not be released until August 2008, the only increase in assessed value— that is, the new bonding capacity—would be based solely on the new construction and sales in the area.

### e.  The Significant Shortfall in Assessed Property Values

Metzler took on the role of collecting information regarding the increase in assessed value expected from new construction.  Deutsche Bank required the City to confirm the expected increase in a certificate provided by Metzler.  To meet that requirement, Metzler personally contacted the assessor's office to obtain information as to the values that would be placed on the assessor's rolls for six significant construction projects:  TXI / Riverside cement plant, the Newell/ Rubbermaid facility, and four airplane hangars that had been constructed with bond proceeds by KND Affiliates, LLC a close affiliate of the underwriter.

1    Metzler quickly learned that the values from the assessor's office were

2    substantially lower than the values that Kinsell had originally represented to Deutsche

3    Bank.  The low assessed values raised serious concerns with Deutsche Bank, and

4    threatened to derail the deal.  For example, in December 2007, at the start of the bridge

5    financing negotiations, Kinsell had represented to Deutsche Bank that the TXI/

6    Riverside cement plant would add approximately $150-$200 million to the assessor's

7    rolls to be used to secure any new bonds.  But by January 2008, the assessor had

8    informed Metzler that the increase in assessed value would only be $41 million.  This

9    news sent Deutsche Bank representative Patrick Marsh into what KND Vice President,

10   Williams, described as "panic mood."  Williams attempted to calm Marsh by telling

11   him that the increased aggregate values from the four hangars would be $65 million,

12   and that Williams "had a call into" Metzler why the TXI values were so low.

13       But Metzler had already learned that the news on the assessed property values

14   was only getting worse.  Shortly after Metzler learned of the low TXI/ Riverside

15   values, the assessor informed him that the increased value of the Newell Rubbermaid

16   plant was only $14.1 million—much lower than the $60 million increase that Kinsell

17   had told Deutsche Bank at the start of the negotiations.  Even more alarming, the

18   assessor provided assessed values for the first two hangars that made clear that the

19   $65 million aggregate value could never be met.  Specifically, in an email dated

20   January 14, 2008, the assessor informed Metzler that hangars 1 and 2 had already

21   been assessed, and that their values were as follows:

22       Hangar 1:    2007-08 Assessed Value:  $3,945,000.

23                    2008-09 Assessed Value:  $4,023,900

24       Hangar 2:    2007-08 Assessed Value:  $4,834,000

25                    2008-09 Assessed Value:  $4,930,680

26   The assessor also noted that the other two hangars had not been assessed yet, and that

27   "[w]hen they are we will send you an email with the 2008-2009 assessed values."

28       The values provided by the assessor made clear that the hangars could not give

19

rise to a $65 million increase in assessed value on the 2008-2009 tax rolls. Because the Authority had already bonded against the 2007-08 rolls, it was the increase in assessed value that mattered. The aggregate increase in assessed value for the two hangars from 2007-08 to 2008-09 was only $175,580.

Further, the assessed values for hangars 1 and 2 did not bode well for the values that could reasonably be expected for hangars 3 and 4. Hangar 2 was the largest of the four hangars, and hangars 1, 3 and 4 were about the same size. If hangars 3 and 4 were valued the same as hangar 1, then total increase in assessed value for all of the hangars would have been only $8,223,380 (the $175,580 increase from hangars 1 and 2, and the total assessed values of 3 and 4 for 2008-2009)—well below the $65 million represented to Deutsche Bank.

The low hangar values were concerning for another reason. The Authority had used over $90 million in bond proceeds to fund the hangar construction, and Deutsche Bank had been involved in that financing. Although the Authority had originally contracted with another developer, the construction had been taken over in 2006 by Affiliates, a company controlled by KND president Kinsell. The assessed value of the hangars—which turned out to be only a fraction of the money that had been spent on their construction—had the potential to raise questions about the defendants' management of the project, further raising questions with Deutsche Bank's credit committee.

### f.     Metzler's Misleading Certificate to Deutsche Bank

Deutsche Bank required Metzler to prepare a spreadsheet with the expected increase in assessed value, and to certify that the values represented Metzler's best estimate as to the expected increase. Metzler provided the certificate on February 29, 2008.

Metzler included the values he had obtained from the assessor's office for the TXI Riverside plant and the Newell Rubbermaid facility, and based his certification as to the estimated increase in assessed values for those facilities on assessor values.

But rather than risking further panic by Deutsche Bank, Metzler did not provide the 2008-2009 values for the hangars. Instead, he included a $65 million figure for the total assessed values for the hangars that Metzler had obtained from KND and that purported to represent the construction cost of the hangars. From that he subtracted the values for the hangars that had already been included on the 2007-2008 equalized tax rolls, and represented that the expected increase in assessed value for all four hangars was $56,221,000.

