DOUGLAS M. MILLER, Cal. Bar No. 240398
Email: millerdou@sec.gov
DONALD W. SEARLES, Cal. Bar No. 135705
Email: searlesd@sec.gov
AMY JANE LONGO, Cal. Bar No. 198304
Email: longoa@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
LeeAnn G. Gaunt, Chief
Mark R. Zehner, Deputy Chief
Municipal Securities and Public Pensions Unit
Philadelphia Regional Office
The Mellon Independence Center
701 Market Street
Philadelphia, Pennsylvania 19106

Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
Los Angeles Regional Office
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. EDCV 13-0776-JAK (KKx) |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| vs. | Judge: Hon. John A. Kronstadt |
| CITY OF VICTORVILLE, SOUTHERN CALIFORNIA LOGISTICS AIRPORT AUTHORITY, KINSELL, NEWCOMB, & DEDIOS; J. JEFFREY KINSELL, and JANEES L. WILLIAMS. | Courtroom: 10B |
| Defendants. | |

Plaintiff Securities and Exchange Commission (the "SEC") alleges as follows:

## SUMMARY

1. This matter involves the offer and sale of tax increment municipal bonds issued from 2006 to 2008 by one of the Defendants, the Southern California Logistics Airport Authority (the "Authority"), which is an agency with redevelopment powers controlled by its co-Defendant, the City of Victorville (the "City"). The Authority was created to redevelop a 132-square mile area in and around a former Air Force base in San Bernardino County, California. It conducted several tax increment bond offerings in connection with this redevelopment. Defendant Kinsell, Newcomb & DeDios, Inc. ("KND") was the sole underwriter for these bond offerings.

2. Tax increment bonds are secured solely by and repaid solely from increases in property tax revenues attributable to increases in the total assessed value of the property located in the redevelopment project area. This means that the "tax increment" – that is, the increase in tax revenue from increases in property value – is critical to the security of the tax increment bonds. Equally important is the metric called the "debt service ratio," which compares the annual tax increment revenue available to pay the outstanding bonds to the annual debt service on those bonds.

3. The Authority used tax increment bond offerings to finance a number of ill-conceived redevelopment projects, including the construction of a power plant and four new airplane hangars ("Hangars") on the former Air Force base. By late 2007, it needed $50 million to pay a deposit on a turbine for the power plant pursuant to a contract entered into between the City and a third party. Although the Authority was not a party to the contract to purchase the turbine, the City pledged future bond proceeds from the Authority as security for the contract. The Authority planned to finance the $50 million down payment with a new $68

1

million tax increment bond offering.   However, given the tightening credit market and the subordinate nature of the bonds, prospective bond purchasers demanded that the debt service ratio for this offering be increased to 1.25 (from the 1.10 ratio governing prior bond offerings).  As a result, the Authority was forced to downsize its December 2007 bond offering from $68 million to $42 million.  This left the Authority with few resources to continue its redevelopment activities.  Indeed, by this time, nearly all of the tax increment available to the Authority had been used to secure its prior bond issuances.

4.      In February 2008, in an effort to escape from this financial constraint, the Authority borrowed $35 million in short-term financing.  It then publicly offered $13.3 million of subordinate tax increment bonds in April 2008 to repay part of that short-term debt.  This April 2008 financing was premised, in part, on an assessed value of $65 million for the four Hangars.  This $65 million valuation was used to determine the all-important tax increment for the April 2008 bond offering, and allowed the Authority to satisfy the minimum 1.25 annual debt service ratio for the offering.

5.      However, the Hangars' $65 million assessed value was vastly inflated, resulting in the disclosure of false tax increment and debt service ratios in the Official Statement provided to investors in the April 2008 bond offering.  Keith Metzler ("Metzler"), the Director of Economic Development for the City and an agent for the Authority, and the two KND investment bankers—Defendant Jeffrey Kinsell ("Kinsell"), the owner of KND, and Defendant Janees Williams—knew or should have known that the assessed value of the Hangars was inflated, and, as a result, that the tax increment and debt service ratios disclosed to investors were false.  Yet they each withheld this information, resulting in materially misleading disclosures and a substantially oversized bond offering.

6.      Kinsell and KND also took undisclosed construction and management fees collected on the airport hangar project.  In 2006, the Authority retained KND

Affiliates, LLC ("Affiliates"), an entity partially-owned by Kinsell, to manage this project. The Authority agreed to compensate Affiliates and its contractor under a "cost plus 10% construction management fee" contract. However, Affiliates exploited this fee arrangement by paying itself at least $450,000 more in fees than it was owed.

7. Affiliates further took $2.3 million of bond proceeds through a 15% monthly "property management fee." Affiliates transferred over $1 million of unauthorized property management fees to KND Holdings ("Holdings"), the parent of KND. KND then used the majority of these fees to finance KND's operating expenses, including payroll. The Authority never authorized Affiliates to collect these excessive fees, which Affiliates took from bond proceeds intended to complete construction of the Hangars. As a result of the unauthorized construction management fees and property management fees, Affiliates took a total of approximately $2.7 million in bond proceeds.

8. By engaging in this conduct the Authority and the City, violated Section 17(a)(2) of the Securities Act of 1933 (the "Securities Act"). KND, Kinsell and Williams aided and abetted the Authority's violations of Section 10(b) of the Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder. Moreover, KND violated Section 15B(c)(1) of the Exchange Act and Municipal Securities Rulemaking Board Rules G-17, G-27 and G-32(a)(iii)(A)(2), Kinsell aided and abetted each of these violations, and Williams aided and abetted KND's violations of Section 15B(c)(1) and Rule G-17. Therefore, with this action, the SEC seeks permanent injunctions, disgorgement with prejudgment interest and civil penalties against Defendants.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Exchange Act, 15 U.S.C.

§§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa.

10.    Defendants Authority, the City, KND, and Kinsell have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

11.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because the City and the Authority reside in this district.

## **DEFENDANTS**

12.    **The City of Victorville** is located in southwestern San Bernardino County, approximately 90 miles northeast of Los Angeles, California.  As of 2012, the City's population was estimated at approximately 115,000 residents.  The City is governed by a five-member council, the members of which also comprise the governing board of the Authority.  With regard to the Authority, the City operates as a successor to the Victor Valley Economic Development Authority.  The City's general fund, along with the funds belonging to the Authority (and to the City's other component units), are all pooled and co-mingled in a single bank account in the name of the City.  The funds are sometimes used interchangeably, including during the fiscal year covering July 1, 2007 through June 30, 2008.  At times, including in 2007 through 2008, when the April 2008 Bonds were issued, funds belonging to various component units of the City (including the Authority) were transferred between City component units.  These interfund transfers were not identified or recorded in the City's accounting system until the end of the fiscal year, on or about June 30, 2008.  For example, during the fiscal year ending June

30, 2008, funds from the City's Water District Fund were transferred to the Authority to cover its budget shortfall of more than $15 million.

13.     **The Southern California Logistics Airport Authority**, a joint exercise of powers authority under state law, is the issuer of the relevant bonds discussed herein, and is considered a component unit of the City for accounting purposes.  The Authority is governed by a five-member commission, which consists of all members of the city council of the City, and the City's administrative staff serves as the Authority's administrative staff.  The Mayor serves as the Authority's Chairman, the City Manager serves as the Authority's Executive Director and the City's Finance Director serves as the Authority's Treasurer.  To the extent the Authority experienced a shortfall in its annual budget, including in 2007 through 2008, when the April 2008 Bonds were issued, the City would advance money from its various funds, such as the City's general fund and the City's Water District Fund, to meet the shortfall.  At the end of the City's fiscal year, including the fiscal year ended June 30, 2008, this borrowing activity would be noted in the City's financial statements.

14.     **Kinsell, Newcomb, & DeDios, Inc.** is a California corporation formed on March 22, 1985 and located in Carlsbad, California.  It has been registered with the SEC as a broker-dealer since May 30, 1985.  It is owned by KND Holdings, which in turn is owned by Kinsell.

15.     **J. Jeffrey Kinsell**, age 61, resides in Carlsbad, California.  He is the owner, Director, President and Chief Compliance Officer of KND.  He is the owner of KND Holdings and 50% owner of Affiliates.  He has series 7, 24, 53 and 63 FINRA licenses.