But Metzler did *not* disclose in his certificate or in his spreadsheet that the assessor had *already* provided 2008-2009 assessed values for hangars 1 and 2, and that the values did not support an aggregate valuation of $65 million. Had he included those numbers, it would have been obvious that the $56.2 million increase in assessed value could not be reached. Since the increase in assessed values for hangars 1 and 2 was *de minimis*, almost the entire $56 million increase would have to come from hangars 3 and 4. The 2008-2009 assessed values for hangars 1 and 2 made it clear that was impossible.

Metzler falsely certified that the values represented Metzler's best estimate of the increase in assessed values. His certificate also implied that the assessor had not yet provided any values for 2008-2009 by stating that it was "*possible* that the actual assessed value by the Assessor's Office could be adjusted." But that was not true— the assessor had *already* told Metzler that the increase in assessed values for hangars 1 and 2 would only be $175,580. Moreover, although his certificate noted that the "hangars aggregate" values were based on "construction costs," Metzler did *not* disclose that the actual values that Metzler had received from the assessor's office had made the construction costs an *unreasonable* basis for estimating the assessed values of the hangars.

All of this was material information. Deutsche Bank representative Patrick Marsh testified that he would have expected Metzler to disclose the values from the assessor's office and that the assessed values of the hangars would have raised

21

questions with the Bank's credit department.  Similarly, the Authority's disclosure counsel testified that Metzler's spreadsheet was misleading, and that had they known of the assessor email, they would have required Metzler to include those numbers in the spreadsheet and certificate.

### g.    RSG's Reliance on Metzler's False Estimates

As a further condition of closing, Deutsche Bank required RSG, the Authority's fiscal consultant, to certify the tax increment revenue figure that would be available for bonding under the terms of the additional bonds test imposed by the December 2007 indenture.  As Metzler's certificate expressly acknowledged, RSG relied on the values in Metzler's spreadsheet in calculating the tax increment figure in accordance with the additional bonds test from the December 2007 bond indenture. Specifically, Metzler certified that the 2008-2009 values in his spreadsheet "are included in the value certified by RSG … for the purpose of determining revenues as a function of the additional bonds test."

Based on those values—which included the inflated $65 million—Michael Benjamin of RSG calculated the tax increment revenue to be $22,606,356, of which $22,052,104 had already been bonded against in the prior offerings.  That is, only $554,262 of tax increment revenue was available to support the issuance of anymore new bonds by the Authority.  RSG certified the number as part of the closing of the private placement transaction, and Benjamin provided back up charts and a memorandum explaining the methodology to Metzler.  *Id.* 141, 165.

### h.    Metzler's Continued Communications with the Assessor's Office

The private placement closed on February 29, 2008.  The parties knew that Deutsche Bank could exercise its forward bond option at any time.  So Metzler continued to follow up with the assessor's office regarding the assessed values for hangars 3 and 4, urging KND to provide construction costs to the assessor in the hopes of persuading the assessor to arrive at a higher value for hangars 3 and 4 than

had been assigned for hangars 1 and 2.  But construction costs are just one factor among many that the county assessor's office used to determine the assessed value of property fairly and consistently for all taxpayers.

On March 10, 2008, *after* construction costs for hangar 3 had already been provided to the assessor, Metzler received notice from the assessor's office as to the assessed value of hangar 3.  The assessor's notice stated that the assessed value for hangar 3 was only $9,483,260.  The assessor also told Metzler that "[i]f I do not hear anything else, in the next 2 weeks.  I will be assessing the other hangar with the same valuation.  Both hangars are identical."

Metzler directed his assistant to forward this notice to Williams with a note saying:  "FYI . . . lower than we expected."  Williams forwarded that email to Kinsell and KND Affiliates Ray Bishop with a notice saying: "FYI we need to get this done this week."  Metzler's email shows that he, Kinsell and Williams all knew the assessor's values were coming in lower than expected and that they did not support the $56.2 million increase in assessed value that had been provided to RSG.  Based on the notices from the assessor's office, the combined increase in assessed value for hangars 1, 2 and 3 totaled $9,661,260.  For the $56.2 million value to be met, hangar 4 would have had to have been valued by the assessor at $46,559,740, of which there was *no* possibility.

### i.     Deutsche Bank's Exercise of its Option and RSG's Preparation of its Fiscal Consultant Report for the New Bonds

On April 3, 2008, just over a month after the private placement closed, Deutsche Bank exercised its option, requiring the Authority to issue bonds within 30 days.  The day after receiving notice of Deutsche Bank's exercise, RSG circulated a fiscal consultant report that purported to estimate the tax increment figures in accordance with the additional bonds test.  Because the assessor rolls had not been equalized after the December 2007 bonds were issued, RSG did not create an entire new report, but

instead attached a supplement to the report that had been used in the December 2007 offering.  The supplement consisted of charts that had been prepared and provided to Metzler in connection with the private placement offering.  These charts showed that the estimated increased value due to new development in the airport subarea was $111,309,322.