16.     **Janees L. Williams**, age 36, resides in San Diego, California.  She is the Vice President of KND.  She has series 7 and 63 FINRA licenses.

## STATEMENT OF FACTS

### A. The City and the Authority

17. Formerly a small town on the edge of the Mojave Desert, during the 2000s, the City became an "ex-urb" of Los Angeles, and saw its population jump from 40,000 in 1990 to 115,000 in 2012, making it one of the fastest growing cities in the nation. The City sought to use its expanding property tax base to establish local industries and create jobs, particularly after the 1992 closure of one of its largest employers, George Air Force Base, located within the City.

18. Working in conjunction with the County of San Bernardino and other local communities, the City created the Authority. The Authority adopted a plan under California's redevelopment law to redevelop a 132-square mile project area in and around the former George Air Force Base now known as the Southern California Logistics Airport (the "Airport"). Much of the work on the redevelopment plan was conducted under the auspices of the Authority's predecessor, the Victor Valley Economic Development Authority, which delegated all of its redevelopment powers to the Authority.

### B. Tax Allocation, or Tax Increment, Financing

19. Municipalities often raise funds through "general obligation bonds," which, in general, are secured and their debt service paid by a municipality's its ability to raise revenue through the imposition of taxes.

20. However, the Authority does not have the power to levy property taxes. Therefore, instead of general obligation bonds, it relied on "tax allocation" bonds, also known as "tax increment" bonds, to finance the capital projects for the redevelopment of the Airport area.

21. Although fairly common in California, tax increment bonds are structured very differently than the more familiar general obligation bonds. Unlike general obligation bonds, tax increment bonds cannot rely on a municipality's general taxing authority to secure and pay the obligation of the bonds. Instead, tax

increment bonds are only secured, and their obligations can only be paid, by the "incremental" increase in property tax revenues resulting from an increase in the aggregate assessed value of the property within the relevant redevelopment area. The increased assessed value can result from appreciation in existing properties or new construction.

22.     Consequently, the amount of tax increment bonds that a redevelopment agency like the Authority can issue is limited to the increase in the aggregate assessed value of the property in the redevelopment area.

23.     To calculate the amount of the property tax increment available to secure and pay the debt service of tax increment bonds, the assessed value of property in a redevelopment area is first determined for a particular "base" year, typically the year immediately before the redevelopment plan was adopted.  The annual tax revenue collected from the property in the area is then divided among the local taxing agencies within the redevelopment project area and the redevelopment agency.  Generally, the tax agencies receive the taxes that are generated from the base year valuation of that property, while, subject to various exceptions and carve-outs, the redevelopment agency receives the remainder—that is, the "tax increment"—which is the tax revenue collected on any increase in the assessed value of the project area over the base year valuation of that property. The redevelopment agency may then pledge this tax increment revenue to repay tax increment bonds used to finance or refinance redevelopment projects.

24.     A redevelopment agency does not typically pledge tax increment to repay a specific bond issuance by that agency.  Instead, the aggregate amount of the tax increment in a project area is often "pooled" and pledged to repay all of the associated tax increment bonds issued by the agency.  Nevertheless, specific tax increment bonds may have a senior or subordinated claim to the aggregate tax increment pledged by a redevelopment agency.  Generally, investors holding subordinate bonds, like the April 2008 Bonds that are at the heart of this action, are

more sensitive to any changes in the tax increment than those holding senior lien bonds.

25.     Because the obligations under tax increment bonds are secured by and paid from the incremental increase in property tax revenues, the amount of the increase in the aggregate assessed value of the redevelopment area is material information for the bond investors, especially those holding subordinate bonds. For the same reason, the ability of the agency issuing the bonds to pay the debt service is material information for bond investors, and even more so for subordinated bondholders. One common measure of this ability is the "debt service ratio," which compares the annual tax increment revenue available to repay bonds to the annual debt service payments on all outstanding bonds. The ratio shows how much the Authority and bondholders would be protected in the event assessed property values in the project area dropped. For example, a debt service ratio of 1.25 means that the tax increment has a 25% cushion above the amount owed on all outstanding bonds. As a result, the debt service ratio was material information to bond investors.

**C.     The Authority's Tax Increment Bond Offerings**

**1.     The Offerings, KND and the Official Statements**

26.     Between 2006 and 2008, the Authority offered and sold at least four tax increment financings relevant to this action: (1) a $34,980,000 tax allocation revenue parity bond offering dated November 1, 2006 (the "November 2006 Parity Bonds"); (2) a $64,165,000 subordinate tax allocation revenue bond offering dated November 21, 2006 (the "November 2006 Revenue Bonds"); (3) a $42 million subordinate tax allocation bond offering dated December 5, 2007 (the "December 2007 Bonds"); and (4) a $13,334,924.85 subordinate tax allocation bond offering dated April 30, 2008 (the "April 2008 Bonds").

27.     The proceeds from the bond offerings by the Authority inured to the benefit of the City. For example, proceeds from bonds issued by the Authority in

December 2007 and proceeds from Notes entered into between the Authority and a private bank in February 2008 were used to a make a $50 million down payment on behalf of the City for a power plant turbine.

28.     For each of the four tax increment bond offerings by the Authority, investors were provided with an "Official Statement" describing the terms and conditions of each bond.

29.     KND was the underwriter for each of these four tax increment bond offerings.  KND was first engaged as the underwriter for the City in 1997, and by 2001, it began serving as the sole underwriter for the Authority.  Between 2001 and 2008, KND earned over $5.1 million in underwriter fees for bonds issued by the Authority and sold by KND to investors.

## 2.     The Tax Increment for the Bonds

30.     The assessed valuation of the Airport project area for its 1997-1998 base year was $1.8 billion.  Any increase in this assessed valuation, and the resulting tax revenue, subject to various exceptions and carve-outs, represented the tax increment available to the Authority for securing and paying the obligations of its tax increment bonds.  However, as discussed below, by the end of 2007, the Authority's total outstanding debt from its previously-issued tax increment bonds was so large that the Authority could not issue any additional tax increment bonds unless the property value in the area increased or there was new development in the area.

31.     For each offering, the Authority hired a fiscal consultant (the "Consultant") to determine the additional tax increment revenue available to secure the repayment of any new bond issue, and to prepare a report included as an appendix to the Official Statements for the bond offerings.

32.     In calculating projected tax increment revenues, the Consultant first looked to the county assessor's most recent property rolls to determine the assessed

value of property in the area.  The county assessor is the municipal official responsible for determining the value of property in the county for tax purposes.

33.    The assessor's office revises the property tax rolls only once a year, creating a lag time before the current assessed values of properties resulting from new sales or construction appear on the property tax rolls.  As a result, the Consultant could not simply compare the county assessor's most recent annual property roll to that for the 1997-1998 base year.

34.    Rather, the Consultant had to add the new assessed values due to new construction, which had not yet been incorporated onto the annual property roll, to the assessed values reflected on the last annual property roll.  The Consultant typically received the increased assessed values regarding new construction for the project area from Metzler's office.

35.    The Authority's Official Statements referenced the Consultant's reports, which discussed among other things, the current status of development in the project area and the resulting tax increment revenue available to serve as security for the bonds.  The Official Statements also attached the Consultant's reports as an appendix.  As such, the Consultant's reports were also provided to bond investors.

**D.    The Official Statement for the April 2008 Bond Offering**

**1.    The Hangars and the November 2006 Bond Offerings**

36.    The Authority undertook a variety of ill-conceived projects in connection with its efforts to develop the Airport area.  These included the construction of a proposed power plant known as "Victorville 2," an inter-modal rail facility and, at the crux of this action, the Hangars.

37.    In 2005 and 2006, the Authority issued bonds underwritten by KND in order to build the Hangars, including the November 2006 Parity Bonds and the November 2006 Revenue Bonds.  The Authority initially hired an outside

developer to develop the Hangars.  As discussed in more detail below, however, the Authority eventually hired Affiliates to take over the project.