The $111.3 million and other new development figures came solely from Metzler.  The $111.3 million figure is the same number that Metzler had provided to RSG for the private placement, and was based on the $41 million increase due to the TXI/ Riverside plant, the $14.1 million increase due to the Newell Rubbermaid facility, and the $56.2 million purported increase for the four hangars (based on an overall hangar valuation of $65 million).

The tax increment revenues as calculated by RSG were $22,606,366, of which $22,052,104 had been bonded against in prior offerings.  Thus, the new bonding capacity for the May 2008 bonds was only $554,262, of which $307,496—more than half—was attributable to the hangars.

Moreover, in its single explanatory paragraph in the supplement report, RSG's supplement stated that the added value due to new development – the $111.3 million figure -- had been based on "*building permits* completed between September 2007 and December 2007" that had not been included in the December 2007 report (emphasis added).  Michael Benjamin, the RSG representative who created the charts, had understood, consistent with past practice, that the $111,309,322 figure provided by Metzler had been based on building permit values.  However, Metzler knew that the numbers that he had provided to RSG were not based on building permit values.  The hangars' aggregate permit values were only $12.4 million, representing an aggregate increase of assessed values for the hangars of only $3.6 million (as compared to the $56.2 million that was used).

### j. The Resulting Misleading Investor Disclosures

The fiscal consultant report was circulated to the Authority's financing team,

24

including Metzler.  RSG required the issuer to review and approve its report, and, consistent with long-standing practice, RSG expected that this review and approval to come from Metzler.

The tax increment revenue calculated by RSG was incorporated into the debt service coverage table in the Authority's preliminary official statement, and used to calculate the 1.25 debt service coverage ratio that determined compliance with the additional bonds test.  The 1.25 debt service coverage ratio was also the basis for the sizing of the bonds.  The Authority's preliminary official statement specifically stated that RSG's estimates were "based on assumptions which the Authority believe[d] to be reasonable."  Because the preliminary official statement was issued by the Authority, the Authority had to review and approve it before it could go to print and be used to pre-market the bonds to investors.  Metzler provided the Authority's approval on April 16 and 17, 2008.  The preliminary official statement was finalized, and the final official statement was provided to Metzler in early May.

Nowhere in the fiscal consultant report, the preliminary official statement, or the official statement was there any disclosure that any portion of the new development numbers was based on construction costs—let alone construction costs provided by the underwriter.  Instead, the only explanation for the source of the new bonding capacity was the representation that the figures were based on building permit values that constituted a conservative estimate of the ultimate assessed value.

### k.    The Authority Acted Knowingly or Recklessly, or at a Minimum, Negligently

The Authority claims that it cannot point to a single City or Authority employee who reviewed the fiscal consultant report, preliminary official statement or official statement.  Further, despite the Authority's express representation that RSG's estimate of future revenues were based on assumptions that the Authority believed to be reasonable, the Authority claims that it cannot identify a single City or Authority employee who took any action to determine the reasonableness of RSG's

1  assumptions.

2      Although defendants claim Metzler had little to no role in reviewing the

3  investor disclosures, the evidence will establish that Metzler was on actual notice that

4  the tax increment revenue figures in the May 2008 disclosures continued to rely on

5  construction costs for the hangars, and not the assessor's assessed values.  Not only

6  were the charts and values the same as the ones that had been prepared less than two

7  months before in connection with private placement, Metzler was also expressly

8  informed that the $65 million aggregate value was still being used in an email from

9  Janees Williams sent on April 16, 2008.

10     Other communications show Metzler's interest in and concern with the

11 assessed value of the hangars at precisely the time he was asked to approve and sign

12 off on the preliminary official statement. After receiving Williams' email on April 16,

13 2008, Metzler's office contacted the assessor's office, at Metzler's direction and on

14 Metzler's behalf, to ask how the assessor had arrived at the assessed values for the

15 hangars.  When the assessor responded the next day, Metzler asked his assistant to

16 print out the assessor's response, and to "keep it handy."  The printout included the

17 assessed values for the four hangars that had previously been provided with Metzler.

18 Also, shortly after Metzler signed off on the preliminary official statement, Williams

19 forwarded Standard & Poor's the very spreadsheet that Metzler had created in the

20 private placement to provide a breakdown of the new development figures. Metzler

21 was copied on that email.