### 2. The Downsized December 2007 Bond Offering

38.     The Authority initially planned to issue approximately $68 million of tax increment bonds in late 2007 to finance an initial deposit for an electric turbine for the "Victorville 2" power plant pursuant to a contract between the City and a third party.  The Authority was  not a party to this agreement.  Ultimately, by the time it issued the December 2007 Bonds, the Authority was only able to offer $42 million in bonds, and netted just $37 million from the offering.

39.     The Authority was forced to downsize the December 2007 Bond offering because prospective bond purchasers demanded that the Authority increase the debt service ratio.  Bond investors had previously accepted a debt service ratio of 1.10.  However, due to the tightening credit market at the time and the subordinate nature of the bonds, prospective bond purchasers demanded a significant increase in the annual debt service ratio to 1.25.

40.     The debt service ratio is determined by taking the projected annual tax increment revenue available to repay all tax increment bonds and dividing that number by the annual debt service payments on all outstanding tax increment bonds.  The debt service ratio was determined from data provided by the consultant and KND.  Specifically, the projected annual tax increment revenue available to repay all tax increment bonds was calculated by the Consultant and set forth in the report it issued for the December 2007 Bonds (the "December 2007 Report").  The annual debt service payments on all outstanding tax increment bonds was calculated by KND.

41.     Although the aggregate tax increment revenue available to pay debt service was substantial, by December 2007, the Authority had already consumed all but a small portion of that amount to service its prior bond issues.  Therefore, under the increased debt service ratio of 1.25 required by prospective investors, the

Authority was no longer able to service $68 million in debt. Therefore, it downsized the bond issuance from $68 million to $42 million. The majority of the proceeds the Authority received from this offering, $37 million, was used to make a down payment of $50 million pursuant to the turbine agreement between the City and a third party. Proceeds of the Authority's bond offering therefore directly benefited the City.

42.     Prospective investors also demanded that, for all of the Authority's future tax increment bond issuances, the annual debt service ratio for each year all of the bonds are outstanding must be at least 1.25 to comply with the 1.25 annual debt service ratio. This requirement was incorporated in the "additional bonds" covenant under the governing indenture, which generally set limitations on the Authority's ability to issue new bonds.

**3.      The Private Placement in February 2008**

43.     The downsizing of the December 2007 bond issuance from $68 million to $42 million left the Authority with few resources to continue its redevelopment activities. Indeed, the Authority needed to apply all of the net proceeds of the December 2007 Bonds to make the initial $50 million deposit on the "Victorville 2" electric turbine pursuant to the contract between the City and a third party. The Authority did so pursuant to a security agreement between it and the third party. As part of that agreement, the Authority agreed to provide security for the City's turbine agreement because the Authority had determined that it will benefit from the goods and services to be received by the City under the turbine agreement. Among other things, the security agreement, executed in December 2007, gave the third party a security interest in and a lien on the Authority's future bond offerings.

44.     In late November 2007, Kinsell recognized the Authority's difficult financial situation. He wrote emails stating that the Authority had essentially "put themselves out of the redevelopment business and have few resources to do

anything else." Kinsell also described the Authority as being "panicked" at this time and believed it "needed money right away." He noted that a third party could emerge to help the Authority obtain funds for other projects.

45. Third-party financing is the option the Authority ultimately pursued. In particular, the Authority borrowed $35 million in a private placement offering of Subordinate Tax Allocation Revenue Notes to a major commercial bank (the "Bank"), on February 29, 2008. A portion of the proceeds the Authority received from this offering, $13 million, was used to fund the remaining portion of the $50 million down payment for the "Victorville 2" electric turbine. Proceeds of the Authority's bond offering therefore directly benefited the City.

46. As part of this private placement, the Bank required the Authority to enter into a forward bond purchase agreement that, in essence, obligated the Authority to issue publicly offered "forward" tax increment bonds, at the time of the Bank's choosing, for the purpose of repaying, in whole or in part, the $35 million invested by the Bank. The Bank was not obligated to purchase any of those forward bonds, and the Authority's obligation was dependent on the existence of sufficient tax increment to secure such bonds.

**4. The Hangars' Assessed Value for the Private Placement**

47. The Authority needed sufficient tax increment revenue to repay the $35 million in Subordinate Tax Allocation Revenue Notes held by the Bank. Therefore, during the private placement negotiations, the Bank focused on the estimated additional assessed value and resulting tax increment from any new construction that had not been used to secure the December 2007 Bonds.

48. On December 17, 2007, just two days after the December 2007 Bonds closed, the Bank held a conference call with Williams, Metzler and the Consultant to discuss the timing and amount of any new assessments, and, by virtue of being a factor in determining the amount of any new assessed value, the cost of any new development at the Airport. As conditions for closing the private placement, the

Bank required, among other things, that: (1) the Consultant certify the estimated tax increment revenues and compliance with the additional bonds test; and (2) Metzler provide an affidavit, attached to his estimates of assessed valuations, certifying that the estimates were correct to the best of his knowledge.

49.     Metzler prepared a spreadsheet for the Bank that, among other things, set forth the estimated additional assessed values for projects not reflected in the December 2007 Bonds (the "Metzler Spreadsheet"). These projects included the four Hangars, as well as the expansion of a cement factory by one of the largest taxpayers in the project area. The assessed value of these projects was critically important to the Authority's ability to close the private placement with the Bank.

50.     On January 17, 2008, Metzler reported to the Bank, Kinsell and Williams that the assessor's office informed him the cement factory's additional assessed value was just $41 million. This was tens of millions less than the anticipated range of $91 million to $141 million in additional assessed value from the cement factory expansion.

51.     That same day, Williams wrote to Kinsell that the Bank was concerned about the unexpectedly low assessed valuation increase. Williams also called Metzler on or about January 17, 2008 to discuss the situation, and cautioned him that his assumptions need to be correct because they related to tax increment. Around this time, Kinsell also expressed concern about the unexpectedly low assessed value of the cement factory.

52.     Although the increase in the assessed value for the cement factory dropped significantly from the earlier estimates, the estimated assessed value of all four Hangars never changed. On January 17, 2008, Williams told the Bank that the total value of the four Hangars would be $65 million. This figure had been provided by Affiliates, and was purportedly based on the Hangars' construction costs.

53.     On January 18, 2008, Metzler forwarded an email he received from the assessor's office to Williams showing it had assessed the values of Hangar Nos. 1 and 2 at an aggregate value of only $8,779,000 for the 2007-2008 fiscal year, and $8,955,000 for the 2008-2009 fiscal year.  The assessor's office also informed Williams that it had not yet assessed the value of Hangar Nos. 3 and 4.

54.     These assessment figures undermined the $65 million estimate for all four Hangars.  Under this assessment, the remaining two Hangars (Nos. 3 and 4) would have to be valued at approximately $56 million alone for the previously provided estimate for all four Hangars of $65 million to have any validity.  But the remaining two Hangars could not be assessed at over $56 million. The four Hangars were too similar for such a disparate valuation to be possible.

55.     Nevertheless, Williams and Metzler used the $65 million assessed value for all four Hangars.  Metzler included the $65 million value in a draft of the Metzler Spreadsheet he prepared in advance of a conference call with the Bank, Williams, the Authority's counsel ("Disclosure Counsel") and others.  Williams emailed the Metzler Spreadsheet to the meeting participants, as well as to Kinsell. The Metzler Spreadsheet reflected:  (1) the estimated $65 million assessed value for all four Hangars for the 2008-2009 fiscal year; and (2) the $56,221,000 Hangar valuation available for bonding in 2008-2009 (i.e., the $65 million estimated assessed value for the Hangars in 2008-2009 minus the $8.779 million assessed value for Hangars No. 1 and 2 in 2007-2008 ).

56.     The Consultant relied on the $65 million estimated assessed value Metzler provided for the Hangars when it conducted its tax increment analysis. The Consultant prepared a spreadsheet (the "Consultant Spreadsheet") showing the total value of new development at the Airport was $111,309,322, and that the Hangars constituted $56,221,000, or over half, of that amount.  The Consultant noted in its spreadsheet that the $56,221,000 valuation was based on "Data Provided By Keith [Metzler]."  On February 11, 2008, Williams emailed the

Consultant Spreadsheet to the Bank, Kinsell and Metzler.  As alleged below, the Consultant used the $111,309,322 value of the new development at the Airport, which included the inflated $65 million value of the four Hangars, to determine the tax increment revenue for the April 2008 Bonds.