22     Despite being on notice that RSG was still relying on his inflated figures, and

23 despite his contemporaneous communications with the assessor's office showing that

24 Metzler had in mind the assessor values when he reviewed and signed off on

25 disclosure documents, Metzler did not provide the values from the assessor's office to

26 RSG or to disclosure counsel, and did not even raise the issue with them.   Each of

27 these witnesses are expected to testify that they would have expected Metzler to

28 provide the information based on Metzler's role in this and previous bond offerings.

Benjamin, the RSG representative responsible for calculating the tax increment revenues, is expected to testify that he felt "misled" by Metzler since Metzler had failed to provide the hangar values that Metzler had received from the assessor.

Nor did Metzler correct RSG's erroneous statement that the new development figures were based on building permit values, despite the fact that Metzler had provided $65 million value and knew full well that it was not based on building permits. Informing RSG that the values were not based on building permits would have elicited further questions from RSG, and ultimately would have led to the reduction of tax increment revenues.

Thus, Metzler had the relevant information but, acting knowingly, recklessly, or, at a minimum, negligently, failed to ensure that the important tax increment and additional bond test calculations used this information for purposes of the disclosures to the investors. And since, according to defendants, no one else at the Authority reviewed the disclosure documents, the Authority, acted knowingly, recklessly, or, at a minimum, negligently, based on Metzler's conduct in providing the $65 million hangar value to RSG, by his failure to provide information from the assessor's office that demonstrated the falsity of the $65 million value, and by allowing bonds to be issued that incorporated the falsely inflated values.

### l.    The Material Impact of the Authority's Negligent Disclosures

The tax increment revenues as calculated by RSG were $22,606,366, of which $22,052,104 had been bonded against in prior offerings. Thus, the new bonding capacity for the May 2008 bonds was only $554,262, of which $307,496—more than half—was attributable to the hangars.

Had Metzler had provided the assessor values to RSG and Fulbright, the new bonding capacity would have been much lower. Benjamin is expected to testify that if Metzler had provided the assessor's emails. Benjamin would have used the assessor values for hangars 1, 2 and 3, and would have used permit values for hangar

4, resulting in a total increase in assessed value of $12.3 million (as opposed to $56.2 million).  But even if hangar 4 were valued the same as hangar 3, the total increase in assessed value would only be $18.9 million. Similarly, Fulbright lawyers Kim and Hunt are expected to testify that, if Metzler had provided them with the assessor's emails, they would have required the values from the assessor's office to be used in the calculation, and not the $56.2 million based on construction costs.

Using the assessor's numbers would have resulted in a reduction of at least $200,000, or 37% of the $554,252 in new bonding capacity. More significantly, use of the overinflated values meant that the debt service coverage ratio required by the additional bonds test had not been met, and the Authority's issuance of $13.3 million in tax increment bonds was invalid.

Metzler was on actual notice that the bonds had been sized in such a way that any overstatement of revenues meant that the additional bonds test had not been met. Shortly before the bonds were issued, Williams had sent a memorandum to Metzler and other members of the financing team, telling them that the offering had to be downsized by a small amount because the ratio had been 1.2498 and the additional bonds test did not permit rounding.  The bonds had been sized—down to the penny— to just clear the required 1.25 threshold.

By using the inflated hangar valuations, the Authority issued bonds in violation of the additional bonds test, putting the parity position of bonds at risk.  It is undisputed that the bonds could not be issued without compliance with the test.  At best, had the correct values been used, the issuance would have had to have been downsized by at least $2.5 million (if it could have been issued at all).  But that was not done, and thus the entire issuance was in violation of the test.

- **Fact witnesses.**  The following fact witnesses (among others as the need may arise) will testify about the May 2008 bond offering and related matters:

    o   Miles Benickes

    o   Michael Benjamin

1        o        Ray Bishop

2        o        Andre de Bortnowsky

3        o        Edward English

4        o        Jim Hayes

5        o        Aaron Hodgdon

6        o        Donald Hunt

7        o        William Jayne

8        o        Kevin Johansen

9        o        Danny Kim

10       o        J. Jeffery Kinsell

11       o        Patrick Marsh

12       o        Keith C. Metzler

13       o        Steven Peterson

14       o        Jon Roberts

15       o        Kathleen Rosenow

16       o        John Sullivan

17       o        Jennifer Thompson

18       o        Janees L. Williams

19   •   **Expert witnesses.**

20       o        Robert Doty

21       o        Dan Levenson

22       o        James Pike

23       o        David Schey

24   •   **Documents.**

25       The key documents the SEC intends to rely upon include of the May 2008 bond

26   offering documents and drafts thereof; documents concerning the Deutsche Bank

27   private offering and draft thereof; documents concerning the December 2007 bond

28   offering and draft thereof; and written and electronic communications between the

29

defendants and fact witnesses described above.