57.     On February 19, 2008, the Consultant sent a letter to Metzler, Williams and Disclosure Counsel setting forth the methodology it used to determine its tax increment revenue projection of $22,606,356.  That letter noted that the assessed values in the Airport's portion of the project area increased by $111,309,322 due to new construction.

58.     Metzler and Williams were concerned that the assessor's office would provide assessed values for Hangar Nos. 3 and 4 that, when added to the assessed values of Hangar Nos. 1 and 2, would reduce the total assessed value of the four Hangars to less than $65 million.  On February 19, 2008, Metzler received an email that attached a voicemail from the assessor's office alerting him that it had not received construction cost information for Hangar Nos. 3 and 4.  Metzler forwarded the email and attached voicemail to Williams that same day and wrote: "Can you follow up and make sure this happens…. My concern is without the construction numbers, they will value the hangars low as the leases are not commensurate with the construction costs."  Williams forwarded the email to Kinsell that same day.

59.     As part of the closing documents for the private placement on February 29, 2008, Metzler provided the final version of the Metzler Spreadsheet and attached it to a signed certification stating that his estimates were true and accurate based on his personal knowledge and communications with the assessor's office and the Airport's master developer.  In his certification to the Bank, Metzler noted that:  (1) the $65 million estimate for the Hangars was based on an estimate provided by Affiliates; and (2) it was possible the value could change because the assessor's office had yet to complete its valuation of the Hangars.  Notably,

Metzler did not make a similar disclosure in connection with the April 2008 Bonds sold to the public.

**5.  The April 2008 Bond Offering**

60.  In April 2008, the Bank exercised its option to require the Authority to issue publicly offered bonds to repay part of the $35 million note. Approximately $13.335 million in subordinate tax increment bonds were offered on April 30, 2008 to repay part of this debt (the "April 2008 Bonds").

61.  The April 2008 Bonds are at the crux of this action.  The April 2008 Bonds were the only forward bonds the Authority was ever able to issue pursuant to its forward bond purchase agreement with the Bank.  In addition to proceeds from the April 2008 Bonds, the Authority ultimately used funds loaned from another City component unit to repay the debt to the Bank.

**6.  The Hangars' Assessed Value for the April 2008 Bond Offering**

62.  When the Authority began preparing for the April 2008 Bond offering to make the required payment to the Bank, the Consultant needed to revisit the amount of available tax increment.  For the April 2008 Bonds, the Consultant prepared a supplement to its December 2007 Report (the "April 2008 Supplement") that "contain[s] tax increment projections that supplement information contained in" the December 2007 Report.  The December 2007 Report and the April 2008 Supplement (collectively, the April 2008 Report") were attached as Appendix D to the Official Statement for the April 2008 Bonds (the "April 2008 Official Statement").  The April 2008 Official Statement also references the April 2008 Report at page 23.  The April 2008 Official Statement and the April 2008 Report contained material information for bond investors related to the bonds' tax increment and debt service ratio.

63.  Like the Consultant's spreadsheet prepared for the February 2008 private placement, the April 2008 Supplement included assessed values and resulting increased tax increment derived from new, finalized construction and

sales not included in the December 2007 Report. The April 2008 Supplement, at Exhibit 10C on page 4, provided that the increased assessed value due to new development at the Airport was $111,309,322, the same amount used in the Consultant Spreadsheet prepared for the private placement.

64.     This $111,309,322 valuation of new development at the Airport included Williams's and Metzler's inflated $65 million estimated value for all four Hangars. The Consultant used this $111,309,322 valuation of new development at the Airport to determine the tax increment revenue for the April 2008 Bonds.

65.     By April 2008 though, Metzler, Williams and Kinsell knew or should have known that the Hangars' $65 million estimated assessed value was no longer valid. On March 10, 2008, Metzler received an email from the assessor's office informing him that Hangar No. 3's 2008-2009 assessed value was only $9,483,260. The assessor's office also informed Metzler that it had not heard from Affiliates regarding the construction cost of Hangar No. 4. It further noted that if it did not hear from Affiliates, the assessor's office would assess Hangar No. 4 at the same value as Hangar No. 3 because "[b]oth hangars are identical." Metzler directed his assistant to forward the assessor's office's email to Williams with the dictated message: "FYI…lower than we expected." Williams forwarded that email the same day, copying Kinsell, and wrote that "we need to get this done ASAP this week."

66.     Also on March 10, 2008, Metzler's assistant replied to the assessor's office's email, asking if the assessor's office could re-send the assessed valuations for Hangar Nos. 1 and 2. The assessor's office provided those assessed values to Metzler's assistant that night. Metzler's assistant printed out her March 10, 2008 email correspondence with the assessor's office showing the assessed values for Hangar Nos. 1, 2 and 3, as well as the likely assessed value for Hangar No. 4, and gave it to Metzler on or about March 10, 2008.

67.     On April 9, 2008, Disclosure Counsel provided Metzler and others

with a draft of the Preliminary Official Statement.  Disclosure Counsel specifically asked Metzler to review the development sections and advise Disclosure Counsel of any changes.  The Preliminary Official Statement listed the tax increment revenue projection at $22,606,356, the same amount listed in connection with the Private Placement Offering with the Bank.  Although Metzler  should have been aware by this date that the Hangars were valued at less than $28 million, rather than $65 million, he did not correct the tax increment revenue projection listed in the Preliminary Official Statement or alert Disclosure Counsel about the lower assessed value for the Hangars.

68.     On April 14, 2008, Janees Williams sent an email to Disclosure Counsel, with a copy to Metzler, that contained the Supplement from the Consultant.  The Supplement listed new development at the Airport as $111,309,322 and the tax increment revenue projection was listed as $22,606,356.  These amounts had not been reduced since the Private Placement with the Bank, despite the fact that Metzler should have known that the Assessor had valued the Hangars at less than $28 million, rather than $65 million.  Metzler did not inform the Consultant or Disclosure  Counsel about the lower assessed values for the Hangars after receiving this email with the Consultant's Supplement.

69.     Later on April 14, 2008, Disclosure Counsel sent Metzler and others another draft of the Preliminary Official statement and informed them that "[i]n preparation for printing early this week, attached for your review and comment are clean and marked copies of the SCLAA Preliminary Official Statement, together with a Summary of the Indenture.  Kindly advise me of any comments or updates at your earliest opportunity."  The tax increment revenue projection listed in the attached Preliminary Official Statement as $22,606,356; it had not been reduced to accurately reflect the lower assessed values for the Hangars.

70.     On April 15, 2008, Metzler's assistant sent an email to Disclosure Counsel with Metzler's revisions to the Preliminary Official Statement.  Although

Metzler made changes to the Preliminary Official Statement, including changing the population and construction permit data, he did not change the tax increment projection table, which listed the tax increment revenue projection at $22,606,356.

71.  Later on April 15, 2008, Disclosure Counsel sent an email to the City Attorney and Director of Finance, with a copy to Metzler.  Disclosure Counsel included another draft of the Preliminary Official Statement and noted that she had "received comments from Keith Metzler, which we are incorporating in the document."

72.  Also on April 15, 2008, Metzler emailed Williams and Disclosure Counsel and notified them that he had "issued my comments this morning" and asked to advise him if his comments had not been received.  That evening Disclosure Counsel emailed Metzler and confirmed that she had received his comments.

73.  On April 16, 2008, Williams sent a two-page email to Metzler asking him to confirm various facts for proposed buyers of the April 2008 Bonds, including fourteen different issues separated by bullet points.  Among the many items she asked Metzler to confirm was "4 Hangars approximately $65,000,000 based on construction value."  Metzler's assistant responded at his direction to Williams the same day by email, attaching the Assessor's office's March 10, 2008 emails containing the assessed valuations for Hangar Nos. 1, 2 and 3, and the likely assessed valuation for Hangar No. 4.  That same day, Williams forwarded the email, along with the attached Assessor's office's email, to Kinsell.

74.  Despite the fact that Williams was continuing to use the $65 million valuation for the Hangars, Metzler did not inform Disclosure Counsel of the lower assessed value for the Hangars, even though he should have known the Preliminary Official Statement was being finalized and printed that week.  In addition, based on his experience, Metzler knew Disclosure Counsel was in control of the Preliminary Official Statement and any changes to the Preliminary Official Statement should

have been sent directly to Disclosure Counsel.