### 2.    Claim 2:    Exchange Act, Section 10(b) and SEC Rule 10b-5

The key evidence in support of the SEC's claim against the Authority under Section 10(b) and SEC Rule 10b-5(b) is substantially the same as the evidence in support of its Section 17(a)(2) against the Authority, *see supra*.

### 3.    Claim 3:    Aiding and Abetting Violation of Exchange Act, Section 10(b) and SEC Rule 10b-5

The key evidence in support of the SEC claim against the City, KND, Metzler, Kinsell and Williams for aiding and abetting the Authority's violation of Section 10(b) and SEC Rule 10b-5(b) is substantially the same as the evidence in support of its Section 17(a)(2) against the Authority, see *supra*.

In particular, the City and Metzler aided and abetted the Authority's violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) thereunder, as Metzler had actual knowledge of the misrepresentations and omissions in the Official Statement for the May 2008 bonds.  As the Authority and the City admit in their Wells submissions, Metzler acted as their agents with regards the May 2008 bond offering, he sat on the disclosure committee, reviewed and commented on bond documents, met with rating agencies concerning the Authority's bonds, met with investors concerning the Authority's bonds, and was viewed as the point person for the Authority's bonds by KND and Disclosure Counsel, who required Metzler's sign-off on the Official Statements before proceeding.  The Authority's Executive Director tasked Metzler with providing valuation dates to the Fiscal Consultant (RSG) and reviewing the Official Statements for accuracy.  The Authority's Executive Director also relied on Metzler's due diligence concerning the valuation of the hangars.

Like Metzler and the City, KND, Kinsell and Williams also aided and abetted the Authority's primary violation of Section 10(b) and Rule 10b-5(b) in connection with the May 2008 bond offering.  Kinsell and Williams each had knowledge of the tax increment misrepresentations and omissions since they each received emails

stating that the hangars had been assessed at an amount significantly lower than the $65 million valuation used to size the May 2008 bonds.  Williams was on the Authority's unofficial disclosure committee and she and Kinsell reviewed and commented on the draft Official Statements, the Fiscal Consultant's reports, indentures, and other documents related to the May 2008 bonds.  Williams sized the May 2008 bonds, and using the tax increment amount provided by RSG, prepared the debt service schedule in the Official Statement, which set forth the misstated annual debt service ratios.  Williams also met with Kinsell on a daily basis about the bonds and copied him on key emails concerning the valuation of hangars.  KND Affiliates received $10.4 million in proceeds from the Private Placement, a substantial portion of which KND and Kinsell misappropriated.  This provided a powerful motive for the actions of KND, Kinsell and Williams in overstating the hangar values.

### 4.  <u>Claim 4</u>:     Section 17(a)(2) Against KND

The SEC has already obtained summary judgment against KND on it Section 17(a)(2) claim, and against KND and Kinsell on its related Section 15B(c)(1) claim, relating to their failure to disclose the receipt of bond proceeds in the May 2008 bond offering.  *See* Dkt. No. 405 at 83.  Accordingly, the remaining portion of this claim that remains to be tried relates to KND's and Kinsell's misstatements and omissions with respect to the valuation of the hangars.  The evidence relating to that portion of this claim has been summarized under Claim 1, see *supra*.

### 5.  <u>Claim 5</u>:     Exchange Act, Section 15B(c)(1)

The SEC has already obtained summary judgment against KND on it Section 17(a)(2) claim, and against KND and Kinsell on its related Section 15B(c)(1) claim, relating to their failure to disclose the receipt of bond proceeds in the May 2008 bond offering.  *See* Dkt. No. 405 at 83.  Accordingly, the remaining portion of this claim that remains to be tried relates to KND's and Kinsell's misstatements and omissions with respect to the valuation of the hangars.  The evidence relating to that portion of this claim has been summarized under Claim 1, see *supra*.

1          **6.**    <u>**Claims 6 & 7**</u>:    **Aiding and Abetting Violation of Section**

2          **15B(c)(1)**

3    The SEC has already obtained summary judgment against KND on it Section

4    17(a)(2) claim, and against KND and Kinsell on its related Section 15B(c)(1) claim,

5    relating to their failure to disclose the receipt of bond proceeds in the May 2008 bond

6    offering. *See* Dkt. No. 405 at 83. Accordingly, the remaining portion of this claim that

7    remains to be tried relates to KND's, Kinsell's and Williams' misstatements and

8    omissions with respect to the valuation of the hangars. The evidence relating to that

9    portion of this claim has been summarized under Claim 1, see *supra*.