75.     Later on April 16, 2008, Disclosure Counsel sent an email to Metzler and to the Director of Finance.  Disclosure Counsel asked that they advise her if they are "signed off on the printing of SCLAA's Preliminary Official Statement tomorrow."  She noted that she had "incorporated the comments Keith sent yesterday."  Disclosure Counsel attached a copy of the Preliminary Official Statement, which listed the tax increment revenue projection as $22,606,356. Metzler understood that Disclosure Counsel sent him the Preliminary Official Statement in order to make sure that he did not have any additional comments and so that she would have the most reliable version of it.

76.     The evening of April 16, 2008, Metzler responded to Disclosure Counsel by email and wrote that "[p]resuming no changes beyond what I suggested from the last version, I am ok with the document."

77.     The next morning, on April 17, 2008,  Disclosure Counsel sent Metzler and others an email stating "[a]ttached for your review and approval are 8 pages of the SCLAA POS, reflecting changes made since the last distribution." She attached a copy of the changes to the Preliminary Official Statement.  She also asked that Metzler and the other recipients of the email provide her with "any comments or your approval to print" the Preliminary Official Statement.

78.     A few minutes later on the same date, April 17, 2008, Williams asked that Metzler, the City Attorney and the Director of Finance "sign off on the POS as soon as possible so that we can begin to market the bonds."  She included a copy of the Preliminary Official Statement.  Later that afternoon, April 17, 2008, Williams emailed disclosure counsel that she "[j]ust got sign off from Keith."

79.     Assuming Hangar No. 4 would be assessed at the same value as Hangar No. 3, the total assessed values of the four Hangars would have been $27.7 million for 2007-2008 and $27.9 million for 2008-2009.  In either case, this

valuation is less than half the estimated value of $65 million that was used in the April 2008 Supplement, referenced in and attached to the Official Statement.

80.     The minimum 1.25 annual debt service ratio for the April 2008 Bond offering was only achieved because the approximate $111.3 million valuation of new development at the Airport included the inflated $65 million valuation of the four Hangars.

**7.     The False and Misleading April 2008 Official Statement**

81.     Page 24 of the April 2008 Official Statement contained a debt service schedule listing the annual tax increment and debt service ratios for the April 2008 Bonds (the "Debt Service Schedule").  One column on that schedule listed the tax increment for every bond year (the "Total Non-Housing Increment"); another column showed an "all-in," "no growth" debt service ratio of 1.26 for 2008 (representing tax increment revenues of $22,606,356 and total debt service of $17,825,734), and 1.25 for every bond year thereafter.

82.     KND, which through Williams and Kinsell, knew or were reckless in not knowing that the estimated assessed value of the Hangars was inflated, prepared the Debt Service Schedule.  The figures KND used in the Total Non-Housing Increment column of the Debt Service Schedule relied on the inflated value of the Hangars, and came from the "Total Pledge Revenue" column of Exhibit 10A on page 2 of the Consultant's April 2008 Supplement, which was attached to the April 2008 Official Statement.

83.     The statements regarding the tax increment and the debt service ratios in the April 2008 Official Statement and the attached April 2008 Supplement were false and misleading.

84.     Neither the Consultant nor Disclosure Counsel knew that the tax increment analysis in the April 2008 Report relied on false and inflated Hangar values overstating the tax increment revenue.  Neither Williams, Kinsell nor Metzler  informed Disclosure Counsel that the $65 million estimated assessed

value of the Hangars was wrong. As a result, the Debt Service Schedule in the April 2008 Official Statement and Exhibits 10A and 10C of the April 2008 Supplement overstated the tax increment available to secure those bonds and to repay investors.

85. The Debt Service Schedule also overstated the debt service ratio for the offering. The Authority only met the required 1.25 minimum annual debt service ratio because it used the overstated Hangar valuation. Therefore, the Debt Service Schedule failed to disclose a debt service ratio based on an accurate valuation of the four Hangars. Had the Authority used the accurate valuation, it would have failed to meet the minimum 1.25 ratio in every bond year after 2008.

86. Moreover, because of the overstated values of the Hangars and resulting false disclosure of the tax increment and annual debt service ratio, the April 2008 Bonds were substantially oversized.

87. The tax increment and debt service ratio misrepresentations and omissions in the April 2008 Official Statement and the April 2008 Supplement were material. The tax increment securing the April 2008 Bonds and the annual debt ratios disclosed in the Debt Service Schedule were critical factors investors used to determine how they would be repaid. Moreover, the market required the 1.25 debt service ratio, which ensured that the Authority's total projected annual tax increment revenue would be 25% greater than the total annual debt service payments for each year bonds would be outstanding, thereby providing a safety net in the event assessed property values in the project area suffered unexpected losses. Meeting the annual debt service ratio of 1.25 was also a prerequisite to the issuance of the bonds under the indenture. Thus, if the 1.25 annual debt service ratio was not met, the bonds would not have issued. Moreover, the credit rating agencies focused on the debt service ratio, and a ratio below 1.25 would have affected the credit quality of the April 2008 Bonds.

88.    The December 2007 Bonds and April 2008 Bonds are currently in default, and as of April 2013 were trading at roughly forty-five cents on the dollar.

**3.      The Roles of the Authority and the City in the April 2008 Official Statement**

89.    As the issuer, the Authority had ultimate authority over all of the contents of the Official Statements and the attached Consultant reports, including the April 2008 Official Statement and the attached April 2008 Supplement.

90.    As a senior officer, with a close relationship to the City and the Authority, Metzler collaborated with both entities in the issuance of the April 2008 Bonds.

91.    Metzler played a significant role in connection with the Authority's tax increment bond offerings in general, including the April 2008 Bonds.  He had intimate knowledge of the projects at the Airport, and understood tax increment financing and how annual debt service ratios are calculated.

92.    During much of the relevant time period, Metzler was the City's Director of Economic Development.  As a result of that role, Metzler was the person most familiar with economic development occurring or expected to occur in the redevelopment area known as the Victor Valley Economic Development Area (VVEDA), to which the City is the successor.  Metzler worked on at least five bond offerings for the Authority.  He developed intimate knowledge of the projects at the airport, and understood tax increment financing and how annual debt service ratios are calculated.

93.    Beginning in about 2005, Metzler reviewed City bond documents, particularly the official statements, from a disclosure perspective.  Metzler reviewed these documents in order to make sure that the representations regarding the organization and regarding the projects were correct.  Metzler also assisted in compiling statistical data that was owned by the City, such as construction figures, permit valuation and the number of permits that were pulled in the project area.

Metzler often provided this information to the Consultant so that the Consultant could obtain the most correct representation of property values that were expected in the current year. Metzler understood this information was typically set forth in a chart in the official statements. Metzler understood that other than permit values, the Consultant relied only on information that ultimately came from the Assessor's office. The City's Executive Director ("Executive Director") met with Metzler and others to jointly discuss each preliminary official statement and official statement. Metzler was part of a group, which included the Authority's Disclosure Counsel and the City's Finance Director, that would review the projections and Official Statement. That group would then meet with the Executive Director offer their opinions and voice any concerns.

94. Although the Authority's Official Statements were drafted initially by Disclosure Counsel, these drafts were circulated to an unofficial disclosure committee for comments. Metzler was a member of this committee. Working at the direction of the City Manager, who also served as the Executive Director of the Authority, Metzler worked with the Disclosure Counsel and the underwriters at KND to draft sections of the Official Statements. He took the lead in drafting some of the disclosure language concerning the Authority's redevelopment projects.

95. The Authority's Disclosure Counsel and KND looked to Metzler as the Authority's representative to approve the Official Statements, including the April 2008 Official Statement. Metzler received drafts of the Authority's preliminary official statements and official statements, including the April 2008 Official Statement, and reviewed and commented on those drafts. He worked with the Disclosure Counsel and the Underwriter to draft sections of the documents, including some of the disclosure language concerning the Authority's redevelopment projects. Disclosure Counsel would send the preliminary draft of the Official Statement for comment. Metzler would offer his comments,

suggestions and edits directly back to Disclosure Counsel. Metzler understood that Disclosure Counsel was in control of the official statement. In the event Metzler saw something inaccurate in the official statement, he would change it.