10       **D.**   **Anticipated Evidentiary Issues**

11         **1.**    **Plaintiff's *In Limine* Motions**

12   The SEC has filed eight *in limine* motions: (1) to exclude opinions of the

13   Municipal Defendants' expert Dr. Glenn Meyers; (2) to exclude certain opinions of

14   the KND Defendants' expert Joseph Carney; (3) to exclude testimony of Michael

15   Heddon and evidence and argument that the assessor's valuation of the hangars was

16   flawed;  (4) to bar any reference to the value of the TXI Riverside cement plant; (5)

17   to exclude inadmissible evidence and improper argument during the trial; (6) to

18   preclude the KND Defendants from arguing KIND was not the underwriter of the

19   May 2008 bonds; (7) to preclude evidence or argument that Defendants relied on the

20   advice of counsel; and (8) to exclude defendants' prior statements.

21         **2.**    **Defendants' *In Limine* Motions**

22   The Authority, the City and Metzler have filed ten *in limine* motions: (1) to

23   exclude "habit evidence; (2) to exclude evidence re bond defaults; (3) to exclude

24   evidence re international trips; (4) to exclude certain testimony of the SEC's experts

25   Dana Levenson, Robert Doty and David Schey; (5) to exclude the valuation opinion

26   of SEC expert James Pike; (6) to exclude certain testimony of SEC expert Dana

27   Levenson; (7) to exclude certain investigative testimony; (8) to exclude certain

28   witnesses lacking personal knowledge from testifying; (9) to exclude certain

improper testimony; and (10) to conduct the trial in phases.

The Municipal Defendants have also sought leave to file an *ex parte* motion for judgment on the pleadings.  Dkt. 437.  Although the *ex parte* application was denied, the Court set a briefing schedule for the SEC to address the substantive arguments advanced in the Municipal Defendants' application. Dkt. No. 466.

**E.    Issues of Law**

**1.    The Defendants Violated Multiple Federal Securities Laws**

The evidence will show that the Authority violated Section 17(a)(2) of the Securities Act by obtaining money or property by means of material false statements and omissions in the May 2008 Official Statement, including in the debt service schedule and the fiscal consultant supplement, regarding the tax increment revenues available to repay the May 2008 bond offering and the projected annual debt service ratio for every bond year after 2008.  The evidence will also show that the Authority violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, by making material false statements and omissions in the May 2008 Official Statement, including the debt service schedule and fiscal consultant supplement, regarding the tax increment revenues available to repay the May 2008 bond offering and the projected annual debt service ratio for every bond year after 2008.  The evidence will also show the City of Victorville, Metzler, KND, Kinsell, and Williams aided and abetted the Authority's violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) in connection with the Authority's May 2008 bond offering.

The Authority and the City are liable based on their acts and omissions of their agent, Keith Metzler. Similarly, KND is liable based on the acts and omissions of their agents, Kinsell and Williams. *See, e.g.,* Dkt. No. 405 at 67 (SJ Order "[c]laims against entities are always predicated on the actions of individuals. Thus, entities like the Authority can only "act" through its officers, employees, or other agents.").

The evidence will also establish that the statements contained in the May 2008 Official Statement were materially misleading.  Information is material if there is a

1    substantial likelihood that a reasonable shareholder would consider the information

2    important in making investment decisions.  *See Basic v. Levinson*, 485 U.S. at 231-32.

3    The Ninth Circuit has adopted an objective test for determining materiality.  That is, a

4    court must assess whether the information would have been considered important by a

5    reasonable investor.  *Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb,*

6    *Inc.*, 769 F.2d 561, 565 (9th Cir. 1985); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1306

7    (9th Cir. 1982); *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1201 (C.D. Cal. 2004).

8    Materiality is a mixed question of law and fact.  *TSC Indus. v. Northway*, 426 U.S. 438,

9    450 (1976); *see also Fecht v. Price*, 70 F.3d 1078, 1081 (9th Cir. 1995).

10         By using the inflated hangar valuations, the Authority issued bonds in violation

11   of the additional bonds test, putting the parity position of the bonds at risk.  It is

12   undisputed that the bonds could not be issued without compliance with the test.  At

13   best, had the correct values been used, the issuance would have had to have been

14   downsized by at least $2.5 million (if it could have been issued at all).  But that was

15   not done, and thus the entire issuance was in violation of the test.

16         The evidence will also establish that Metzler acted knowingly, recklessly and/or

17   negligently, and that his conduct and mental state can be imputed to both the Authority

18   and the City.  For the jury to find the Authority liable under Section 17(a)(2) they are

19   only required to find Metzler, the Authority's agent, was negligent.  The evidence will

20   establish that Metzler knew, or was reckless or negligent in  not knowing that RSG

21   used his previous $65 million valuation for the hangars for several reasons, including:

22   (1) Metzler knew that RSG used his $65 million number in connection with the

23   February 2008 private placement; (2) RSG's report used in that placement stated that

24   "new development" for the Authority project area totaled $111,309,322; (3) the same

25   amount was used in the RSG supplement Williams sent to Metzler on April 14, 2008;