96.     Metzler was the Authority's "point person" concerning its Official Statements for all of the bond issuances, including the April 2008 Official Statement. He communicated with the ratings agencies, gave presentations to potential investors and transmitted the county assessor's most recent assessed value figures to the Consultant. The Executive Director specifically tasked Metzler with obtaining and providing the taxable assessed valuation data to the Consultant, and with reviewing the Preliminary Official Statement and the Official Statement to ensure they were accurate. Metzler and the Executive Director met to discuss any substantive issues that Metzler brought to the Executive Director's attention in connection with these documents. In addition, the Executive Director sat down to review the Consultant's report with Metzler and others. The Executive Director asked Metzler to explain the meaning of each of the columns in the Consultant report and the way in which the numbers were computed.

97.     The Executive Director expected Metzler to conduct due diligence concerning the valuations set forth in the Preliminary Official Statement and Official Statement. When the Executive Director signed the April 2008 Official Statement, he relied on Metzler's work and due diligence to do so. With respect to the valuation of the Hangars, the Executive Director relied on Metzler, whom the Executive Director supervised, to offer his opinions and perform due diligence because of Metzler's previously demonstrated ability to accurately project assessed valuations and ensure that the hangar valuations were accurate. The Executive Director expected Metzler would utilize whatever resources and methodology he deemed appropriate to assist in the preparation of accurate valuation projections. Part of Metzler's role included obtaining and providing the taxable assessed valuation data to the Authority's Consultant so that it could calculate the tax

increment.  Metzler also should have known that the Consultant relied on him for the assessed values of the hangars.

98.    In signing the April 2008 Official Statement, the Executive Director relied on Metzler's work and due diligence.  Disclosure Counsel and the underwriter looked to Metzler as the Authority's representative to approve the Official Statements.

99.    Prior to the issuance of the April 2008 Bonds, Metzler learned facts that reasonably indicated that the Hangars' $65 million estimated assessed value was not accurate.  Metzler learned in March 2008 that the Assessor's office had valued the two hangars at a total of less than $9 million, and had valued a third hangar's at only about $9.4 million.  Metzler also learned that the Assessor's office would assess the fourth hangar at the same value as the third hangar because both hangars are identical unless the assessor's office received the construction cost of the fourth hanger.  Assuming the fourth hangar received the same value as the third, the total assessed values of the hangars would have been about $27 million, less than half of the estimated $65 million used in the April 2008 Supplement prepared by the Consultant and attached to the Official Statement.  Metzler should have known this, but did not exercise reasonable care in providing the updated Hangar valuations to the Authority's Consultant.

100.    In each of the roles described above, Metzler did not exercise reasonable care in informing anyone about the inflated Hangar valuations or the misstatements in the Official Statements about the tax increment and debt service ratio.  As a result, the inflated $65 million valuation was used to calculate the tax increment revenue and debt service ratio for the April 2008 Bonds.

101.    Metzler should have known that the April 2008 Official Statement materially misstated the tax increment and debt service ratio for the April 2008 Bonds.  Because he was an employee of the City, and reported to the City

Manager, the City should have known the falsity and misleading nature of these misstatements.

102.    Moreover, Metzler was the agent for the Authority with regard to content in the Authority's Official Statements. The Authority authorized him to perform acts and communicate on its behalf in connection with the Authority's bond offerings. Therefore, the Authority was negligent in not knowing the falsity and misleading nature of the misstatements concerning the tax increments and the debt service ratio.

### a.    KND, Kinsell and Williams

103.    KND, as the underwriter, had ultimate authority over the portions of the Official Statements it prepared, including the false and misleading Debt Service Schedule in the April 2008 Official Statement. KND's name was also prominently featured on the first page of the Official Statement for each bond offering that it underwrote for the Authority.

104.    Kinsell and Williams knew that the April 2008 Official Statement materially misstated the tax increment and debt service ratio for the bonds. Williams was a member of the informal disclosure committee for the Official Statement, and both Kinsell and Williams reviewed and commented on draft official statements, the April 2008 Supplement and other documents related to the April 2008 Bonds. Despite knowing that the $65 million estimated assessed value of the Hangars was wrong, Williams nonetheless used the April 2008 Supplement to determine the size of the April 2008 Bonds and to generate the false Debt Service Schedule in the April 2008 Official Statement. The annual debt service ratios were critical to Williams's sizing calculation because they limited the principal amount of the bond offering. As such, Kinsell and Williams, along with KND, substantially assisted the Authority in making that false and misleading April 2008 Official Statement. Moreover, Kinsell and Williams substantially assisted KND in making the false and misleading Official Statement.

105.   Because Williams and Kinsell were employees of KND, KND had actual knowledge that the April 2008 Official Statement, the April 2008 Supplement attached as an appendix and the Debt Service Schedule were false and misleading.

**E.     Kinsell, Affiliates and KND's Undisclosed Receipt of Bond Proceeds**

106.   Kinsell, Affiliates and KND, which underwrote the Authority's bond offerings from November 2006 through 2008, received  over $2.7 million of bond proceeds from the Authority and bondholders in connection with the project to construct the four Hangars.

**1.     The Unauthorized Construction Management Fees**

107.   Affiliates received  bond proceeds of at least $450,534 from the Authority and the bondholders in the form of construction management fees.

108.   By mid-2006, the Authority and Kinsell learned of allegations that the developer for the Hangars project had not been paying the subcontractors and that the developer's principal had likely diverted some of the bond proceeds from the project for his own personal use.

109.   Kinsell reached a "handshake deal" in June or July 2006 with the Executive Director of the Authority whereby Kinsell, through Affiliates, would oversee the project.  Although formed earlier in 2002, the sole purpose of Affiliates after June 2006 was to develop the Hangars.  Kinsell is one of two managing members of Affiliates, each of whom holds a 50% interest in the company.  Kinsell had no construction experience but retained a longtime friend as the new contractor to complete construction of the Hangars.

110.   Although that "handshake deal" was never reduced to a written contract, all of the parties understood that it was a "cost plus 10% construction management fee" arrangement.  In a memorandum Kinsell sent on October 18, 2006 to Disclosure Counsel and to Authority representatives, Kinsell confirmed that a 10% construction management fee would be charged "where necessary for a

general contractor to be involved." He also explained that he was "dividing these monies by eight (8%) to [the new contractor] and two percent (2%) to Affiliates for the overall project coordination." Thus, although Affiliates was not actually building the Hangars, it would be paid this 2% to oversee the use of the funds and to perform "fund control."

111.   In July 2006, the Authority approved Affiliates's new role, and, over the next two years, made five separate loans totaling $60.38 million to Affiliates. These loans included $22.2 million lent in August 2006, which was used: (1) to immediately pay over $12 million to disgruntled subcontractors and $6 million to the original developer to resolve various claims; and (2) to pay a portion of the remaining costs necessary to complete the Hangars.

112.   All of the loans made to Affiliates were funded from the proceeds of bonds or notes issued by the Authority and underwritten or placed by KND. Affiliates placed these lump sum amounts into bank accounts in its name, and there was little, if any, oversight regarding how Affiliates spent these bond funds.

113.   Periodically throughout the construction of the Hangars, Affiliates paid the new contractor the 10% construction management fee that had been earned as of that date. The contractor retained its 8% share of the fee and "rebated" back to Affiliates the 2% fee owed to Affiliates, totaling not more than $865,990 from October 2006 through October 2010.

114.   However, Affiliates actually took at least $1,316,524 as the 2% construction management fee, or at least $450,534 more than the amount that was "rebated" back to it by the contractor. Affiliates simply took this excess construction management fee directly from the bond proceeds the Authority loaned Affiliates to construct the Hangars.

115.   Affiliates collected the 2% construction management fee based on expenses incurred in August 2006 that had nothing to do with the remaining costs of construction, such as the payments to subcontractors for prior work and the

payment to the original developer to settle claims.  Thus, before KND underwrote bonds for the Authority in November 2006, Kinsell and KND knew, or were reckless in not knowing, that Affiliates planned to charge more than the authorized 2% construction management fee and did not disclose this information to investors.