26   (4) Metzler reviewed, or was reckless or negligent in not reviewing, the RSG report

27   attached to Williams' email, and recognized the same $111,309,322 figure, or was

28   reckless or negligent in not doing so; (5)  Williams referred to the $65 million in

34

construction costs in an email sent on April 16, 2008, regarding conversation with investors; (6) Metzler's instructions to his assistant, Jennifer Thompson, to contact the assessor's office regarding its methods for valuation of the hangars reflect his concerns over the valuation and that the assessor was not using construction costs as a basis for valuation.  This and other evidence will demonstrate that Metzler either knew, or was reckless or negligent in not knowing that his prior values given to RSG were used in connection with the May 2008 offering, and that such values materially misstated the assessor's valuation of the hangars.

The Authority may also be independently liable under Section 17(a)(2), regardless of Metzler's conduct, for failing to implement or follow reasonable procedures to  ensure that the disclosures relating to the May 2008 bond offering were true and correct.

In addition to Metzler, the evidence will also establish that KND, Kinsell and Williams aided and abetted the Authority's violation of Section 10(b) and Rule 10b-5(b), and also violated Section 15B(c)(1) and related MSRB rules, as both Kinsell and Williams also knew the assessor's valuation of the hangers did not support Authority's statements contained in the May 2008 Official Statement, including the debt service schedule and the  fiscal consultant supplement, regarding the tax increment revenues available to repay the May 2008 bond offering and the projected annual debt service ratio for every bond year after 2008.

## 2.     The SEC Is Entitled To The Relief It Seeks

### a.     Permanent injunctions are appropriate

To obtain an injunction, the SEC must establish that there is a reasonable likelihood of future violations.  *See SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).  Whether a likelihood of future violations exists depends upon the totality of the circumstances.  *Id.*  The existence of past violations may give rise to an inference that there will be future violations.  *Id.*  Courts also consider factors such as the degree of scienter involved, the isolated or recurrent nature of the violative conduct, the

1    defendant's recognition of the wrongful nature of the conduct, the likelihood that,

2    because of the defendant's occupation, future violations may occur, and the sincerity

3    of defendant's assurances (if any) against future violations. *See Murphy*, 626 F.2d at

4    655. Based on the anticipated evidence to be presented at trial, all of the above factors

5    are present, making permanent injunctions appropriate.

### b. Disgorgement should be ordered

7    Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to

8    deter others from violating securities laws by making violations unprofitable; a

9    district court has broad equity powers to order the disgorgement of ill-gotten gains

10   obtained through violation of the securities laws. *SEC v. Platforms Wireless*, 617

11   F.3d 1072, 1096 (9th Cir. 2010); *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191

12   (9th Cir. 1998). "The amount of disgorgement should include all gains flowing from

13   the illegal activities." *See SEC v. Platforms Wireless*, 617 F.3d at 1096, *quoting SEC*

14   *v. JT Wallenbrock*, 440 F.3d 1109, 1114 (9th Cir. 2006).

15   The SEC need only present evidence of a "reasonable approximation" of the

16   defendant's ill-gotten gains. *See Platforms Wireless*, 617 F.3d at 1096; *JT*

17   *Wallenbrock*, 440 F.3d at 1113-14. The burden then shifts to the defendant to

18   "demonstrate that the disgorgement figure was not a reasonable approximation."

19   *Platforms Wireless*, 617 F.3d at 1096, *quoting SEC v. First City Financial Corp.,*

20   *Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989).

21   With respect to the Authority, the amount of ill-gotten gain is the amount of the

22   bond offering, or $13.3 million. With respect to KND and Kinsell, the amount of the

23   ill-gotten gain on the offering fraud claim on which the SEC has already prevailed is

24   $133, 349, the amount of the underwriting fees that KND received in connection with

25   the May 2008 bond the offering. Kinsell is jointly and severally liable for that amount.

26   The SEC does not have claims for disgorgement against Metzler or Williams.

27   Additionally, disgorgement normally includes prejudgment interest to insure that

28   wrongdoers do not profit from their illegal conduct, which may be calculated based on

the rate provided in 26 U.S.C. § 6621 for tax underpayments.  *See Platforms Wireless*, 617 F.3d at 1099.

### c.    Remedies Act civil penalties should be imposed

The federal securities statutes set forth three tiers of penalties.  If the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons" a third tier penalty may be imposed.  *See* Section 21(d)(3)(B)(iii) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(B)(iii).  The factors used to determine the appropriateness of an injunction are helpful when assessing penalties.  *SEC v. Abacus International Holding Corp.*, [2001 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 91,542, 2001 U.S. Dist. LEXIS 12635, 2001 WL 940913, *5 (N.D. Cal. August 16, 2001).