**2.  The "Property Management" Fees**

116.  Affiliates also charged the Authority a 15% "property management fee" to take  an additional $2.3 million – purportedly to "manage" the Hangars for the Authority.

117.  Kinsell told Affiliates' CFO in August 2006 that Affiliates was earning the property management fee as a result of Kinsell's discussion with the Executive Director of the Authority.  This was false.  Kinsell never told the Executive Director about the property management fees, and the Authority never authorized or agreed to pay the excessive property management fee taken by Affiliates.  In addition to the absence of any document confirming the property management fee agreement, the Executive Director lacked the authority to enter into any verbal agreement above $1,500 and any written agreement exceeding $125,000 per year, limitations that Kinsell generally understood.

118.  To keep track of the property management fees, Kinsell directed Affiliates's CFO to begin accruing the 15% property management fee based on what Kinsell claimed were the "market rates" for the Hangar rents, as opposed to the actual rents collected, which were much lower.  Affiliates's CFO prepared an internal spreadsheet showing that Affiliates was purportedly accruing the fees as early as March 2006, several months before KND underwrote the November 2006 Parity and Revenue Bonds.  The Official Statements for these bonds did not disclose this property management fee or the resulting conflict of interest.

119.  Although Affiliates began accruing these fees as early as March 2006, it did not take any of the property fees until much of the Hangars project was complete.  Specifically, the CFO's spreadsheet shows that Affiliates accrued

property management fees of $3,657,540 from March 2006 until June 2011, when the Hangars were finally returned to the Authority. But Affiliates only took $2,295,322 of these accrued fees because, as Kinsell explained, by 2009 or 2010 "the money ran out." Indeed, Affiliates's bank records confirm that only $32,187 remained in its accounts as of December 2009.

120. Kinsell used a significant portion of the property management fees collected by Affiliates to pay the expenses of KND and its parent company, Holdings. In October 2007 Affiliates transferred $25,000 to Holdings with the notation "payroll" and, just a day before the April 2008 Bonds were issued, Affiliates lent Holdings $100,000. In July 2008, KND agreed to immediately pay $4 million to the U.S. Treasury to settle unrelated I.R.S. claims involving advance refunding municipal bonds underwritten by KND between 1993 and 2003. Beginning at that time and continuing through at least June 2011, Affiliates transferred over $1 million in unauthorized property management fees to Holdings. Without the funds from Affiliates, it would have been difficult for KND to pay its employees.

121. Kinsell and Affiliates misled Authority representatives and hid the fact that Affiliates was earning a property management fee.

### 3. KND and Williams's Lack of Disclosure of the Fees

122. None of the Official Statements for the bonds the Authority issued between November 2006 and April 2008 disclosed to investors that Affiliates received more than the agreed upon 2% construction management fee or that Affiliates, an entity related to Kinsell and KND, was accruing an unauthorized property management fee.

123. Affiliates received $9.9 million of proceeds from the November 2006 Parity Bonds, which, for a fee of $437,250, had been underwritten by KND. The Official Statement for the November 2006 Parity Bonds did not disclose that: (1) Affiliates was acting as construction manager of the Hangars and was receiving a

2% construction management fee; (2) Affiliates had already received $22,200,000 in bond proceeds from the Authority; or (3) Affiliates was accruing an unauthorized property management fee.

124.   On November 21, 2006, the Authority issued the November 2006 Revenue Bonds, which KND underwrote for a fee of $802,000.  Affiliates received $13.6 million of the proceeds from that offering.  The Official Statement disclosed that Affiliates had taken over the Hangars from the prior developer and that "[f]or its efforts in overseeing the completion of the Hangar-Facilities, KND Affiliates is in negotiations with the Authority to receive a construction management fee in an amount no greater than 2% of the remaining costs to complete the Hangar Facilities . . ."  Although this Official Statement disclosed Affiliates's anticipated role as construction manager and its 2% fee, KND and Kinsell concealed from investors that Affiliates also charged a 2% fee for costs that were unrelated to the remaining construction and that Affiliates was also accruing an unauthorized 15% monthly property management fee.

125.   On February 29, 2008, the Authority issued the $35 million in Subordinate Tax Allocation Revenue Notes in the private placement with the Bank.  KND received a fee of $262,500 as the placement agent.  That same date, Affiliates received $10.4 million of the proceeds from this private placement to build the Hangars.

126.   During this 2007-2008 time period, KND underwrote other bonds issued by the Authority.  Although none of the proceeds of these issuances went to Affiliates, it was not disclosed to investors that Affiliates was taking property management and construction management fees that came from prior bonds issued by the Authority and underwritten by KND.  These include the following bonds: (1) Taxable Housing Set-Aside Revenue Parity Bonds in March 2007 in the amount of $41,460,000 for which KND received an underwriter's fee of $518,250; (2) the December 2007 Bonds for which KND received an underwriter's fee of

$735,000; and (3) the April 2008 Bonds for which KND received an underwriter's fee of $133,349.

127. The misstatements and omissions in the Official Statements for the Authority's bonds from November 2006 through April 2008 were material because a reasonable investor would want to know about an undisclosed financial arrangement such as here, where an entity related to the underwriter, like Affiliates, received unauthorized proceeds from bonds underwritten by KND. These misstatements and omissions were also material to the Authority because such fees increased the costs of issuing the bonds.

**F.    KND's, Kinsell's and Williams's Due Diligence Failures**

128. KND, through Williams and Kinsell, served as the underwriter in negotiated offerings with the Authority and therefore substantially participated in the preparation of the Authority's Official Statements for the bonds. KND's name appeared prominently on the first page of each Official Statement. KND also recommended and sold the Authority's municipal securities to investors. In so doing, KND made an implied representation it had reviewed the accuracy of the Authority's Official Statements and formed a reasonable basis for belief in the truthfulness and completeness of the key representations made therein.

129. Kinsell and Williams worked on behalf of KND to underwrite the bonds. In that regard, each reviewed and commented on draft Official Statements, the Consultant Reports, indentures and other bond documents. Both Kinsell and Williams had authority to sign the bond purchase agreements. Although Williams was responsible on a day-to-day basis, she made sure to copy Kinsell on emails and to talk to him daily about the bonds. Indeed, the Authority was Kinsell's client and he had hands-on involvement with regard to the Authority's bond offerings.

130. Notwithstanding its obligation as an underwriter, KND's implicit representations regarding its due diligence were false. First, as alleged above, the April 2008 Official Statement, the Debt Service Schedule and the April 2008

Supplement misstated the tax increment and debt service ratios based on inflated assessed values of the Hangars. Kinsell and Williams substantially assisted in preparing the Official Statement, and each knew the April 2008 Supplement relied on the inflated $65 million estimated assessed value of the Hangars, but omitted to disclose the estimate was no longer valid. As set forth above, on two separate occasions before the April 2008 Bonds were issued, Williams and Kinsell received emails from the assessor's offices showing that the Hangars' $65 million estimated assessed value was inflated by more than 100%.

131. Second, KND's lack of disclosure regarding the construction and property management fees paid to Affiliates in connection with the Authority's bonds from November 2006 through April 2008 was misleading. Kinsell substantially assisted in preparing the Official Statements, and knew that these fees were being accrued by Affiliates. Despite this knowledge, none of the Official Statements for those bonds disclosed to investors that Affiliates received more than the agreed upon 2% construction management fee or that Affiliates, an entity related to Kinsell and KND, was accruing an unauthorized property management fee.

132. Following the April 2008 Bond offering, Kinsell decided to transition from investment banker to financial advisor for the City in order to assist the City with a power plant project. Kinsell expressly acknowledged that in his new role as financial advisor, he was a fiduciary to the City, yet he never disclosed that Affiliates was taking unauthorized management fees from bond proceeds issued by the Authority.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a)(2) of the Securities Act
### (against the City and the Authority)

133. The SEC realleges and incorporates by reference paragraphs 1 through 132 above.

134.   The Authority's April 2008 Official Statement, including the Debt Service Schedule and the April 2008 Supplement contained material misrepresentations and omissions to investors regarding, among other things, the tax increment amount available to repay those bonds and the projected annual debt service ratios for every bond year after 2008, which its agents were negligent in not knowing were false and misleading.