### F.    Bifurcation of Issues

All relief is to be determined by the Court.  To the extent that all of the evidence that would be necessary for the SEC to prove its entitlement to the relief it seeks is not presented to the jury, the SEC requests the bifurcation of liability and relief in order to provide additional facts and law in support of the remedies it seeks.

### G.    Jury Trial

The issue of liability for the SEC's claims is triable to a jury as a matter of right.  Defendants have made a jury demand.

All relief is to be determined by the Court.  Injunctive relief is equitable, and disgorgement is a form of injunctive relief.  The Court, not the jury, must therefore determine whether injunctive and disgorgement relief is appropriate.  *See SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993) (no right to jury trial in SEC action seeking injunctive and disgorgement relief).

Finally, although the Seventh Amendment grants Defendants the right to a jury trial on those claims for which the SEC seeks imposition of a civil penalty, that right is limited to a determination of their liability.  The Court must determine the amount of the

penalty, if any. *Tull v. United States*, 481 U.S. 412, 427 (1987).

**H.    Attorney's Fees**

The SEC does not seek attorneys' fees in this action.

**I.    Abandonment of Issues**

The SEC has stipulated to the dismissal of its claims against Kinsell, KND and KND Affiliates for violations of Section 10(b)/Rule 10b-5(a) and (c) and Section 17(a)(1) and (3); otherwise, it is not abandoning any of the claims in its Complaint. As noted previously, the SEC has already obtained summary judgment against KND on it Section 17(a)(2) claim, and against KND and Kinsell on its related Section 15B(c)(1) claim, relating to their failure to disclose the receipt of bond proceeds in the May 2008 bond offering. *See* Dkt. No. 405 at 83. As such, the SEC does not intend to adduce any evidence at trial in its case-in-chief with respect that portion of its Section 17(a)(2) claim, and its related Section 15B(c)(1) claim.


Dated:  January 5, 2018                          Respectfully submitted,

                                                 */s/ Amy Jane Longo*
                                                 Amy Jane Longo
                                                 Kristin S. Escalante
                                                 Douglas M. Miller
                                                 Donald W. Searles
                                                 Attorney for Plaintiff
                                                 Securities and Exchange Commission

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On January 5, 2018, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S AMENDED MEMORANDUM OF CONTENTIONS OF FACT AND LAW [L.R. 16-4]** on all the parties to this action addressed as stated on the attached service list:

☐   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐   **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐   **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐   **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐   **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒   **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐   **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  January 5, 2018                    */s/ Amy Jane Longo*
                                          Amy Jane Longo

*SEC v. City of Victorville, et al.*
**United States District Court—Central District of California**
**Case No. 5:13-cv-00776-JAK-KK**

## <u>SERVICE LIST</u>

Terree A. Bowers, Esq.
*terree.bowers@arentfox.com*
Alexander Stephenson Birkhold, Esq.
*alexander.birkhold@arentfox.com*
Jerrold E. Abeles, Esq.
*jerry.abeles@arentfox.com*
Karen Peters-Van Essen, Esq.
*vanessen.karen@arentfox.com*
Arent Fox LLP, Attorneys at Law
Gas Company Tower
555 W. Fifth Street, 48th Floor
Los Angeles, CA 90013

Peter V. B. Unger, Esq.
*peter.unger@arentfox.com*
Arent Fox LLP, Attorneys at Law
1717 "K" Street, N.W.
Washington, DC 20006
*Attorneys for Defendants City of
Victorville and Southern California
Logistics Airport Authority*

Randall S. Polycn, Esq.
Randall.polycn@gmail.com
5855 Carnegie Street
San Diego, CA 92122

Mark A. Maasch
Maasch Law, Inc.
1220 Rosecrans Street, Suite 910
San Diego, CA 92106

Shaun M. Murphy, Esq.
*murphy@sbemp.com*
Slovak Baron Empey Murphy &
Pinkney, LLP
1800 E. Tahquitz Canyon Way
Palm Springs, CA 92262

*Attorneys for Defendants Janees
Williams, Jeffrey Kinsell, Kinsell
Newcomb & DeDios (KND), KND
Affiliates and KND Holdings*

Michael D. Torpey, Esq.
*mtorpey@orrick.com*
James N. Kramer, Esq.
*jkramer@orrick.com*
Lacey Bangle, Esq.
*lbangle@orrick.com*
Orrick, Herrington & Sutcliffe LLP
405 Howard Street
San Francisco, CA 94105

Kevin M. Askew, Esq.
*kaskew@orrick.com*
Natalie Nahabet, Esq.
*nnahabet@orrick.com*
Orrick, Herrington & Sutcliffe LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90071

George E. Greer, Esq.
*ggreer@orrick.com*
Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, WA 98104-7087
*Attorneys for Defendant Keith C.
Metzler*