135.   Defendants the City and the Authority, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

136.   By engaging in the conduct described above, Defendants Authority and the City violated, and unless restrained and enjoined, will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (against KND)

137. The SEC realleges and incorporates by reference paragraphs 1 through 132 above.

138. Defendant KND, as underwriter for the Authority's bond offerings, made an implied recommendation that it had reviewed the accuracy of the Official Statements and formed a reasonable basis for belief in the truthfulness and completeness of the key representations made in those offering documents. These implicit representations were false.

139. Moreover, Defendant KND obtained money or property by means of material misrepresentations and omissions to investors in the April 2008 Official Statement, including the Debt Service Schedule and the April 2008 Supplement, regarding, among other things, the tax increment amount available to repay those bonds and the projected annual debt service ratios for every bond year after 2008.

140. Defendant KND also obtained money or property by means of material misrepresentations and omissions to investors in the Official Statements for the November 2006 Revenue and Parity Bonds regarding, among other things, KND's compensation and the use of bond proceeds.

141. Defendant KND also obtained money or property by means of material misrepresentations and omissions to investors in the Official Statements for the Authority's bonds issued from November 2006 through April 2008 regarding, among other things, Affiliates's unauthorized receipt and misappropriation of over $2.7 million in bond proceeds.

142. Defendant KND by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails,

obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

143.   By engaging in the conduct described above, Defendant KND violated, and unless restrained and enjoined, will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**THIRD  CLAIM FOR RELIEF**

**Aiding and Abetting Violations of Section 10(b)**

**of the Exchange Act and Rule 10b-5**

**(against KND, Kinsell, Williams)**

144.   The SEC realleges and incorporates by reference paragraphs 1 through 132 above.

145.   Defendant Authority violated Section 10(b) of the Securities Act and Rule 10b-5(b) thereunder by making material misrepresentations and omissions to investors in the April 2008 Official Statement regarding, among other things, the tax increment amount available to repay those bonds and the projected annual debt service ratios for every bond year after 2008.

146.   Defendants KND, Kinsell and Williams knowingly provided substantial assistance to the Authority in its violation of Section 10(b) of the Securities Act and Rule 10b-5(b) thereunder in connection with the Authority's April 2008 Bond offering.

147.   By engaging in the conduct described above, Defendants KND, Kinsell and Williams, and each of them, aided and abetted and, unless restrained and enjoined, will continue to aid and abet violations of Section 10(b) of the Securities Act and Rule 10b-5 thereunder.

## FOURTH CLAIM FOR RELIEF

**Violations of Section 15B(c)(1) of the Exchange Act and**

**MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2)**

**(against KND)**

148.   The SEC realleges and incorporates by reference paragraphs 1 through 132 above.

149.   Defendant KND, by engaging in the conduct described above, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, to effect a transaction in, or to induce the purchase or sale of, a municipal security in contravention of Rules promulgated by the Municipal Securities Rulemaking Board ("MSRB"), in particular Rules G-17, G-27 and G-32(a)(iii)(A)(2).

150.    Defendant KND, by engaging in the conduct described above, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, to provide advice to or on behalf of a municipal entity with respect to municipal financial products or the issuance of municipal securities in contravention of Rules promulgated by the MSRB, in particular Rules G-17, G-27 and G-32(a)(iii)(A)(2).

151.   By engaging in the conduct described above, Defendant KND violated, and unless restrained and enjoined, will continue to violate, Section 15B of the Exchange Act, 15 U.S.C. § 78o-4.

# FIFTH CLAIM FOR RELIEF

## Aiding and Abetting Violations of Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2)

### (against Kinsell and Williams)

152.    The SEC realleges and incorporates by reference paragraphs 1 through 132 above.

153.    By engaging in the conduct alleged above, Defendant KND violated Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2).

154.    Defendant Kinsell knowingly provided substantial assistance to KND in its violations of Section 15B(c)(1) of the Exchange Act and MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2).

155.    Defendant Williams knowingly provided substantial assistance to KND in its violations of Section 15B(c)(1) of the Exchange Act and MSRB Rule G-17.

156.    By engaging in the conduct described above, Defendant Kinsell aided and abetted and, unless restrained and enjoined, will continue to aid and abet violations of Section 15B(c)(1) of the Securities Act and MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2).

157.    By engaging in the conduct described above, Defendant Williams aided and abetted and, unless restrained and enjoined, will continue to aid and abet violations of Section 15B(c)(1) of the Securities Act and MSRB Rule G-17.

# PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that the Authority, the City, KND, Kinsell, and Williams committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Authority and the City and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a).

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant KND and its agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a), and 15B(c)(1) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78o-4(c)(1), Rule 10b-5thereunder, 17 C.F.R. §§ 240.10b-5 and MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2), and from aiding and abetting violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Kinsell and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and from aiding and abetting violations of Sections 10(b) and 15B(c)(1) of the Exchange Act, Rule 10b-5 thereunder, and MSRB Rules G-17, G-27 and G-32(a)(iii)(A)(2).

## V.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of

Civil Procedure, permanently enjoining Defendant Williams and her agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from aiding and abetting violations of Sections 10(b) and 15B(c)(1) of the Exchange Act, Rule 10b-5 thereunder, and MSRB Rule G-17.

## VI.

Order Defendants KND, Kinsell, and Williams to disgorge all ill-gotten gains from their illegal conduct, up to and including the entire proceeds of the April 2008 Bonds, together with prejudgment interest thereon.

## VII.

Order Defendants KND, and Kinsell to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VIII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## IX.

Grant such other and further relief as this Court may determine to be just and necessary.


Dated:  July 26, 2018                    Respectfully submitted,


                                        */s/ Donald W. Searles*
                                        Douglas M. Miller
                                        Donald W. Searles
                                        Amy Jane Longo
                                        Attorneys for Plaintiff
                                        Securities and Exchange Commission

**PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

> U.S. SECURITIES AND EXCHANGE COMMISSION,
> 444 S. Flower Street, Suite 900, Los Angeles, California 90071
> Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On July 26, 2018, I caused to be served the document entitled **SECOND AMENDED COMPLAINT** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.


Date:  July 26, 2018          */s/ Donald W. Searles*
                              Donald W. Searles

<u>SERVICE LIST</u>

Terree A. Bowers, Esq.
*terree.bowers@arentfox.com*
Alexander Stephenson Birkhold, Esq.
*alexander.birkhold@arentfox.com*
Jerrold E. Abeles, Esq.
*jerry.abeles@arentfox.com*
Karen Peters-Van Essen, Esq.
*vanessen.karen@arentfox.com*
Arent Fox LLP, Attorneys at Law
Gas Company Tower
555 W. Fifth Street, 48th Floor
Los Angeles, CA 90013

Peter V. B. Unger, Esq.
*peter.unger@arentfox.com*
Arent Fox LLP, Attorneys at Law
1717 "K" Street, N.W.
Washington, DC 20006
*Attorneys for Defendants City of*
*Victorville and Southern California*
*Logistics Airport Authority*

Michael D. Torpey, Esq.
*mtorpey@orrick.com*
James N. Kramer, Esq.
*jkramer@orrick.com*
Lacey Bangle, Esq.
*lbangle@orrick.com*
Orrick, Herrington & Sutcliffe LLP
405 Howard Street
San Francisco, CA 94105

Kevin M. Askew, Esq.
*kaskew@orrick.com*
Natalie Nahabet, Esq.
*nnahabet@orrick.com*
Stephanie Albrecht, Esq.
*salbrecht@orrick.com*
Orrick, Herrington & Sutcliffe LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90071

George E. Greer, Esq.
*ggreer@orrick.com*
Charles J. Ha, Esq.
*charlesha@orrick.com*
Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, WA 98104-7087
*Attorneys for Defendant Keith C.*
*Metzler*

Shaun M. Murphy, Esq.
murphy@sbemp.com
Slovak Baron Empey Murphy &
Pinkney, LLP
1800 E. Tahquitz Canyon Way
Palm Springs, CA 92262

Attorneys for Defendants Janees
Williams, Jeffrey Kinsell, Kinsell
Newcomb & DeDios (KND)